IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANGEL PEREZ, JUANITA BERRY, and CALVIN COFFEY, on behalf of themselves and all other Persons similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 13-cv-4531 |
| vs. | ) ) | Judge Robert M. Dow, Jr. |
| CHICAGO POLICE OFFICERS JORGE L. LOPEZ, EDMUND ZABLOCKI, JOSEPH WAGNER, HERBERT BETANCOURT, MATTHEW CLINE, JOHN DOLAN, and the CITY OF CHICAGO, | ) ) ) ) ) ) ) | Magistrate Judge Mary M. Rowland |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION**

Daniel A. Edelman
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 S. Clark St., Ste. 1500
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

Plaintiffs allege that they, and members of the classes, have been held and interrogated at a "non-district facility," Homan Square, without formally processing and without making any record of their detention in the official booking databases, for long periods of time while the arrestees are denied access to legal counsel and others. (Plaintiffs' Third Amended Complaint ("TAC") ¶11). Plaintiffs allege the purpose of these "off-the-book" detentions and interrogations is to "squeeze" information out of the detainees about crimes totally unrelated to the stated reason for the initial arrest, thereby coercing them into cooperating with the police in investigating and arresting other individuals. (TAC ¶¶11, 12, 17, 65-66, 96, 128). The arrestees are kept off the official booking databases, frequently mistreated by police, shackled to the wall in isolation for prolonged periods of time, denied access to legal counsel, and are unable to be located by family or attorneys while being held. (TAC ¶9) Plaintiffs further allege that it is an ongoing practice and policy of the City of Chicago, through the Chicago Police Department, to arrest and detain individuals for this purpose using non-district facilities like Homan Square. (TAC ¶¶16, 127).

Plaintiffs assert that use of off-the-books facilities like Homan Square, to detain and interrogate arrestees without promptly making it a matter of public record is unconstitutional as (i) restricting freedom of speech by preventing detainees from communicating with their lawyers and family, (ii) violating the Fourth Amendment, and (iii) Violating the right of habeas corpus

A similar practice of Chicago Police Department was held unconstitutional by the Seventh Circuit in *Lopez v. City of Chicago*, 464 F.3d 711 (7th Cir. 2006). There, officers intentionally held arrestees "past court call" in order to continue investigating and interrogating arrestees without taking them before a judicial official for a probable cause hearing within 48 hours. The use of the facilities like Homan Square is a continuation of this practice. (TAC ¶19)

I.  FACTS RELATED TO HOMAN SQUARE

The Chicago Police Department ("CPD") has approximately 22 District stations. (Exhibit 1, Nichols18:15-22) District Stations are typical police stations which are open to the public to report crimes and where officers in the District typically bring arrestees for processing, initial approval of charges and booking of the arrestee. *Id.* District Stations typically have "Holding" or "Lockup" facilities, where arrestees are processed, fingerprinted and photographed. (Exhibit 1, Nichols, 24:13-24) The holding or lockup facilities house arrestees after they are arrested, but before they are presented to a judicial officer for a probable cause hearing.

There are specific standards, policies and procedures in place for holding and lockup facilities to ensure the well being of the arrestee, allow the arresetee to make phone calls, and monitor the visitors and movement of the arrestees prior to the probably cause hearing. (Exhibit 2, Special Order S06-01-02) Lockup personnel are responsible for taking "physical count of all arrestees in custody", "maintaining current and accurate record of all arrestees in the lockup," "ensuring that the lockup facility is maintained in "a condition consistent with the Illinois Administrative Code, Title 20, Part 720, 'Municpal Jail and Lockup Standards.'" (Exhibit 2, Special Order S06-01-02)

While at the holding/lockup facility, visitations, phone calls, movements, attorney requests and visitations, and last time fed are all recorded and monitored through the electronic Automated Arrest system used by CPD. (Exhibit 3, Coffey Arrest Report) Lockup personnel are required to "complete a visual check of each arrestee every 15 minutes ...and record the time of each inspection...." (Exhibit 2, Special Order S06-01-02)

Additionally, while under the supervision of the lockup personnel, "Arrestees must be permitted to make a reasonable number of telephone calls to communicate with their attorney,

family, or friends within a reasonable period of time after their arrival..." (Exhibit 4, General Order G06-01-04, Arrestee and In-Custody Communications)

Homan Square is not a District Station. (Exhibit 1, Nichols, 24:13-24) Homan Square is not a "holding facility" or a lockup. *Id.* Homan Square does not have the equipment necessary to process an arrestee for booking (i.e. fingerprinting and mug shot equipment). *Id.* Rather, Homan Square is described as a "non-district facility," which may be used for "initial processing." (Exhibit 5, General Order G06-01-01, Effective 11/12/15, p. 1) Unlike a District Station, the section of Homan Sqaure which houses the interview and interrogation rooms are not open to the public. (Exhibit 1, Nichols, 24:13-24) Until recently, the fact that a person is being held at Homan Square for interrogation is not even known to those at the District Stations.

The vast majority (approximately 90%) of the arrestees who are detained in the interrogation rooms at Homan Square are arrestees of the Narcotics Division. (Exhibit 6, Kilroy, 43:2-4, 9-10) Hoan Square is typically used to interrogate arrestees "to try to turn evidence on their co-conspirators or other people ...." (Exhibit 1, Nichols, 41:4-42:1) If the person provides information about a more serious crime that turns out to be valid information, it is "very likely you're not going to get charged..." (Exhibit 6, Kilroy, 69:7-11) Thus, it is "very frequent" that arrestees are brought to Homan Sqaure for interrogation and processing, but are then subsequently released without charges. (Exhibit 6, Kilroy, 53:2-9). In this situation, where no charges are brought, there is no public record made in the official booking database of the arrest. (Exhibit 6, Kilroy, 52:13-19)

Once brought to Homan Square, arrestees are placed in an interrogation room and handcuffed to a bar or a ring along the wall above a small metal bench by themselves. (Exhibit 6, Kilroy, 37:11-13). There are no bathrooms, phones, or windows (other than a small window on the door covered

3

by a flap only allowing outsiders to look in). Because arrest reports cannot be completed in the interview interrogation rooms, officers must go to their offices to complete the arrest reports. (Exhibit 6, Kilroy, 61:1-9) Arrestees are left in the interrogation rooms and then become subject to questioning. (Exhibit 6, Kilroy, 38:3-5 Kilroy, 37:13-17).

Because Homan Square is not a lockup and does not have the fingerprint and photograph equipment necessary to "book" an arrestee, the only "processing" of the arrestee which actually takes place at Homan Square, is the demographic information required on the first page of the arrest report. (Exhibit 3, Coffey Arrest Report) The demographic portion of the Arrest Report can be completed in a matter of minutes. The remainder of the Arrest Report containing the names of the arresting officers, the offenses cited and a short narrative of the arrest, can usually be prepared in about a half an hour. (Exhibit 7, Kravitz 55:19-21) Arrestee's can be held at Homan Square anywhere from less than an hour or more than several hours, depending on whether they "cooperate." (Exhibit 6, Kilroy, 40: 3-6) If the arrestee does "not to give up any information," then the officer "would follow through with the arrest." (Nichols, 41:4-42:1) Those arrestees who ultimately "cooperate" with the police, are not placed in the automated arrest system. (Exhibit 6, Kilroy, 50:13-16).

There are no public phones made available to arrestees at Homan Square to call attorneys or family members. (Exhibit 6, Kilroy, 91:1-2) If an arrestee invokes his right to speak to his attorney, the arrestee cannot do so until he/she is brought to a District station. (Exhibit 6, Kilroy, 39: 15-19; 70:21-24) However, there is no policy or procedure for requiring that an officer document in the arrest report if an arrestee invokes his right to an attorney while at Homan Square. (Exhibit 6, Kilroy, 100:18-21) If an arrestee asks to call a family member, arrestees are required to wait until they get to a District station, where a phone is made available for them to use. (Exhibit 7, Kravtiz,

4

69:24-70:5) This is especially troubling because, until recently, juveniles were also taken to Homan Square for "processing" and interrogations.

Until recently, there was no desk sergeant or other similar supervisor at Homan Square to whom officers were required to report to about the arrestee's presence or well being. (Exhibit 7, Kravitz 45:4-13) The arresting officer was the only person responsible for checking and maintaining the well being of arrestees held in the interrogation rooms.

By contrast, officers taking arrestees to District stations were required to "immediately notify the desk sergeant that an arrestee has been brought into the facility and report the name of the arrestee, the circumstances of the arrest, and the probable charges, and ensure all the required arrest documentation is properly completed and presented to the watch commander of te district of arrest." (Exhibit 8, General Order G06-01-01, Version 8/21/12, II.D.2.)

An arrest report does not generate a CB number (central booking number) until the arrest report is submitted electronically to the District station. (Exhibit 1 Nichols 122:9-16) However, officers do not submit arrest report if the arrestee is being interviewed because the arrestee could become a cooperating individual. (Exhibit 7 Kravtiz 56:1-6; 21-23) The arrest and detention does not get included in the official booking database until the officers have determined that the arrestee is not going to "cooperate," but even then, the Arrest Report will state that the arrestee had been held at the District station where the arrestee ultimately gets booked, not Homan Square. (Exhibit 1 Nichols, 49:9-15;50:8-11) This is because, when completing the arrest report, the officer has to select a "holding facility" from a drop down menu. (Exhibit 1, Nichols, 52: 1-3) Until recently, Homan Square was not an option, so the arrest report would reflect that the person was taken to a District station, not Homan Square. *Id.*

5

Thus, if an attorney called a District station, looking for his client, there would be no way for the District station to determine if the arrestee was being detained or interrogated at Homan Square. (Exhibit 7, Kravitz 52:18-5312)  If no CB number is ever generated, you cannot determine from the booking databases that the arrestee was at Homan Square.  (Exhibit 7 Kravitz, 54:3-6; 19-21)

There is no time limit on how long an arrestee can be held and interrogated at Homan Square. Until recently, there was no procedure in place which would require an officer to complete and submit an Arrest Report through the Automated system before interrogating an arrestee.  In fact, there was no mechanism by which an officer could do so.

General Order 06-01-01 governs the policies and procedures for Field Arrest Procedures. The purpose of the directive is to (1) establish the responsibilities of the Department members who take individuals into custody (2) to set forth procedures for investigation or detenion outside the district of arrest, and (3) to identify the specific duties that must be follow for (a) adult female arrestees, (b) foreign nationals and aliens, (c)  juveniles (d) traffic violaors (e) sick or injured arrestees (f) arrestees requiring hospitilazations and (g) arrestees in need of mental health. (CITE-November version).

It was not until November 12, 2015, that General Order 06-01-01 was amended, to "*introduce*[] the...Requirement to *record the custody* of each arrestee using the Automated Arrest Application *prior to the submission of a complete Arrest Report*" and further "that *a complete Automated Arrest Report* be submitted to a station supervisor for *all arrestees* that are released from custody without being formally charged."  Specifically, the amended General Order required arresting officers to (1) "*without unnecessary delay*, complete the first screen of the Automated Arrest Report and save the report in 'Preliminary' status," (2) save the "Automated Arrest Report

6

in 'Preliminary' status ...***prior to any additional processing*** ..., and (3) indicate where the arrestee is located and the facility of initial arrest processing as the "Unit of Initial Approval of Probable Cause." (11/12/15 Version) The Automated Arrest Report also now lists Homan Square as one of the holding facility options to list in the Preliminary status report. (CITE)

The new procedure of saving the "Preliminary" status, upon securing the arrestee, and prior to further "processing" or interrogation, allows Department members to "use the 'Search / Print Arrest Report' function in the Automated Arrest Application to search ...[and] display a roster of current persons in custody at a Department facility," thereby making a searchable, accessible record of arrestees being held at Homan Square, whether or not the person is ever formally booked at a District station. (Exhibit 5, G06-01-01, Ver 11/12/15)

In December 2017, General Order G06-01-01, was further amended to "introduce" the requirement that "For the Homan Square Facility (HSF), a supervisor will be designated ***on each watch*** the facility is operational to perform the arrest processing and approval." (Exhibit 9, G06-01-01, 12/8/17 Version). The designated supervisor is now responsible for "initial approval of probable cause and final probable cause approval for arrest reports" and ensuring that all "Automated Arrest Report be submitted to the watch operations lieutenant for all arrestees that are released from custody without being formally charged." *Id.* Prior to the December 2017 change in procedures, Arrest Reports were submitted to and approved by a District Station supervisor, located at the District Station and with little knowledge of any activity or interrogations being conducted out of Homan Square. (Exhibit 9, Version 12/8/17; Exhibit 7, Kravtiz 60:17-23)

Special Order S06-04, Processing of Juveniles and Minors Under Department Control, which became effective May 8, 2017, further "introduce[d]" the requirement that juveniles arrested by units

7

operating out of Homan Square, must process the juvenile at the Juvenile Intervention and Support Center. (<u>Exhibit 10 </u>S06-04, V.C.2.a.)

## II. FACTS RELATED TO THE DETENTION AND INTERROGATION OF PLAINTIFFS

Plaintiffs Coffey and Berry were arrested together on February 6, 2015 at approximately 5:00pm. (TAC ¶78) Plaintiff Coffey was arrested on suspected drug dealing charges to an undercover officer. (CITE) Plaintiff Berry was a passenger in the car at the time of Coffey's arrest. (CITE) Both Plaintiff Coffey and Berry were handcuffed and separately taken to Homan Square. (TAC ¶¶79 and 92). Once at Homan Square, Plaintiffs Coffey and Berry were placed in separate interrogation rooms and handcuffed to the wall above a metal bench. (TAC ¶¶ 80 and 93) Neither Plaintiff Berry or Coffee were read their Miranda warnings while at Homan Square. (TAC ¶¶82 and 94) Plaintiffs Coffey and Berry were each asked to "help" themselves by providing information to the police. (TAC ¶80; Iglesias, 149:1-13)

While held at Homan Square, Coffey asked for his attorney on more than one occasion, but his requests were ignored. (TAC ¶81) After several hours of interrogation, Coffey refused to cooperate with the officers and was eventually left alone in the interrogation room. (TAC ¶83)

Officer Iglesias interrogated Plaintiff Berry about whether she knew of any homicides, location of people with arrest warrants, guns and specifically, whether she knew of any additional narcotics related to Plaintiff Coffey. (Iglesias, 141:6-16; 1482:7-13). Berry was told that she would be charged with aiding in the delivery of a controlled substance if she did not provide information to the police about other drugs. (TAC ¶95)

After two hours of interrogation, Plaintiff Berry gave in to the officer's demands. At

approximately 7:30 p.m., Plaintiff was relocated from Homan Square to her home to recover drugs which allegedly belonged to Plaintiff Coffey. (Iglesias, 156:18-157:8; 160:22-161:22) After searching Plaintiff Berry's bedroom, Plaintiff Berry was required to locate "a gun" to avoid charges. (TAC ¶95) At approximately 8:23 p.m., Plaintiff Berry was taken by Officer Iglesias and another officer to recover a gun that she convinced a friend to leave for her so she would not be charged by police. (Iglesias, 176:4-11) After retrieving the gun, Plaintiff Berry was then taken back to Homan Square and her car, in which Coffey had been arrested from, was released to her.

Plaintiff Berry was not charged with a crime, she was never brought to a District Station or otherwise booked. (TAC ¶¶101-104) Plaintiff Berry's detention and interrogation is not in the official booking database.

During this time, Plaintiff Coffey remained alone in an interrogation room at Homan Square. (TAC ¶78). Plaintiff Coffey was left in the interrogation room by himself for several hours. (TAC ¶84) While handcuffed to the wall in the interrogation room, Plaintiff Coffey had to relieve himself. *Id.* Plaintiff Coffey called out for help for more than two hours to have someone escort him to the bathroom. *Id.* Plaintiff Coffey's requests to use the lavatory were ignored. Plaintiff Coffey was forced to relieve himself on the floor of the interrogation room. *Id.*

Defendant Kravitz discovered that Plaintiff Coffey had had a bowel movement in the interrogation room and made Plaintiff Coffey clean it up with his skull cap. (TAC ¶85). Because one of his hands was restrained, Plaintiff Coffey struggled to obey the command, and did so inadequately. (TAC ¶86) Plaintiff Coffey was forced to endure the stench in the interview room for the remainder of his stay at Homan. *Id.* Plaintiff Coffey was held at Homan Square for more than six hours, without food, water, access to a lavatory or his attorney. (TAC ¶ 87).

9

Plaintiff Coffey was finally brought to District 11 and booked at 11:42 p.m. The Arrest Report related to Plaintiff Coffey was not submitted (making a public record of his arrest and detention) until 11:37 p.m. (Coffey Arrest Report).

### III. ARGUMENT

Plaintiff seeks to certify a damages class and an injunctive class pursuant to Fed. R. Civ. P. 23 (b)(2) and (3). The proposed classes must meet each of the requirement of Rule 23(a), which are that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a).

A class that meets each of these requirements is properly certified as a (b)(3) class so long as the questions of law and fact common to the class predominate over individualized questions and a class action is the superior method of resolving the class members' claims. Fed. R. Civ. P. 23(b)(3); *Arreola v. Godinez*, 546 F.3d 788, 793-94 (7th Cir. 2008).

### A. The Class Meets the Requirements of Rule 23(a)

#### (1) The class is sufficiently numerous

Federal Rule of Civil Procedure 23(a)(1) (the "numerosity prong") requires that the class be so numerous that it would be impracticable to join all of the members in a single action. This is not a difficult hurdle to meet. Courts have generally found that 40 or so members are sufficient, and that in some cases even fewer than 40 class members will suffice. *Lucas v. GC Services L.P.*, 226 F.R.D. 337, 340 (N.D. Ind. 2005) ("[b]ecause there is no mystical number at which the numerosity requirement is established, courts have found this element satisfied when the putative class consists

10

of fewer than 40 members") (citations omitted); *Parker v. Risk Management Alternatives, Inc.*, 206 F.R.D. 211, 213 (N.D. Ill. 2002) (class of "at least 39" was sufficiently numerous). In addition, the exact size of the class need not be known; a court can rely on "common sense assumptions" and on plaintiffs' "good faith estimates of class size." *Lucas*, 225 F.R.D. at 340 (citations omitted). *See also Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989); *Young v. County of Cook*, 2007 WL 1238920, at *2 (N.D. Ill. April 25, 2007); *Lopez v. City of Chicago*, 2002 WL 31415767, at *4 (N.D. Ill. Oct. 25, 2002)("Plaintiff need not demonstrate the exact number of class members so long as a conclusion is apparent from good faith estimates.").

Here, we know that the class size likely exceeds 5,000 individuals. In the FOIA litigation entitled *Guardian News & Media, LLC v. Chicago Police Department*, 15 CH 6157, in the Circuit Court of Cook County, the Chicago Police Department was required to search and produce a list of all arrests which ultimately resulted in formal booking of the individual in which Homan Square was referenced in the officer's narrative. CPD identified approximately 7,000 arrests between August 5, 2004 and June 30, 2015. (Exhibit 11, FCRL008335-008461) Each page of the list contains approximately 60 arrests. *Id.* Based on this, it is estimated that 5,085 of those arrests occurred during the class period beginning on May 7, 2011. The Rule 30(b)(6) witness for the CPD testified that this list is likely under inclusive as it does not take into account those individuals who were not formally booked after being taken to Homan Square because the data warehouse only maintains records for those arrests which generate a CB number, meaning formal charges were ultimately sought against the person and the person was booked at a District station. (Exhibit 1, Nichols, 65:11-13; 126:9-12)

Additionally, Sergeant Scott Kravitz (an officer at the time) was an enforcement officer who

assisted in the arrests of Plaintiffs Coffey and Berry. (Exhibit 12, City Response to Interrogatory No. 2). Kravitz worked Narcotics out of Homan Square from 2013 to December of 2015. (Exhibit 7, Kravitz 12:10-17). Kravitz testified that a brought a "few hundred" arrestees to Homan Square during this time. (Exhibit 7, Kravitz, 24:2-4)

Officer Carlos Iglesias III was another enforcement officer who assisted in the arrrests of Plaintiffs Coffey and Berry on February 6, 2015. (Exhibit 12, City Response to Interrogatory No. 2) Iglesias also worked Narcotics out of Homan Square from 2002 to 2007 and then again from about 2012 to the present. Iglesias testified that he brought approximately 200 arrestees to Homan Square for processing and questioning while working Narcotics out of Homan Square.

**(2) The class satisfies the commonality and typical requirements**

**(a) Commonality**

Under Rule 23(a)(2), plaintiffs generally must show only that there is at least one question of law or fact common to the class. *Young v. Cook County*, 2007 WL 1238920, at *5; *Adams v. R.R. Donnelly & Sons*, 2001 WL 336830, at *5 (N.D. Ill. April 6, 2001) ("Rule 23(a)(2)'s commonality requirement does not require that all or even most of the issues in the litigation be common issues; one common issue is enough").

Allegations of a policy or a widespread practice affecting the members of a putative class are usually sufficient to satisfy this requirement. *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998) ("Common nuclei of fact are typically manifest where the defendants have engaged in standardized conduct towards members of the proposed class"). This is true even where some detainees are treated more badly than others. *See Dunn v. City of Chicago*, 231 F.R.D. 367, 373 (N.D. Ill. 2005) ("The fact that certain detainees were treated marginally better on an *ad hoc* basis than others does

not alter plaintiffs' allegations . that the interrogation rooms are inherently unfit for human occupancy for more than a few hours") (citing *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001)); *Thompson v. City of Chicago*, 2002 WL 1303138, at *4 (N.D. Ill. June 12, 2002) at *4 (N.D. Ill. June 12, 2002) ("a suit challenging the constitutionality of a police department's standard policy satisfies the prerequisite of commonality, even if there exist individual issues regarding the application of that policy").

In any event, the Seventh Circuit has held that the need for "separate proceedings of some character . . . to determine the entitlements of the individual class members to relief" should "not defeat class treatment of the question whether defendants violated [the law]." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). "Once that question is answered, if it is answered in favor of the class, a global settlement . . . will be a natural and appropriate sequel. And if there is no settlement, that won't be the end of the world. Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues. Those solutions include (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class member concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." *Id.*

The claims at issue here are, completely common amongst the class members. Indeed, whether the class members were to proceed as a class or in individual lawsuits each will have to advance the same legal theories and prove the same facts using much the same evidence in order to establish liability for constitutional violations.

13

**(b)     Typicality**

Rule 23(a)(3) requires that the claims of the class representatives be typical of those of the class as a whole. Typicality exists so long as the named plaintiffs' claims arise from the same practices that give rise to the claims of the other class members, and the claims are based on the same legal theories. *Keele*, 149 F.3d at 595.

Commonality and typicality overlap and a finding of one usually results in a finding of the other. *Adams,* 2001 WL 336830, at *5; *see also General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 158, n. 13 (1982) ("The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence"). Some differences between the class members' particular experiences will not defeat typicality. *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) ("The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. Thus, similarity of legal theory may control even in the face of differences of fact").

Plainly, each of the named Plaintiffs will have to challenge the same practices as the absent class members they seek to represent, and all are relying on the same legal theories as to why the practices are unlawful. Specifically, Plaintiffs and each class member allege that Defendants are liable for the constitutional violations they suffered because the use of facilities like Homan Square and the unconstitutional policies surrounding these types of off-the-book interrogations. Even though the lengths of the interrogations and detentions vary within the class, "such issues will not

14

destroy typicality, because `the likelihood of some range of variation in how different groups of new detainees were treated does not undermine the fact that the claims of each class [member] share a common factual basis and legal theory.'" *Streeter v. Sheriff of Cook County*, 2009 WL 928611, at *3 (N.D. Ill. April 7, 2009)

### (3) Adequacy of Representation

Under Rule 23(a)(4), the class representatives and their counsel must "fairly and adequately protect the interests of the class." That protection involves two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation; and (b) the plaintiff must not have interests antagonistic to those of the class. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992); *accord*, *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975); *In re Alcoholic Beverages Litigation*, 95 F.R.D. 321

Plaintiff understands the obligations of a class representative, and has retained experienced counsel, as is indicated by Exhibit 13, which sets forth counsel's qualifications and resources.

Further, here, both Plaintiffs and the class members seek injunctive and monetary damages as the result of Defendants' unconstitutional practices. Given the identity of claims between Plaintiffs and the class members, there is no potential for conflicting interests in this action. There is no antagonism between the interests of the named plaintiff and those of the class.

### B. The Class Meets the Requirements for Certification under Rule 23(b)(3)

Efficiency is the primary focus in determining whether the class action is the superior method for resolving the controversy presented. *Eovaldi v. First Nat'l Bank*, 57 F.R.D. 545 (N.D. Ill. 1972). The Court is required to determine the best available method for resolving the controversy in keeping with judicial integrity, convenience, and economy. *Scholes*, 143 F.R.D. at 189; *Hurwitz v. R.B.*

*Jones Corp.*, 76 F.R.D. 149 (W.D.Mo. 1977). It is proper for a court, in deciding the "best" available method, to consider the ". . . inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1165 (7th Cir. 1974).

In considering whether the common questions predominate over individual ones, courts focus for the most part on questions going to liability, as it is not at all uncommon for issues of proof to vary when it comes to damages. *Arreola*, 546 F.3d at 801 ("[a]lthough the extent of each class member's personal damages might vary, district judges can devise solutions to address that problem if there are substantial common issues that outweigh the single variable of damages amounts"); *Hobson v. Lincoln Ins. Agency, Inc.*, 2001 WL 648958, at *2 (N.D. Ill. June 7, 2001) (The "possibility of individualized damage inquiries does not defeat class certification even if individual hearings ultimately may be required") (citations omitted); *Gary v. Sheahan*, 1999 WL 281347, at *2 (N.D. Ill. Mar. 31, 1999) ("The Seventh Circuit has found that it is common for Rule 23(b)(3) class actions to involve differing levels of injury and damages for different class members; however, that does not mean that certifying a class under Rule 23(b)(3) is incorrect"). *See also Blanford v. St. Vincent Hosp. and Health Care Center, Inc.*, 2009 WL 500527, at *8 (S.D. Ind. Feb. 27, 2009); Parish, 2008 WL 4812875, at *6.

Moreover, where liability is predicated upon the constitutionality of a policy or a common course of conduct towards each member of the class, the predominance requirement generally will be satisfied. *Calvin v. Sheriff of Will County*, 2004 WL 1125922, at * 4 (N.D. Ill. May 17, 2004) ("'when the class is challenging a uniform policy, the validity of that policy predominates over individual issues and class certification is appropriate'") *citing Blihovde v. St. Croix County, Wis.*,

16

219 F.R.D. 607, 620 (W.D. Wis. 2003). *See also Young v. County of Cook*, 2007 WL 1238920, at *7 ("When a class challenges a uniform policy or practice, the validity of that policy or practice tends to be the predominant issue in the ensuing litigation"); *Rahim v. Sheahan*, 2001 WL 1263493, at *14 (N.D. Ill. 2001) ("the predominance requirement of Rule 23(b)(3) [is] satisfied by the allegations of standardized conduct, at least for purposes of liability [and] individual damages issues . . . can be addressed through the creation of subclasses").

Here, the putative class bases its claims on the common course of conduct of detaining and interrogating arrestees in "non-district facilities" not open to the public, unmonitored and without the right to counsel. The class members all rely on the same legal theories and facts to prove their case.

### IV.  CONCLUSION

The proposed classes meet the requirements of Rules 23(a) and (b)(3). Plaintiffs respectfully requests that this Court certify this action as a class action.

Respectfully submitted,

s/ Cassandra P. Miller
Cassandra P. Miller

Daniel A. Edelman
Cassandra P. Miller
EDELMAN, COMBS LATTURNER & GOODWIN, LLC
20 S. Clark St., Ste. 1500
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

17

**CERTIFICATE OF SERVICE**

   I, Cassandra P. Miller, certify that on March 5, 2019, a true and accurate copy of the foregoing document was filed via th the Court's CM/ECF system and notification of such filing was sent to the following:

jcazares@pjjlaw.com
jcifonelli@pjjlaw.com
wjones@pjjlaw.com
kcoleman@pjjlaw.com

                                 s/ Cassandra P. Miller
                                 Cassandra P. Miller

Daniel A. Edelman
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 S. Clark St., Ste. 1500
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

18