# **EXHIBIT 7**

---

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                  EASTERN DIVISION

 4

 5    ANGEL PEREZ, INDIVIDUALLY,    )
      JUANITA BERRY, AND CALVIN     )
 6    COFFEY, on behalf of          )
      themselves and all other      )
 7    persons similarly situated,   )

 8              Plaintiffs,          )

 9       vs.                         )  No. 13 C 4531

10    CITY OF CHICAGO, et al.,       )

11              Defendants.          )

12

13          The deposition of SCOTT KRAVITZ,  taken pursuant

14    to notice and pursuant to the Federal Rules of Civil

15    Procedure for the United States District Courts pertaining

16    to the taking of depositions on the 31st day of January,

17    2018, before Laurel E. Laudien, a Certified Shorthand

18    Reporter of said state, at the location of 20 South Clark

19    Street, Suite 1500,  Chicago, Illinois, commencing at the

20    hour of approximately 10:00 o'clock a.m.

21

22

23

24
```

---

**Page 2**

```
 1      PRESENT:

 2          EDELMAN, COMBS, LATTURNER & GOODWIN, LLC,
            BY:  MS. CASSANDRA P. MILLER,
 3          20 South Clark Street, Suite 1500,
            Chicago, Illinois 60603,
 4          (312) 739-4200,

 5              On behalf of the Plaintiffs;

 6

 7

 8      PRESENT:  (Cont'd)

 9          PUGH, JONES, & JOHNSON, PC,
            BY:  MR. JONATHAN BOOKER CIFONELLI,
10          BY:  MS. KHARA COLEMAN,
            180 North LaSalle Street, Suite 3400,
11          Chicago, Illinois, 60601,
            (312) 768-7800,
12
                On behalf of the Defendants;
13

14

15          PEOPLE'S LAW OFFICE,
            BY:  MS. SHUBA OHRI,
16          BY:  MR. FLINT TAYLOR,
            1180 North Milwaukee Avenue, 3rd Fl,
17          Chicago, Illinois 60642,
            (773) 235-0070,
18
                On behalf of the Mann Plaintiffs.
19

20

21

22

23

24    Laurel E. Laudien, RMR, RPR, CSR #084-001871
```

---

**Page 3**

```
 1                    I N D E X

 2    DATE:  1-31-2018
      PAGES:  1-223
 3
      WITNESSES:                              PAGE:
 4
      SGT. SCOTT KRAVITZ
 5       Exam By Ms. Miller .........................4
         Exam By Ms. Ohri .........................159
 6       Exam By Mr. Cifonelli ....................216
         Exam By Mr. Taylor   .....................219
 7

 8    EXHIBITS:                       MARKED   IN EVIDENCE

 9    Deposition Exhibit

10       No. 1 ...........................75
         No. 2 ...........................80
11       No. 3 ..........................149
         No. 4 ..........................199
12       No. 5 ..........................200

13

14

15

16

17

18

19

20

21

22

23

24
```

---

**Page 4**

 1   **MS. MILLER:** Everybody ready?

 2   **MR. CIFONELLI:** Yeah.

 3   **MS. MILLER:** Can we swear in the witness.

 4   (WITNESS SWORN.)

 5   **THE WITNESS:** Yes.

 6   SGT. SCOTT KRAVITZ,

 7   called as a witness herein, having been first duly sworn,

 8   was examined and testified as follows:

 9   E X A M I N A T I O N

10   **BY MS. MILLER:**

11   Q.  Sergeant Kravitz, have you been deposed before?

12   **A.  Yes.**

13   Q.  How many times?

14   **A.  Twice.**

15   Q.  Okay.  So just a couple reminders.

16   Make sure to speak audibly.  Nods don't come

17   off on the record.

18   If you need to take a break, please let me

19   know.  The only time that I would not allow you to take a

20   break is if there's a question pending that doesn't

21   require some conversation with your attorney about an

22   asserted privilege.

23   If you don't understand my question, please let

24   me know.

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 5

1    If you answer the question, I'll assume that
2  you understood the question that was asked.  Is that
3  fair?
4    A.  Sure.
5    Q.  Okay.  Can you state your full name for the
6  record.
7    A.  My first name is Scott, S-C-O-T-T.  My middle
8  name is Douglas.  My last name is Kravitz,
9  K-R-A-V-as-in-Victor-I-T-Z.
10    Q.  And what is -- where are you currently
11  employed?
12    A.  The 25th District Chicago Police Department.
13    Q.  And what is your current rank?
14    A.  Sergeant.
15    Q.  And when did you become a sergeant?
16    A.  I was sworn in I believe on the 1st of February
17  of 2016.
18    Q.  And what is your current badge number?
19    A.  1046.
20    Q.  How long have you had that badge number?
21    A.  I don't know.  When I was originally promoted,
22  I had a different badge number, 2252.  I had switched to
23  1046 because somebody had asked for it.  Their family had
24  that star number.

Page 6

1    Q.  The 2252?
2    A.  Right.  So I gave it up.
3       Maybe six months, to a year.
4    Q.  How many different badge numbers have you had?
5    A.  Three.
6    Q.  And so prior to 2252, what was your badge
7  number?
8    A.  6554.
9    Q.  And how long have --
10    A.  6554.
11       I see it's --
12    Q.  6554, okay.  Thank you.
13       How long have you worked for the Chicago Police
14  Department?
15    A.  Approximately 11 and a half years.
16    Q.  So you'd say about 10 and a half of those
17  years, you had that original star number?
18    A.  It's that original star number from
19  approximately February of 2007, when I graduated the
20  police academy, until February of 2016.
21    Q.  And where were you originally assigned after
22  coming out of the academy?
23    A.  The 11th District.
24    Q.  And in what capacity?

Page 7

1    A.  Patrol.
2    Q.  And how long were you on patrol for the 11th
3  District?
4    A.  I worked the watch for approximately four
5  years.
6    Q.  And did you have any partners while you worked
7  patrol for the 11th District?
8    A.  Yes.
9    Q.  How many?
10    A.  Regular partners?
11       I worked with numerous people while I was on
12  the watch.  I had, at one point in time, I had two
13  regular partners.
14    Q.  Two regular partners?
15    A.  Yes.
16    Q.  And who were they?
17    A.  Officers Borowski and Neberizea.
18    Q.  How do spell the first one, do you know?
19    A.  B-O-R-O-W-S-K-I.
20    Q.  And Neberizea you said?
21    A.  Yeah, N-E-B-E-R-I-Z-E-A.
22    Q.  And when were they your partners, what years?
23    A.  I worked with them while I was on the watch up
24  until probably around 2010 when I went to a tact team in

Page 8

1  the 11th District, and then I had more partners after
2  that.
3    Q.  And so while you were on patrol for the 11th
4  District, these two individuals were your partners the
5  entirety of your tenure there?
6    A.  No.  Like I said, I could work with a different
7  person every day.
8       When I finally got on a car, I had regular
9  partners.  I don't remember exactly how long that was.
10    Q.  Okay.
11    A.  And then I went to a tact team.
12    Q.  And when were you assigned a car?
13    A.  I don't understand your question.
14    Q.  You said when you were put on a car, then you
15  received two regular partners, right?
16    A.  Yes.
17    Q.  When was that?
18    A.  I don't remember, sometime between 2008 and
19  2010.
20    Q.  And did you have -- who was your supervisor at
21  the 11th District?
22    A.  Can you be more specific?
23    Q.  Who did you report to directly?
24    A.  A sergeant.

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 9

1    Q.  How many different sergeants did you report to
2  while you were at the 11th District?
3    A.  Numerous.
4    Q.  At any given time, were you to report to
5  different sergeants or would it depend on who the
6  sergeant was at that specific date?
7    A.  It could be a sergeant every night.
8        I mean, ultimately I probably worked for 30
9  sergeants while I was on the watch.
10   Q.  And how many sergeants are typically assigned
11  to a watch?
12   A.  Can you be more specific?
13   Q.  On any given day, how many sergeants work out
14  of the 11th District that you would report to?
15   A.  Well, I would report to one --
16   Q.  Okay.
17   A.  -- on any given day.
18   Q.  On any given day, how many sergeants would
19  be working out of the 11th District?
20   A.  Anywhere from three to six, during my watch.
21   Q.  Okay.  Do you remember the names of any of
22  those sergeants?
23   A.  Yes.
24   Q.  Can you tell me the names that you do remember?

Page 10

1    A.  Mulligan, Murphy, Lazoric, Kerns, McCall,
2  Gardner, Roberts, Kelly, Mahaffy, Uding.
3        I'm sure there's more than that I'm not
4  recalling at the moment.
5    Q.  When you were on patrol through the 11th
6  District -- well, let me go back.
7        Are you familiar with the facility Homan
8  Square?
9    A.  I am.
10   Q.  When did you first learn about the facility
11  Homan Square?
12   A.  I don't know.
13   Q.  Were you aware of Homan Square when you were
14  working patrol through the 11th District?
15   A.  Yes.
16   Q.  And what was your understanding at that time
17  what -- of what Homan Square was?
18   A.  It was a facility where different units in the
19  police department worked out of.
20   Q.  Was it your understanding that arrestees could
21  be taken to Homan Square when you were working patrol
22  through the 11th District?
23   A.  Yes.
24   Q.  Did you have occasion to bring anyone to Homan

Page 11

1  Square while you were working patrol for the
2  11th District?
3    A.  As a transport car for another unit, yes.
4    Q.  Was there a specific unit that you would act as
5  a transport car for?
6    A.  No.
7    Q.  How many times would you say that you
8  transported somebody to Homan Square when you were on
9  patrol?
10   A.  I don't know, approximately three.
11   Q.  And what were the circumstances under which you
12  brought those individuals to Homan Square?
13   A.  I would meet up with a requesting unit, they
14  would ask for a transport to Homan Square, I would drive
15  the individual to Homan Square to Door No. 2, pull in the
16  garage, and either be met by the officers or walk the
17  prisoner up to the back stairs to an interview room, and
18  then he would be logged in.
19   Q.  Would you log in the prisoner if you were
20  bringing them up to the interview room?
21   A.  Sometimes.  It depends if you were met by the
22  arresting officers while you were there.
23   Q.  Have you ever signed somebody in to the log-in
24  book at Homan Square while you were patrolled through the

Page 12

1  11th District?
2    A.  I don't recall.
3    Q.  And you said you would go to Door No. 2?
4    A.  Yes.
5    Q.  Was there any security that you would have to
6  go through to get to Door No. 2?
7    A.  Yeah, there's a guard shack.  There is a gate
8  that comes down.  You would have to be buzzed or the gate
9  would have to be raised by whoever is working the guard
10  shack.
11   Q.  And would you then transport anyone or
12  transport these individuals to a district?
13   A.  Not -- no, I mean, not the same -- I wouldn't
14  wait there while they are processed and then transport
15  them, but if somebody called for a transport from Homan
16  Square to the 11th District, then cars would go.
17       I don't recall ever doing that, but --
18   Q.  Okay.  Do you remember the first time that you
19  went to Homan Square?
20   A.  No.
21   Q.  Do you know if it was within a certain range of
22  years, like the first two years you were on patrol,
23  second two years?
24   A.  I don't know.

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 13

1    Q.   Was it towards the beginning of your tenure on
2    patrol?
3        A.  I don't know.
4        Q.  Do you remember the officers that you met at
5    Homan to deliver the arrestee?
6        A.  No.
7        Q.  Do you know what -- do you remember which units
8    you were dropping him off for?
9        A.  No.
10       Q.  And then following patrol, what was your
11   assignment after that?
12       A.  After patrol, I was detailed to narcotics.
13       Q.  And when was that?
14       A.  2013.
15       Q.  And how long did you work for narcotics?
16       A.  Until I was in preservice sergeant training
17   which was December of 2015.
18       Q.  Were you assigned a partner in the
19   Narcotics Department?
20       A.  No, I was assigned to a team.
21       Q.  And what was your team?
22       A.  The first team I was assigned to was -- I
23   believe it was C6.
24       Q.  And was that the only team you were assigned

Page 14

1    to?
2        A.  No.
3        Q.  What was after C6?
4        A.  D5.
5        Q.  Did you ever work for any other teams?
6        A.  No.
7        Q.  And when you say narcotics, are you saying --
8    are you referencing Unit 189 out of Homan Square?
9        A.  Yes.
10       Q.  And how long were you on team C6?
11       A.  I would approximate just over a year.
12       Q.  So from 2013 to 2014?
13       A.  Yes.
14       Q.  And who were the members of Team 6?
15       A.  Officers Mark Eldridge, Danny Nunez, Steve
16   Leveille, Ed Legenza, Laura Pagan, Eric Mateo, Tony Ceja,
17   Shirene Hicks, et. al.
18           I'm sure there's one or two I don't recall.
19       Q.  Okay.  And then were you on Team 5 from -- I'm
20   sorry -- D5 from 2014 to December 2015?
21       A.  Correct.
22       Q.  And who did you work with on Team D5?
23       A.  Eli Perez, James Grubisic, Joe Watson, Gus
24   Corona, Carlos Iglesias, Bridgette Herlehy, Roy Ramirez.

Page 15

1            I don't know.  At this point, there might be
2    one or two that I'm missing.
3        Q.  Okay.  Were there different functions of these
4    teams?  Were there different missions or assignments?
5        A.  Of teams at Homan Square or the teams I worked
6    on?
7        Q.  The teams you worked on.
8        A.  The first team that I worked on was -- it was a
9    West Side Narcotics Initiative Team that primarily worked
10   and made covert narcotics purchases that resulted in
11   arrest.
12           The second team, D5, I worked on was a
13   narcotics team that primarily worked in the 10th District
14   and would also do covert narcotics purchases with
15   arrests, but also was more prone to do more some midterm
16   investigations.
17       Q.  What do you mean by midterm investigations?
18       A.  We would execute more search warrants.  We
19   would not arrest targets right away, continue to make
20   purchases from them, possibly in higher amounts, conduct
21   more surveillance.
22       Q.  And why for D5 would you try and get more buys
23   or higher amounts from these individuals?  Is there a
24   reason for that?

Page 16

1        A.  We were just continuing our investigations.
2        Q.  Were they bigger, more long-term
3    investigations?
4        A.  They were certainly bigger and more long-term
5    than some of the covert narcotics purchases that we just
6    made with arrests, but, yeah.
7        Q.  And would any of these investigations also be
8    looking for any gang-type of information?
9        A.  Sometimes.
10       Q.  Would they be targeted at certain gangs?
11       A.  Sometimes.
12       Q.  When you were on the C6 team, was there any
13   wire surveillance done on the C6 team?
14       A.  Could you be more specific?
15       Q.  Would you ever track a buy using any type of
16   wire?
17       A.  Title III?
18       Q.  Yes.
19       A.  No.
20       Q.  Would you do so on your D5 team?
21       A.  We did not.
22       Q.  Why did you switch from C6 to D5?
23       A.  I was asked.  I previously worked for Sergeant
24   Sanchez on the C6 team.

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 17

1    I can't remember if that's C6 or C9, but I
2   previously worked for him on that team and he took over
3   the D5 team, and eventually he asked me to come over to
4   the D5 team.
5        Q.  And what's Sergeant Sanchez's first name?
6        A.  Alejandro.
7        Q.  How many sergeants work out of Homan Square?
8        MR. CIFONELLI: I object, vague on timeframe.
9   BY MS. MILLER:
10       Q.  When you were working out of Homan Square, how
11  many sergeants worked out of there?
12       A.  I don't know, 30 approximately.
13       Q.  And how many sergeants, when you were at Homan
14  Square, how many sergeants were assigned to the Narcotics
15  Division?
16       A.  Oh, I'm sorry.  I meant 30 for narcotics.
17       Q.  Okay.
18       A.  For Homan Square, I have no idea.
19       Q.  And on any given day, how many sergeants would
20  be working out of Homan Square in the Narcotics Division?
21       A.  Depending on the day, out of the building
22  itself?
23       Q.  Yes.
24       A.  I don't know.  In Narcotics, it varies on the

Page 18

1   day.
2        Q.  Is it between 3 and 5, 5 and 10?
3        A.  No, I would say more than that.  I would say
4   between 15 and 20.
5        Q.  And were you assigned to a specific sergeant
6   while you worked out of Homan Square?
7        A.  Yes.
8        Q.  Did that change from day-to-day?
9        A.  No.
10       Q.  Were sergeants assigned to specific teams?
11       A.  Yes.
12       Q.  How many sergeants would be assigned to a team?
13       A.  One.
14       Q.  And you said you worked for Sergeant Sanchez.
15  Did you work for any other sergeants?
16       A.  For Sergeant Avery as well, and then if either
17  of those sergeants were off, then our team would be
18  assigned to a different sergeant temporarily.
19       Q.  And when were you assigned to Sergeant Avery?
20       A.  I would approximate late 2013 to early 2014.
21       Q.  When you first started working out of Homan
22  Square, were you assigned to Sergeant Avery?
23       A.  No.
24       Q.  Who were you assigned to?

Page 19

1        A.  Sergeant Sanchez.
2        Q.  So from early 2013 to late 2013, you were
3   assigned to Sergeant Sanchez and then to Sergeant Avery?
4        A.  Correct.
5        Q.  And then following Sergeant Avery, were you
6   assigned to Sergeant Sanchez right away?
7        A.  Yes.
8        Q.  And did you work with Sergeant Sanchez from
9   early 2014 until December of 2015?
10       A.  That's correct.
11       Q.  When you were on Team C6, were there different
12  assignments within the team on a given day?
13       A.  Yes.
14       Q.  What type of assignments would those include?
15       A.  Purchasing officer, surveillance officer, or
16  enforcement officer.
17       Q.  And would you be assigned to one of these
18  subdivisions or could it change depending on the day?
19       A.  It could change depending on the day.
20            I was primarily an enforcement officer,
21  sometimes surveillance, very rarely a purchasing officer.
22       Q.  And when you say primarily enforcement, was
23  that true for when you were on D5 as well?
24       A.  Yes.

Page 20

1        Q.  And as the enforcement officer, what do your
2   duties include?
3        A.  Any time there was enforcement action after a
4   narcotics investigation, I would take that enforcement
5   action that needed to be taken during a narcotics
6   purchase or narcotics investigation, I would effect that
7   action including detaining people, stopping people,
8   effecting arrests.
9        Q.  So when you say enforcement action, you mean
10  detaining, stopping, and effecting arrests; is there
11  anything else?
12       A.  No.
13       Q.  And the surveillance team, what would they
14  generally do?
15       A.  They would do surveillance.
16       Q.  How many people would you work with in
17  enforcement?
18            So meaning when you were working enforcement,
19  how many people would be in that subdivision?
20       A.  Usually me and a partner.  There could
21  ultimately be -- there could be another car with two
22  people or there could be three people in one enforcement
23  car.
24       Q.  So generally there would be two to three

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 21

1 officers assigned to enforcement?

2    A. Unless there was another enforcement car, then

3 there could be more.

4    Q. So like two to four, two to five?

5    A. If we had more, we can put out more.

6    Q. Okay. How many officers would you put in a

7 single car?

8    A. Usually two. You could fit four in one

9 comfortably.

10    Q. Would you ever ride alone in a car when you

11 were working enforcement?

12    A. I have.

13    Q. Is that usual?

14    A. Usually I would have a partner.

15    Q. Under what circumstances would you ride alone?

16    A. If we were -- if we hadn't -- if we were doing,

17 if we were doing an investigation that we didn't think

18 required enforcement action, then I would ride alone.

19    Q. But typically if you were assigned a partner

20 that day, you would ride with your partner?

21    A. Yes.

22    Q. And I think I cut you off earlier. What was

23 the primary function of surveillance?

24    A. Surveillance -- I don't think you cut me off.

Page 22

1 I answered that.

2    Q. Oh, you did.

3      And when you mean surveillance, do you mean

4 on-the-scene surveillance or monitoring wiretaps? What

5 would that include?

6    A. My experience it's been on-scene surveillance.

7    Q. And typically how many people would work

8 surveillance team?

9    A. The more, the better. Ideally you would have

10 four or five people, but we've done it with two to three

11 before.

12    Q. And, but there would be just a single

13 purchasing officer on your team?

14    A. At one time usually.

15    Q. At one time usually it was one person and that

16 changed?

17    A. No, people played different roles on the team.

18 People sometimes one day, you're surveillance, next day,

19 you could be the purchasing officer. Sometimes there's

20 two purchasing officers in one car.

21    Q. Okay. But usually it's one purchasing officer?

22    A. Yes.

23    Q. Okay. And while you've been employed by the

24 Chicago Police Department, have you had any other jobs?

Page 23

1    A. Some side jobs here and there.

2    Q. What types of side jobs?

3    A. I worked security for T-Mobile maybe four

4 times. I worked security at a private event at Cinespace

5 one time.

6      I believe that's it.

7    Q. When you said you worked security for T-Mobile,

8 is that -- or explain to me what you did for them?

9    A. I sat in a location in a security shirt.

10    Q. In like a store or in an office building?

11    A. A store.

12    Q. And then you said you worked a security event.

13 Was that like through a security service?

14    A. Yes.

15    Q. Do you remember the name of that service?

16    A. I don't off the top of my head.

17    Q. Was it Statewide Investigative Services?

18    A. I believe that was it.

19    Q. When you were working out of Homan Square, how

20 many prisoners do you think you brought to Homan Square

21 for questioning?

22    A. For questioning?

23    Q. Or processing?

24    MR. CIFONELLI: Object, vague term processing.

Page 24

1 BY MS. MILLER:

2    Q. How many people did you bring to Homan Square

3 while you worked out of Homan Square?

4    A. I don't know, approximately a few hundred.

5    Q. When you would make an arrest while working out

6 of Homan Square, would you always bring that individual

7 to Homan Square?

8    A. Not always.

9    Q. Where else would you take the person?

10    A. To a district station.

11    Q. And did you decide whether or not to take the

12 individual to the districts versus Homan Square?

13    A. No.

14    Q. Who would make that decision?

15    A. Usually the sergeant.

16    Q. And is that a decision that's made on scene or

17 is that something, a decision that you have already been

18 made aware of before you go out for an arrest?

19    A. I don't know.

20    Q. Have there been occasions where you were told

21 before you went out for a potential arrest that you would

22 be bringing the individual to Homan Square versus the

23 district?

24    A. Could you repeat the question.

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 25

1  Q. Sure.
2  Have there been occasions when you've been told
3  by the sergeant that if an arrest is made, that
4  individual be brought back to Homan Square as
5  opposed to the district?
6  **A. One more time.**
7  **I'm sorry.**
8  MS. MILLER: Could you read it back.
9  (RECORD READ BACK BY REPORTER.)
10  **THE WITNESS: That was our normal procedure, to**
11  **bring them to Homan Square. That's what we did.**
12  BY MS. MILLER:
13  Q. And so when would you be told to take the
14  person to a district versus Homan Square?
15  **A. If it was -- I have had instances where I've**
16  **worked that part of the City that was not close to Homan**
17  **Square, then we would just go to the district.**
18  Q. Okay. So that would be a decision that's made
19  on scene?
20  **A. I didn't make the decision. I'm not sure.**
21  Q. Before you started working out of Homan Square,
22  did you receive any training about any special procedures
23  that need to be taken when working out of Homan Square?
24  **A. I believe we had a few days of training before**

---

Page 26

1  **we were assigned to teams, but yeah.**
2  Q. And where did this training take place?
3  **A. The training room at Homan Square.**
4  Q. And who lead the training?
5  **A. I don't remember.**
6  Q. Do you know the rank of the individual that
7  would have been conducting the training?
8  **A. I would guess sergeant.**
9  Q. And is there a specific person that's assigned
10  to training for Homan Square?
11  **A. While I was there, there was a training**
12  **sergeant.**
13  Q. Were you trained by that training sergeant?
14  **A. I don't remember.**
15  Q. Who was the training sergeant?
16  **A. I believe while I was there, it was Sergeant**
17  **DiCristafano.**
18  MR. TAYLOR: How do you spell that?
19  THE WITNESS: I don't know.
20  MR. CIFONELLI: Did you say DiChrist --
21  THE WITNESS: DiCristafano.
22  MR. TAYLOR: One word?
23  THE WITNESS: I believe so.
24  That's his last name.

---

Page 27

1  BY MS. MILLER:
2  Q. Did Sergeant DiCristafano serve any other
3  function other than as a training sergeant? So was he
4  assigned to a unit out of Homan Square?
5  **A. When I first got there, he worked in narcotics.**
6  Q. Was he training while he was working as an
7  officer through narcotics?
8  **A. I don't know. When he was first there, he had**
9  **a team, and then I believe he became the training**
10  **sergeant.**
11  Q. And did he still when he was training, did he
12  still have teams in narcotics?
13  **A. I don't know.**
14  Q. Okay. Was he the training sergeant the entire
15  time you were there once he started becoming training
16  sergeant?
17  **A. No, I don't believe so.**
18  Q. Do you remember approximately when he became
19  the training sergeant, what year?
20  **A. I don't know for sure, no.**
21  Q. Was it within the first year that you were at
22  Homan Square?
23  **A. It's possible the first or second year.**
24  Q. And when did he stop becoming the training

---

Page 28

1  sergeant?
2  **A. Towards the end of my time in narcotics.**
3  Q. Was he replaced by somebody?
4  **A. I don't recall.**
5  Q. When you left Homan Square, was there an
6  assigned training sergeant?
7  **A. I don't recall.**
8  Q. Do you know if there is currently an assigned
9  training sergeant?
10  **A. I don't work there anymore. I'm not sure.**
11  Q. And you said how long did the training last?
12  **A. I believe a few days.**
13  Q. And what did the training involve?
14  **A. There was some surveillance training, some**
15  **purchasing officer training, some enforcement training,**
16  **counter-surveillance training, that's all I recall.**
17  Q. And how did this training differ from any prior
18  training that you had received while working for the
19  Chicago Police Department?
20  **A. I never had purchasing officer training before**
21  **while working in the Chicago Police Department.**
22  Q. And what did the purchasing officer training
23  entail?
24  **A. I don't recall.**

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

**Page 29**

1  Q. Was there any training on how prisoners should
2  be processed at Homan Square?
3  A. I don't recall.
4  Q. Was there any training provided as to how long
5  a person can be held at Homan Square?
6  A. I don't recall.
7  Q. Was there any training about keeping people
8  overnight at Homan Square?
9  A. I don't recall.
10  Q. When you worked for or prior to working out of
11  the 11th District, did you receive any training about
12  when an arrestee needs to be presented before a judge?
13  A. Within 48 hours of arrest.
14  Q. And that's something you were trained on before
15  you started working out of District 11?
16  A. It's a general order.
17  Q. Was that included in your training though?
18  A. I don't remember.
19  Q. Were you trained about any orders that provide
20  for specific accommodations when somebody is held
21  overnight at a district?
22  A. Could you repeat the question.
23  Q. Sure.
24  Before you became -- before you worked for

---

**Page 30**

1  District 11, were you trained on any accommodations that
2  need to be required for people to be held at districts
3  overnight?
4  A. I don't know. I have never encountered that.
5  Q. You never encountered that or you were never
6  trained on that?
7  A. Yes.
8  Q. Yes, you were never trained on it?
9  A. I don't know -- I don't recall being trained on
10  that.
11  I have never encountered that as well in a
12  district.
13  Q. And were there any -- were you provided with
14  any training in Homan Square as to any timing
15  requirements in terms of getting an arrestee in front of
16  a judge?
17  A. It's within 48 hours of arrest.
18  Q. And were there any -- was there any specific
19  training as to when that 48 hours begins in terms of when
20  the person is brought to Homan Square?
21  A. Could you repeat the question.
22  Q. Sure.
23  Did you receive any specific training before
24  working out of Homan Square as to, you know, how to log

---

**Page 31**

1  or keep track of an arrestee so that you can comply with
2  the 48-hour requirement?
3  A. Not that I recall.
4  Q. Generally what was the procedure for bringing
5  someone to Homan Square?
6  A. You would bring them to Homan Square, you would
7  place them in an interview room, you would conduct a
8  custodial search, you would secure them in an interview
9  room, you would sign them in on a log sheet.
10  Q. So when you bring the person to Homan Square,
11  you go through that same gate you mentioned earlier
12  like the security gate that's there?
13  A. Yes, ma'am.
14  Q. And would you still bring them through Door 2?
15  A. Now?
16  When I was there?
17  Q. Yeah.
18  A. Yes.
19  Q. How many doors are there?
20  A. At least two. Maybe, I would guess between
21  four and five.
22  They are garage overhead doors.
23  Q. And is the door open to all of these? Is Door
24  1, 2, 3, and 4, 5, kept open, or is that something that

---

**Page 32**

1  also needs permission to gain access?
2  A. It's one big garage with multiple garage doors.
3  We would come through Door 2 because you could
4  pull your car into Door 2.
5  The other doors had things behind them. They
6  were occupied. Even if they would open it, you couldn't
7  pull your car in.
8  Q. Okay. And was Door 2 typically, the garage
9  door, was it typically left open or closed?
10  A. Typically closed.
11  Q. And how would you open the door to enter?
12  A. I wouldn't. The person running the guard shack
13  would.
14  Q. So when you passed through the guard shack,
15  they lift up that initial gate and also the same time the
16  garbage door opens?
17  A. You would have to pull up to the door or you
18  can tell them Door 2, holding up two fingers to the
19  attendant in the garage, and they would open up Door 2.
20  Q. Okay. And you would pull into the garage.
21  Is the person at this point handcuffed?
22  A. Usually, yes.
23  Q. Under what circumstances would the person not
24  be handcuffed?

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 33

1    A.  If they were a confidential informant.
2    Q.  Is the person usually shackled at the ankles?
3    A.  No.
4    Q.  Would someone ever be shackled at the ankles
5    brought to Homan Square?
6        MR. CIFONELLI: Object.
7        MS. MILLER: When you worked out of Homan Square?
8        MR. CIFONELLI: Well, I object to the form.  I
9    didn't know if you were talking about a car or what.
10   BY MS. MILLER:
11   Q.  Oh.  When -- are you aware of any circumstances
12   under which somebody would be brought to Homan Square in
13   ankle shackles?
14   A.  I am not, no.
15   Q.  Have you ever brought anybody to Homan Square
16   in ankle shackles?
17   A.  No.
18   Q.  Okay.  So you go in Door 2, and what's in the
19   garage there?
20   A.  There's some SWAT vehicles.  There's also a
21   command van.
22   Q.  Is anyone permitted to go into Door 2 of Homan
23   Square?
24       MR. CIFONELLI: Object to form.

Page 34

1    Any time I object, you can always answer.
2        THE WITNESS: Could you be more specific.
3    BY MS. MILLER:
4    Q.  When you would go through the guard shack,
5    would you have to show your badge or some kind of
6    identification?
7    A.  Yes.
8    Q.  Would somebody without a badge be permitted to
9    go into Door 2?
10   A.  No.
11   Q.  So is it fair to say that only police officers
12   are permitted to go in through Door 2.
13   A.  No.
14   Q.  Who else would be permitted?
15   A.  If you're in the company of a police officer,
16   or if somebody needed medical attention, paramedics could
17   go through Door 2.
18       Generally you would have to be in the company
19   of a police officer.
20   Q.  So like an average civilian would not be
21   permitted to show an ID and go through Door 2, is that
22   correct?
23   A.  Correct.
24   Q.  Would a civilian be permitted to get past the

Page 35

1    guard shack?
2    A.  No, probably not.
3    Q.  So how would a civilian enter Homan Square?
4    A.  They would go to the guard shack and they
5    would -- they would talk to the person in the guard shack
6    to get access.
7    Q.  And are they typically permitted access?
8    A.  I don't know.
9    Q.  If they were permitted access, how would they
10   enter Homan Square?
11       MR. CIFONELLI: Object to form.
12       THE WITNESS: I don't understand your question.
13   BY MS. MILLER:
14   Q.  Well, you said they would go to the guard shack
15   to request permission to access Homan Square; right?
16   A.  I'm not sure what an ordinary citizen would
17   need at Homan Square, that they would need access to.
18   Q.  Why wouldn't an ordinary citizen need access to
19   Homan Square?
20   A.  Why would they?
21   Q.  I'm asking you the questions.
22   A.  Okay.  Could you repeat it then.
23   Q.  Why wouldn't a civilian citizen -- could you
24   read it back.

Page 36

1        (RECORD READ BACK BY REPORTER.)
2        THE WITNESS: There is nothing for an ordinary
3    citizen at Homan Square unless -- I can't think of a
4    reason why an ordinary citizen would need access to Homan
5    Square.
6    BY MS. MILLER:
7    Q.  Well, so what's your understanding of what
8    Homan Square is?
9    A.  It's a police facility.  There's no -- there's
10   no public decks at Homan Square, for instance, like a
11   district station would have a public desk where people
12   can get accident reports, and make police reports, and
13   things of that nature, and Homan Square, there's no --
14   there's no public desk for that kind of police assistance
15   to be done.
16   Q.  And what about an attorney that wanted to go to
17   Homan Square; would they be permitted to go inside Homan
18   Square?
19   A.  Sure, if their client wants to see them, yeah.
20   Q.  And how would they gain access to Homan Square?
21   A.  They would go to the guard shack.
22   Q.  And then how would they enter the building?
23   A.  There's a stairwell attached to the guard shack
24   and an officer would come down to meet them.

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 37

1    Q. And then how would they be brought up to see
2  their client?
3    **A. Through a -- probably through the garage, the**
4  **same garage, just not through Door 2, and then up the**
5  **stairwell, the back stairwell.**
6    Q. Have you ever brought an attorney into Homan
7  Square?
8    **A. No, I have not.**
9    Q. Have you ever seen an attorney visiting with a
10  client at Homan Square?
11    **A. No, I have not.**
12    Q. And are juveniles permitted to be taken to
13  Homan Square?
14    **A. Yes.**
15    Q. Has that always been the case?
16    **A. As far as I'm aware.**
17    Q. Have you ever brought a juvenile to Homan
18  Square?
19    **A. Yes.**
20    Q. Are there any specific procedures or policies
21  followed for when a juvenile is taken to Homan Square?
22    **A. No. They're no different than when they're**
23  **taken to a district station.**
24    Q. But a parent could not visit a juvenile at

Page 38

1  Homan Square, is that correct?
2    **A. I don't see why they wouldn't get the same**
3  **access as a district station facility.**
4    Q. Well, you just said there's no public access to
5  Homan Square for ordinary citizens.
6    **A. They can go to the guard shack.**
7    Q. And then would they be brought in through the
8  garage and then up the stairwell?
9    **A. If they were going to see their child, that's**
10  **what would have to happen, yeah.**
11    Q. And have you ever seen a parent or a family
12  member visiting Homan Square?
13    **A. I have not.**
14    Q. And so you said you were in the garage after
15  you go through Door 2, and you said that there's a set of
16  stairways that go up to the interview rooms, is that
17  correct?
18    **A. Yes.**
19    Q. And is there a gate there that's locked?
20    **A. No.**
21    Q. So the stairwell is open to the garage?
22    **A. Yes.**
23    Q. There's no door that blocks off the stairwell?
24    **A. There is a door. There's doors on either end**

Page 39

1  of the stairwell.
2    Q. And is that door --
3    **A. I mean, there is a cage.**
4    Q. Okay. So there's a cage?
5    **A. It's generally open.**
6    Q. Okay. Both the cage and the door to the
7  stairwell are generally unlocked; is that what you're
8  saying?
9    **A. Yes.**
10    Q. Are there any signs on the outside of the door
11  leading up to the stairwell?
12    **A. I believe there are.**
13    Q. Do you remember what any of them say?
14    **A. I don't recall, no.**
15    Q. Is there a special procedure for when you're
16  bringing somebody up the stairwell that you have to
17  follow?
18    **A. You would usually announce prisoner on the**
19  **floor.**
20    Q. And what would that do?
21    **A. It would alert undercover officers that there**
22  **was nonpolice personnel coming up the stairs and onto the**
23  **floor.**
24    Q. And if an attorney was going up those stairs,

Page 40

1  what were you supposed to call out?
2    **A. I don't know.**
3    Q. Was there a specific announcement that you were
4  trained to use for attorneys?
5    **A. No. I might say the same thing, just because**
6  **it would -- it's common for UCs to hear it and they would**
7  **know there's somebody on the floor is nonpolice**
8  **personnel.**
9    Q. And what about if a parent or family member
10  were visiting Homan Square, was there any procedure for
11  their announcement?
12    **A. I don't know.**
13    Q. Did you ever hear any announcement that a
14  parent, or a civilian, or an attorney was entering the
15  stairwell?
16    **A. No.**
17    Q. So once you secured the prisoner in the
18  interview room, who is responsible for then signing in to
19  the log-in sheet?
20    **A. I mean, usually somebody on the arresting team,**
21  **somebody on the arresting team is responsible for signing**
22  **him in on the log sheet.**
23    **That doesn't mean that they will sometimes --**
24    **but sometimes the transporting officer might sign them in**

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 41

1   on the log sheet.
2       Q.  How would you know which room to put the person
3   in?
4       A.  There's no -- there's no -- it could change.
5   Basically whatever room is open.
6       Q.  So are the doors left open if there's nobody
7   being interviewed in the room?
8       A.  Generally, yes.
9       Q.  Would you have to check the log-in sheet to see
10  which rooms were open?
11      A.  No, you would generally find the first open
12  room and put them in there.
13      Q.  And was there any specific procedure or policy
14  which -- actually never mind.
15          When the person is signed in, what type of
16  information needs to be included on the log-in sheet?
17      A.  Prisoner's name, arresting officer, team, phone
18  number for the arresting officer, and a time.
19      Q.  So if a transporting officer brought somebody
20  to Homan Square, would they put down their information or
21  the arresting officer's?
22      A.  I don't know what they would do.  They could do
23  either.
24          Generally I would think they would put the

Page 42

1   arresting officer's information down or somebody on the
2   team if it wasn't the arresting officer.
3       Q.  Does the log-in sheet keep track of who is
4   questioning somebody if someone's being questioned at
5   Homan Square?
6       A.  No.
7       Q.  Does it keep track of how long a person has
8   been questioned by an officer?
9       A.  No.
10      Q.  And so the time that's listed on the log-in
11  sheet is just the time that the officer decided to sign
12  in on the log-in sheet?
13      MR. CIFONELLI:  Could you read back that.
14          (RECORD READ BACK BY REPORTER.)
15      MR. CIFONELLI:  Object to form.
16  BY MS. MILLER:
17      Q.  Is that correct?
18      A.  For me, when I brought a prisoner there, I
19  would sign the time that we got there.  That's what time
20  I would put down.
21      Q.  But there wouldn't be any information listed on
22  the log-in sheet which would differentiate between when a
23  person -- when an officer initially brings the arrestee
24  there versus, you know, time which has lapsed since the

Page 43

1   arrestee was brought there and maybe questioned, is that
2   true?
3       A.  Could you --
4       MR. CIFONELLI:  I was just going to object to form.
5       MS. MILLER:  Sure.
6   BY MS. MILLER:
7       Q.  So there's nothing on the log-in sheet that
8   requires an officer to write down if the arrestee had
9   been questioned at all before logged in, is that correct?
10      A.  That's correct.
11      Q.  After you would log somebody in and they are
12  secured in the interview room, what would take place
13  next?
14      A.  Processing.
15      Q.  And what does processing entail?
16      A.  Filling out an arrest report, or interview of
17  the subject.
18      Q.  Would you complete the arrest report before or
19  after interviewing the subject?
20      MR. CIFONELLI:  Objection, form.
21      THE WITNESS:  They can be done simultaneously.  The
22  person that fills out the arrest report, somebody can
23  interview, somebody else can start the arrest report.
24

Page 44

1   BY MS. MILLER:
2       Q.  Where is the arrest report completed?
3       A.  For me, it was in our office at Homan Square.
4       Q.  Are there any other locations at Homan Square
5   that you could complete the arrest report?
6       A.  There's numerous offices.
7       Q.  But typically would an officer go to their
8   officer -- sorry -- office to complete that arrest report
9   or were there any type of general-use desks?
10      A.  No, typically their office.
11      Q.  And the interviews, was this interviews to get
12  more information about the arrest which already took
13  place or is this like information you need to complete
14  the arrest report?
15      A.  I would only ask demographic information about
16  the individual.  I wouldn't usually discuss the case that
17  they are in custody for.
18      Q.  Was there any policy in place which would
19  prevent you getting anything more than demographic
20  information from the person while at Homan Square?
21      A.  Could you repeat the question, please.
22      Q.  Sure.
23          Were you -- was there any rule or policy in
24  place which said officers couldn't get information beyond

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 45

1   demographic information from an arrestee while at Homan

2   Square?

3     **A. No.**

4     Q. And when you brought an arrestee to Homan

5   Square, was there any type of like desk sergeant that you

6   would have to report to?

7     **A. During most of my time at Homan Square, there**

8   **was not.**

9     **I believe they did implement a district station**

10  **supervisor close to the end of my tenure there.**

11  Q. So in like November or December of 2015?

12    **A. To the best of my recollection, I would say**

13  **yes.**

14  Q. And who was -- did you say district sergeant

15  supervisor?

16    **A. No, district station supervisor.**

17  Q. Who was the district station supervisor when

18  you left?

19    **A. I don't believe it was a permanently-assigned**

20  **assignment at that point.**

21  Q. So would it just be somebody that a sergeant

22  that was working that day that would be assigned to the

23  position of district station supervisor?

24    **A. You know, I believe so, but I can't say with**

Page 46

1   **certainty.**

2    Q. Do you remember how many different district

3  station supervisors you encountered before you left Homan

4  Square?

5    **A. No.**

6   Q. More than one?

7    **A. My best guess is more than one.**

8   Q. And so prior to November 2015, the only -- you

9  only would have to report on the sign-in sheet that

10  somebody had been brought there; there wasn't an

11  individual that you had to report to, is that true?

12    MR. CIFONELLI: I'm sorry. Could you read back

13  that, Court Reporter.

14     (RECORD READ BACK BY REPORTER.)

15    THE WITNESS: There wasn't anybody working the desk

16  that I had to report to, that would be accurate.

17  BY MS. MILLER:

18    Q. And were there any logbooks kept as to the last

19  person (sic) somebody had eaten or gone to the bathroom

20  while at Homan Square?

21    **A. Not that I recall.**

22  Q. Was there or would an arrestee be left alone in

23  an interview room?

24    **A. Yes.**

Page 47

1    Q. And was there any type of log to for like

2  well-being checks while somebody is alone in an interview

3  room?

4    **A. There's not a different form, no.**

5   Q. Was there anybody assigned to check on

6  arrestees in interview rooms?

7    **A. It's generally the responsibility of the**

8  **arresting team to check in on the arrestee while I was**

9  **there, the person in the interview room.**

10    **There was sometimes desk personnel that worked**

11  **at the desk, and that's what the phone number was for.**

12  **They could call you if the person you had in the**

13  **interview room needed something.**

14  Q. Oh, so you mean that's why you would put your

15  phone number down on the log in?

16    **A. Correct.**

17  Q. Did you ever receive any calls from the desk

18  asking you to come down?

19    **A. Sure.**

20  Q. How many times?

21    **A. I don't know, maybe between five and ten.**

22  Q. And what were the circumstances?

23    **A. Arrestee had to go to the bathroom, or was**

24  **hungry, or something like that.**

Page 48

1    Q. And how would an arrestee get the attention of

2  the person sitting at the desk?

3    **A. Call out usually.**

4   Q. Is there a door between the interview rooms and

5  the 24-hour desk?

6    **A. Yes.**

7   Q. And how many different interview rooms are

8  there?

9    **A. I believe there's nine interview rooms, and I**

10  **believe there's three bigger cage, bullpen cage rooms for**

11  **you could have multiple arrestees in one of them.**

12  Q. Was there any other way of an arrestee getting

13  the attention of somebody if they were sick or needed to

14  go to the bathroom?

15    **A. No.**

16  Q. And the interview rooms are like cinder block

17  interview rooms, right?

18    **A. Yes.**

19  Q. Can the arrestee see out of the room?

20    **A. There's generally -- no.**

21  Q. Is there somebody always at the 24-hour desk?

22    **A. No.**

23  Q. Are there specific times when no one is at the

24  24-hour desk?

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 49

1    MR. CIFONELLI: I'm going to object, vague as to
2  timeframe.
3  BY MS. MILLER:
4    Q.  When you were there, were there certain like
5  designated hours that nobody would be assigned to the
6  24-hour desk?
7    MR. CIFONELLI: Object on foundation as well.
8    THE WITNESS: I don't believe there was specific
9  times when there wasn't somebody there.
10    It seemed that for a while, Friday evenings,
11  there wasn't people there.  Other than that, I'm not
12  sure.
13  BY MS. MILLER:
14    Q.  And who is assigned to work the 24-hour desk?
15    A.  Generally POs.
16    Q.  And when you say generally POs, do you mean
17  officers that don't actually -- aren't assigned to a unit
18  out of Homan Square?
19    A.  I'm not sure where they were assigned.
20    Q.  But these wouldn't be like members of the teams
21  working out of Homan Square, is that true?
22    A.  That's correct, generally.
23    Q.  And who was responsible for filling out the
24  arrest report once at Homan Square?

Page 50

1    A.  Somebody on the team.
2    Q.  It could be anybody on the team?
3    A.  Sure.
4    Q.  Do the other team members review the arrest
5  reports before they are submitted or is it just drafted
6  by the person actually preparing it?
7    A.  Generally, for me, if somebody else was -- if
8  somebody else authored the arrest report, but I was
9  either the first or second arresting officer on the
10  report, then I would look it over before it was
11  submitted.
12    Q.  Were you required to look it over or that's
13  something you just did as a matter --
14    A.  That's my practice and custom.
15    Q.  And how is the arrest report completed?
16    A.  Computer.
17    Q.  What sections of the arrest report are you
18  required to complete at Homan Square?
19    MR. CIFONELLI: Just, I mean, I think I know what
20  you're going to say, but object to the timeframe, if you
21  want to clarify that.
22  BY MS. MILLER:
23    Q.  When you were working -- well, let me ask you
24  this.  Has the procedure for completing arrest reports

Page 51

1  changed, to your knowledge, regarding Homan Square?
2    A.  I know there was a change that an arrest report
3  will be -- the first page will be saved, I believe the
4  order says without delay when somebody is brought into
5  Homan Square.
6    Q.  Do you know when that change went into effect?
7    A.  If I had to guess, I would say it was the last
8  month that I was there perhaps.
9    Q.  So like November, December of 2015?
10    A.  I believe.  I believe so.
11    Do you mind if I stand up?
12    MS. MILLER: No.  Sure.
13    Do you want to take a break?
14    THE WITNESS: I'm okay right now.
15    MS. OHRI: Do you need anything else?
16    THE WITNESS: No, just to stretch.  I'm fine.
17  BY MS. MILLER:
18    Q.  Were there any other changes prior to that in
19  November-December of 2015 with respect to how you -- or
20  the procedures for completing arrest reports at Homan
21  Square?
22    A.  Not that I recall.
23    Q.  So before November, or before this change, you
24  said you would complete the arrest report on the

Page 52

1  computer.
2    What information were you required to complete
3  at Homan Square?
4    A.  If the individual was going to be arrested, I
5  would complete the entire arrest report.
6    Q.  And if the person wasn't going to be arrested?
7    A.  Then there might not be an arrest report.
8    Q.  What type of documentation then would be
9  generated for somebody that wasn't being arrested who is
10  brought to Homan Square?
11    A.  Generally a narcotics supplementary report or a
12  narcotics general progress report.
13    Q.  How do you track an arrestee like a location of
14  arrestee?
15    MR. CIFONELLI: Objection, form.
16    THE WITNESS: I don't understand your question.
17  BY MS. MILLER:
18    Q.  Have you ever received a call from an attorney
19  or a family member asking where to locate somebody that
20  was recently arrested?
21    A.  While working the desk, sure.
22    Q.  And which desk are you referring to?
23    A.  Like a district station desk.
24    Q.  Okay.  And how would you go about finding

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 53

1    someone in that situation?
2        A. Well, if they were -- I would pull up in the
3    CLEAR System in either the watch commander's queue or the
4    station supervisor queue arrestees for where I was
5    working the 25th District, and I would see if they were
6    there, and it depended on where they got, you know, where
7    they got picked up, I could check other queues as well or
8    other stations.
9        Q. Could you check Homan Square?
10       A. I believe you can now, yes.
11       Q. Was that always the case?
12       A. I don't believe so.
13       Q. Was that something that changed in November of
14   2015 or December of 2015 when the new procedure went into
15   place as to the arrest report?
16       A. I believe so, but I'm not real firm on the
17   timeline.
18       Q. And how do you search for the individual?  Is
19   it by the name or an arresting officer?
20       A. Well, you could do either.
21           If somebody was to call and say, you know, my
22   brother just got locked up at North and Pulaski, then I
23   would -- I would say, well, did they say where they were
24   going, and then if they said Grand and Central, then I

Page 54

1    could go into the queue and look up arrestees in 25 and
2    see if they are there by last name.
3        Q. And would you be able to tell if somebody was
4    there if no CB number had been generated for that
5    individual?
6        A. No.
7        Q. Is that still the case, that you would need a
8    CB number in order to determine if somebody is being held
9    at a specific location?
10       A. Yes, it could be possible that the arrestee is
11   at the 25th District, and -- but they haven't started an
12   arrest report yet, so then I wouldn't see their name in
13   the queue.
14       Q. And so if one was looking for somebody taken to
15   Homan Square, there would have to be a CB number assigned
16   to that person in order for you to determine whether the
17   person was at Homan Square, is that correct?
18           MR. CIFONELLI: Object to foundation.
19           THE WITNESS: In order for me to see it in that
20   system, there would have to be an arrest report with a CB
21   attached.
22   BY MS. MILLER:
23       Q. Okay.  Can anyone search CB numbers through
24   like a CPD website?

Page 55

1        A. I don't know.
2        Q. So after you would complete your arrest report,
3    what would you do?  Would you have to print it out,
4    submit it electronically?
5        A. Attest to it electronically and submit it
6    electronically.
7        Q. Does anybody approve the arrest report before
8    you submit it?
9        A. Before I submit it?
10       Q. Yes.  I'm talking about before November of
11   2015.
12       A. No.
13           And after, no.
14       Q. So a sergeant wouldn't review an arrest report?
15       A. Sure, after I submit it.
16       Q. Okay.  And when would you typically submit the
17   arrest report?
18       A. I don't understand your question.
19       Q. Would you -- how long would it typically take
20   you to complete an arrest report?
21       A. Once I started it, half hour.
22       Q. And when you were completed with it, would you
23   submit it right then?
24       A. Not always.

Page 56

1        Q. Under what circumstances wouldn't you submit it
2    once it's complete?
3        A. If there was an individual -- if there was an
4    interview being conducted with the arrestee and he was
5    going to turn into a cooperating individual, then we
6    might not submit it at all.
7        Q. But you wouldn't know if the person was going
8    to turn into a confidential informant until after the
9    interview was complete, right?
10       A. Right.
11       Q. So if somebody was being interviewed, the
12   arrest report wouldn't be submitted until that interview
13   was complete, is that right?
14       A. Correct.  Yeah.
15       Q. And if the person does become a cooperating
16   individual or informant, would you then submit the arrest
17   report?
18           MR. CIFONELLI: Objection to foundation.
19   BY MS. MILLER:
20       Q. Or would the procedure be different?
21       A. Generally if they were going to turn into a
22   cooperating individual, then they would not be formally
23   charged, so you would not submit the arrest report.
24       Q. And was there any other type of report you

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 57

1 would complete instead of the arrest report in those
2 situations?
3     **A. Instead of, no, but there would always -- there**
4 **would always be a narcotics supplementary report that was**
5 **completed.**
6     Q. Okay. And a CB number is only generated then
7 if there is a charge, is that correct?
8     MR. CIFONELLI: Objection, foundation.
9     THE WITNESS: A CB number is generated when an
10 arrest report is started and saved.
11     If it's started and never saved, there won't be
12 a CB number attached.
13 **BY MS. MILLER:**
14     Q. And prior to November of 2015, when is the
15 first time that you would save it such that a CB number
16 would be generated?
17     **A. I mean, you could do that at any time, and I**
18 **believe, unless it was submitted, you could delete the**
19 **arrest report.**
20     Q. Okay. And so prior to November of 2015, you
21 could save it and generate a CB number but then erase
22 that CB number?
23     **A. I don't know if it's ever erased, but you can**
24 **erase the arrest report.**

Page 58

1     **I don't know what happens to the CB number.**
2 **I'm not sure.**
3     Q. Okay. Have you ever had occasion to start an
4 arrest report such that a CB number would have been
5 generated and no charges were brought so the arrest
6 report wasn't ever submitted?
7     **A. Yeah.**
8     Q. How many times?
9     **A. I'm not sure.**
10     Q. And would you have to have some kind of
11 authority to do that?
12     **A. No.**
13     Q. You said you didn't know what would happen to
14 the arrest report. What would you do to the arrest
15 report so that it was changed or so no charges were
16 reflected for that person?
17     **A. I could just -- if it wasn't -- I believe you**
18 **could just delete the arrest report.**
19     Q. Okay. But you don't know what happens to the
20 CB number?
21     **A. Correct.**
22     Q. Was that like a button on the screen that you
23 could do it?
24     **A. Yes.**

Page 59

1     Q. And did you say how many times you thought you
2 did that?
3     **A. I'm not sure.**
4     Q. More than ten?
5     **A. Maybe, maybe if I had to guess, I would say 20.**
6     Q. 20?
7     And on somebody's report, would you end the
8 report with a clear closed with arrest and prosecution?
9 Does that sound like a familiar statement?
10     **A. Not on arrest reports, no.**
11     Q. Where would that be reflected?
12     **A. Narcotics supplementary report.**
13     Q. And what would that mean?
14     **A. Could you repeat what it was.**
15     Q. Clear/closed with arrest and prosecution.
16     **A. The case has been closed out. If the case is**
17 **not closed, it's open, but if you arrest and charge, then**
18 **it's closed.**
19     Q. And if it just says clear/closed, would that
20 have any significance?
21     **A. I don't know.**
22     **I'm sure there's somebody that can explain it**
23 **better, but it's not me. Sorry.**
24     Q. Sure. That's fine.

Page 60

1     So you said that you would prepare the arrest
2 report, you could save it, and then you would submit it
3 electronically?
4     **A. Well, it's all done electronically, but yeah.**
5     Q. Who is it submitted to?
6     **A. To the district, at the time, it was the**
7 **district station supervisor of the district where the**
8 **arrest took place.**
9     MR. CIFONELLI: Could we take like a three-minute
10 break.
11     MS. MILLER: Yeah, that's fine.
12     (SHORT RECESS.)
13     MS. MILLER: Ready?
14     MR. CIFONELLI: Yes.
15     MS. MILLER: Go back on the record.
16 **BY MS. MILLER:**
17     Q. I think you were just saying that in November
18 of 2015, the arrest report would be submitted to the
19 district station supervisor where the arrest took place?
20     **A. Yes.**
21     Q. At any point, would the sergeant at Homan
22 Square sign off an arrest report?
23     **A. On an arrest report, no.**
24     Q. Okay.

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 61

1    A.  Not when I was there.

2    Q.  Okay.  And when is an arrestee approved for

3  probable cause?

4    A.  There's an initial approval of probable cause

5  which is done by the sergeant of the district of arrest,

6  and then the final approval of charges is done by -- now

7  it's done by the watch operations lieutenant in the

8  district.

9    Q.  And before?

10    A.  Then I don't know if it was either done by the

11  same sergeant or a lieutenant.

12    Q.  So the probable cause then would not be decided

13  until after the arrest report was submitted, is that

14  right?

15    A.  Yes.

16    Q.  Would the probable cause be determined before

17  the arrestee was taken to the district?

18    MR. CIFONELLI:  Objection, foundation, also form.

19    THE WITNESS:  After an arrest report is submitted,

20  it could then be approved by the district station

21  supervisor at any time.

22    BY MS. MILLER:

23    Q.  When would the district station supervisor

24  review a submitted arrest report?

Page 62

1    A.  Well, they have access to it in their queue.

2  If they have their screen up on their queue, and they see

3  an arrest has been submitted, they can approve it on

4  their own.

5    Sometimes we would call from Homan Square and

6  let them know I have an arrest in your queue for

7  approval, and then they would look at it.

8    Sometimes we would just go over there with the

9  arrestee and do it face-to-face with the district station

10  supervisor.

11    Q.  How often would you do it face-to-face versus

12  by phone?

13    A.  I usually did it more face-to-face.  I would

14  maybe 60-40, 70-30.

15    Q.  And so --

16    A.  I'm sorry.

17    If it was a district close, like if the event

18  happened in the 11th District, and the 11th District

19  encompasses Homan Square, you just do it face-to-face.

20    If the incident occurred in the 8th District

21  which is considerably farther away from Homan Square, I'm

22  not going to go to the 8th District for a face-to-face

23  with the desk sergeant about probable cause.  I would

24  call him on the phone, he would approve it, and then they

Page 63

1  would go to the 11th District with the arrestee.

2    Q.  So the district of arrest wouldn't necessarily

3  be the district where the arrestee was taken for booking?

4    A.  That's correct.

5    Q.  But still the arresting district would be the

6  one that signs off on the probable cause?

7    A.  Yes.

8    Q.  Okay.  And you said that on probably 20

9  occasions that you've deleted an arrest report because

10  the person became a cooperating individual, is that

11  correct?

12    A.  Yes.

13    Q.  And is there any difference in your mind

14  between a cooperating individual and confidential

15  informant?

16    A.  No.

17    Q.  So are the two used interchangeably?

18    MR. CIFONELLI:  Object to form, by him or --

19    THE WITNESS:  I think most people would say -- I

20  would use cooperating individual.  That's what I would

21  use.

22    BY MS. MILLER:

23    Q.  Would that label change if the person was being

24  compensated in some way for providing information?

Page 64

1    A.  They could then be called a -- I believe the

2  term is registered confidential informant.

3    Q.  And what's the registration that's involved for

4  a registered confidential informant?

5    A.  You would have to fill out a confidential

6  informant packet, and it would have to be signed off on,

7  and then it would be brought to 35th and Michigan.

8    Q.  Have you ever worked with a registered

9  confidential informant?

10    A.  I have worked with registered confidential

11  informants, none that were my own.

12    Q.  Have you ever had an arrestee who was taken to

13  Homan become a cooperating individual?

14    A.  Yes.

15    Q.  How many times?

16    A.  I don't know.

17    Q.  More than 20?

18    A.  I would say upwards of 20.

19    Q.  And so you previously testified that on

20  approximately 20 occasions, you have started an arrest

21  report but later deleted it because the person became a

22  cooperating individual?

23    A.  Uh-huh.  Yes.

24    Q.  And were you involved in any interviewing of

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 65

1    these individuals that became cooperating individuals?

2    **A. Yes, some of them.**

3    Q. How many or what percentage would you say?

4    **A. I don't know.**

5    Q. Half of them?

6    **A. I don't know.**

7    Q. More than five?

8    **A. Probably.**

9    Q. So someone would be brought to Homan with a

10   potential charge, they would be arrested, correct?

11   **A. Yes.**

12   Q. And then an interview would take place after

13   which the person would agree to cooperate with the

14   police, is that typically --

15   **A. Yes.**

16   Q. And who typically conducts the interviews?

17   **A. It could be the arresting officer, it could be**

18   **sometimes the case officer, the person, the police**

19   **officer that's kind of responsible for the investigation.**

20   **It can change. There's not any set person**

21   **that's going to conduct the interview.**

22   Q. Have you ever released somebody from Homan

23   Square without charges in exchange for an unregistered

24   firearm?

---

Page 66

1    **A. I'm sorry. Could you repeat that.**

2    Q. Have you ever released someone from Homan

3    Square without charges in exchange for a gun?

4    **A. They have cooperated by turning in a firearm**

5    **and cooperated later and they have not been charged**

6    **with a crime, yes.**

7    Q. How many times?

8    **A. I don't know, maybe more than one, less than**

9    **five.**

10   Q. And you said they cooperated by turning in a

11   gun?

12   **A. Yes, or they had knowledge of where one was**

13   **being kept, they'd offer that knowledge.**

14   Q. Okay. Because they wouldn't have a gun on them

15   when they're taken to Homan Square?

16   **A. No.**

17   Q. So the officer would then have to go retrieve

18   the gun, is that correct?

19   **A. Yes.**

20   Q. Was that something that was fairly common at

21   Homan Square to --

22   **A. I don't know.**

23   Q. -- to attempt to get people to turn in illegal

24   guns?

---

Page 67

1    **A. If they had knowledge about where guns were, we**

2    **would ask.**

3    Q. As part of the interview process?

4    **A. Generally, yes.**

5    Q. What other types of information would be

6    requested during the interview process?

7    **A. Do you know where there's any large amounts of**

8    **drugs, do you know about any murders, do you know about**

9    **any shootings that have taken place.**

10   Q. And then in exchange for that information,

11   sometimes the charges would be dropped and they would be

12   considered a cooperating individual?

13   **A. They just wouldn't be charged. I wouldn't say**

14   **they were dropped. They were just not charged.**

15   Q. Okay.

16   **A. Sorry.**

17   Q. And you may have answered this, does a sergeant

18   have to approve of not proceeding forward with charges

19   for a cooperating individual?

20   **A. The sergeant ultimately makes the decision,**

21   **yes.**

22   Q. And you have worked at both districts and at

23   Homan Square. What are the differences in terms of

24   processing at Homan Square versus at a normal district?

---

Page 68

1    MR. CIFONELLI: I'm sorry. Could you read that

2    back.

3    (RECORD READ BACK BY REPORTER.)

4    THE WITNESS: Generally in a district, the interview

5    rooms are going to be much closer to the processing

6    officers. Other than that, the processing is the same,

7    the process of the processing is the same.

8    BY MS. MILLER:

9    Q. Are the interview rooms similar to those at

10   Homan Square?

11   **A. The ones in the 25th District are, yes.**

12   Q. So they are like cinder blocks with no windows?

13   **A. Yep.**

14   Q. Is there any window that an arrestee could --

15   **A. Escape from?**

16   Q. No, just look outside of the cell or the

17   interview rooms?

18   **A. Where?**

19   Q. At the 25th District.

20   **A. There's a maybe a foot-by-foot window. I have**

21   **actually never looked coming out, but I could see in.**

22   **I don't know if it's one way on the other side**

23   **or not, but I believe that's how it is at Homan as well.**

24   **They must have got a contract on these doors.**

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 69

1    I don't know.
2        Q.   Okay.  And what about at the 11th District, is
3    it a similar type of interview room?
4        A.   There are interview rooms that are similar,
5    yes, except in the 11th District, they generally have
6    tables in the rooms, and there's actual like laptop
7    computers affixed to the tables, when I was there.
8            I haven't been in the 11th District in a long
9    time.  When I was there, that's how it was.
10       Q.   So the reporting officer would complete the
11   report in front of the arrestee in the room?
12       A.   Facing, yes.
13       Q.   And at the 25th District, the arrestee is kept
14   in the interview room while the arrest report is being
15   completed, is that correct?
16       A.   Yes.
17       Q.   And that's been the case since you've been
18   there?
19       A.   Yes.
20       Q.   What is the -- if somebody asks to make a phone
21   call at Homan Square, was there any procedure in place as
22   to how to handle that situation?
23       A.   No.
24       Q.   Were arrestees allowed to call family members

Page 70

1    from Homan Square?
2        A.   Generally they have phones that are accessible
3    to arrestees at their booking destination which generally
4    for us would be the 11th District, there's a phone
5    available there.
6        Q.   So they wouldn't be permitted at Homan Square,
7    they would have to wait until they got to the booking
8    facility, is that correct?
9        A.   I haven't really run into that situation when I
10   was at Homan Square.
11       Q.   Has anyone ever asked you to call or to speak
12   to an attorney while at Homan Square?
13       A.   Yes, I have had instances where they have asked
14   to speak to an attorney.
15       Q.   And did you allow the person to speak to an
16   attorney?
17       A.   I immediately ceased questioning of that
18   individual, and they spoke to -- I assume they spoke to
19   the attorney when they got to the 11th District and made
20   a phone call.
21       Q.   Are arrestees allowed to make calls to their
22   attorneys from Homan Square?
23       MR. CIFONELLI: Object to foundation.
24       THE WITNESS: I never allowed anybody to, no.

Page 71

1    BY MS. MILLER:
2        Q.   Did you ever see an arrestee -- if an arrestee
3    were to make a phone call from Homan Square, where would
4    they make the phone call from?
5        A.   In some instances, you could have the arrestee
6    make a phone call on their cell phone.
7            Usually they would be inventoried, however.
8        Q.   So when someone is taken into an interview
9    room, you do an initial pat and take all their personal
10   items?
11       A.   Custodial search.
12       Q.   Yeah, and then you remove all of their personal
13   items?
14       A.   Yes.
15       Q.   And so the person wouldn't have their cell
16   phone after that point?
17       A.   Correct.  Correct.
18       Q.   Is there any designated area that an arrestee
19   could call a family member or an attorney from Homan
20   Square?
21       A.   No.
22       Q.   And have you ever seen anybody on the phone
23   with a family member, an attorney?
24       A.   I have seen people on their cell phones, but I

Page 72

1    don't know who they were talking to.
2        Q.   And where were these individuals on their cell
3    phones?
4        A.   The officer would have had to allow them to use
5    their cell phone before it was inventoried.
6        Q.   And when you inventory personal items from
7    Homan Square, what's that process entail?
8        A.   Prisoner personal property is going to be
9    divided between either money, prisoner money, prisoner
10   jewelry, or other, miscellaneous.
11           It is placed in an inventory bag, it is
12   heat-sealed, it is approved by a sergeant, there's an
13   e-track inventory filled out, and then it is placed in a
14   secure cabinet at Homan Square.
15       Q.   So all of that takes place at Homan Square?
16       A.   Yes.
17       Q.   And is that initiated when the person is
18   brought into the interview room?
19       A.   Yes.
20       Q.   So for somebody to get their cell phone out,
21   they would have to unseal the inventory bag?
22       A.   Unless it wasn't sealed already.
23       Q.   Okay.  And in terms of the arrest report at
24   district offices, are they completed and submitted in a

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 73

1   similar way that they were at Homan Square prior to
2   November 2015?
3       A.  Could you repeat that.  I'm sorry.
4       Q.  Sure.
5           In terms of completing and submitting an arrest
6   report, were there any distinctions between that
7   procedure at Homan Square before November of 2015 and
8   District Headquarters?
9       MR. CIFONELLI:  Objection, form.
10          If you can answer.
11      THE WITNESS:  No, an arrest report is filled out.
12  The only difference is you're usually in the district
13  where, you know, you're just going to walk over to the
14  district station supervisor and get it approved.
15  BY MS. MILLER:
16      Q.  And so are the arrest reports still submitted
17  electronically?
18      A.  Yes.
19      Q.  And have you ever had occasion to prepare an
20  arrest report at either the 11th District or
21  25th District and then delete the arrest report?
22      A.  No.
23      Q.  Is there a reason for that?
24      A.  In the district level and patrol, people that

Page 74

1   are arrested were generally charged.  You didn't -- you
2   didn't really have the option to make somebody a
3   cooperating individual while you were in there.
4       Q.  So you said that your normal procedure out at
5   Homan Square, like a default procedure, is to take them
6   to Homan Square rather than a district, is that right?
7       A.  Yes, usually.
8       Q.  And why is that?
9       A.  That's where our office is.  That's where we
10  work out of.
11          It's an easier place if people would like to
12  cooperate with the police to process.  You're not as --
13  you're not -- I don't know what I'm trying to say here.
14          You're less visible to other arrestees at Homan
15  Square than you would be at a district facility.
16      Q.  So people are brought there with the hopes that
17  they will provide information that can be used that they
18  wouldn't ordinarily volunteer in a more public setting?
19      MR. CIFONELLI:  Objection, form.
20      THE WITNESS:  I wouldn't say that's the main reason.
21  It's a contributing factor, I would say.
22      MS. MILLER:  Okay.  I'm going to mark two exhibits.
23          Could you mark this as Exhibit A or 1.
24

Page 75

1           (WHEREUPON, DEPOSITION EXHIBIT NO. 1 WAS
2           MARKED FOR IDENTIFICATION.)
3   BY MS. MILLER:
4       Q.  Could you take a look at Exhibit 1.
5       A.  Sure.
6       Q.  Do you recognize this document?
7       A.  It is a Chicago Police Department arrest
8   report.
9       Q.  And is this the arrest report that you would
10  use when working out of Homan Square prior to
11  November 2015?
12      A.  Yes, it appears so.
13      Q.  And so looking at this report, what is the
14  information that is completed at Homan Square?
15      A.  The first part where all his demographic
16  information, the second part with the incident date,
17  time, and address, the third section which has the
18  charges listed, the fourth section has the quantities of
19  narcotics, if there was warrant, a warrant would be
20  placed in there.
21          In the next section, the next section was
22  completed at Homan Square, the victim, and complainant.
23  If there was a vehicle, that would be completed at Homan
24  Square.

Page 76

1           This looks like a property section.  I believe
2   we did the e-track separate from the arrest.  We didn't
3   incorporate them, so that's not going to be in there, but
4   it could be also done at Homan Square, and narrative for
5   probable cause is done at Homan Square.
6       Q.  Can I just stop you right there.  You said
7   e-track?
8       A.  Yes.  Yes, inventories.
9       Q.  Oh, okay.
10      A.  Are we good?
11      Q.  Yes.  Go ahead.
12      A.  Desired court date, that's going to be done at
13  Homan Square.
14          Bond info would be done at the station.  That
15  would not be done at Homan Square.
16          The arresting officers, that would be done at
17  Homan Square.
18          The holding facility, that's going to be input
19  at Homan Square.
20          The transport details is going to be input at
21  Homan Square; and on Page 5, the involved arrestee
22  personnel, that's going to be done in Homan Square.
23      Q.  And this is the arrest report for Calvin Coffey
24  or Curtis Coffey?

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 77

1    A.  Yes.
2    Q.  Are you familiar with Curtis Coffey?
3    A.  Yes.
4    Q.  Were you involved in the arrest of Curtis
5    Coffey?
6    A.  I was.
7    Q.  And so for the holding facility, it says
8    District 11, male lockup; do you see that?
9    A.  What page?
10        Oh, I do, yes, on Page 1.
11    Q.  Is that something that's completed at Homan
12    Square?
13    A.  Yes.
14    Q.  And so is that the -- would you put in there
15    the district where the person is going for booking or the
16    district where the arrest was made?
17    A.  I believe that's where he's going to be booked.
18    Q.  Okay.  Prior to November 2015, was there any --
19    well, let me go back.
20        The holding facility, is that something you
21    manually put in or is it like a drop-down menu?
22    A.  It's a drop-down menu.
23    Q.  And before November 2015, was there an option
24    to indicate Homan Square Unit 189 in that field?

Page 78

1    A.  No.
2    Q.  And at the bottom, it says -- it's cut off, but
3    it says INT generated by Gonzalez, America?
4    A.  Yes.
5    Q.  I think you said he was one of your team
6    members?
7    A.  That's correct.
8    Q.  Do you know what his role was in the arrest of
9    Curtis Coffey?
10    A.  I believe he was a surveillance officer.
11    Q.  Is there a reason why you didn't prepare the
12    arrest report?
13    A.  No.
14    Q.  Do you know who the enforcement team was for
15    Curtis Coffey?
16    A.  I believe it was me, Officer Iglesias, Officer
17    Corona, and I believe we had other team members working
18    with us from another team.  I don't recall exactly who
19    that was at this time.
20    Q.  In the vehicle section, what's typically
21    included there, if anything?
22    A.  A vehicle.
23    Q.  Would it be a vehicle that was involved in that
24    arrest or that was impounded?

Page 79

1    A.  Yes.
2    Q.  Either of those?
3    A.  Yes.
4    Q.  When you arrested Mr. Coffey, wasn't he in a
5    vehicle?
6    A.  Yes.
7    Q.  Was that information that should have been
8    included there?
9    A.  Yes, probably.
10    Q.  Looking at the bottom, you'll see it says FCRL
11    013188A; do you see that?
12    A.  I do.
13    Q.  And it lists Gonzalez as the attesting officer,
14    you're listed as the first arresting officer, and
15    Iglesias is listed as second arresting officer?
16    A.  Yes.
17    Q.  Were you partnered with Iglesias on -- in
18    February of 2015, on the date of this occurrence?
19    A.  To the best of my recollection, yes.
20    Q.  And then below, it has approving supervisor?
21    A.  No.
22        Well, it does, yes.  There is a box for
23    approving supervisor.  There's nothing in it.
24    Q.  When is that typically completed?

Page 80

1    A.  After the district station supervisor would
2    approve the probable cause.
3        MS. MILLER: And then if you could, I'm going to
4    mark one more.  This is 2.
5        (WHEREUPON, DEPOSITION EXHIBIT NO. 2 WAS
6        MARKED FOR IDENTIFICATION.)
7    BY MS. MILLER:
8    Q.  Do you recognize this document?
9    A.  Yes.
10    Q.  What is this document?
11    A.  This is an approved arrest report.
12    Q.  I'm sorry.  I should have asked you before in
13    the second part where it says incident?
14    A.  Yes.
15    Q.  It says TRR completed; do you see that?
16    A.  Yes.
17    Q.  What's TRR?
18    A.  Tactical response report.
19    Q.  Okay.  And then looking at FCRL16080, the last
20    field for approving supervisor is now completed?
21    A.  Yes.
22    Q.  Do you know O'Donnell, WM, who that is?
23    A.  I believe it was the district station
24    supervisor that was working at the 11th District.

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 81

1    Q.   And so that's the time when Mr. Coffey's
2    charges were approved for probable cause?
3        A.   The initial probable cause, yes.  That's
4    correct.
5        Q.   And then turning the page.
6        A.   Yes.
7        Q.   The lockup keeper information where it has had
8    a visual check of arrestee?
9        A.   Yes.
10       Q.   And arrestee questionnaire?
11       A.   Okay.
12       Q.   Is that information ever checked at Homan
13   Square?
14       A.   No.
15       Q.   So is this a field that's created once the
16   person is brought for booking?
17       A.   I don't know.
18           I know as an arresting officer, I never had
19   access to that screen.  Who does, I'm not sure.
20       Q.   And then turning the page, it says movement
21   log?
22       A.   Yes.
23       Q.   It says movement log information not available.
24           What type of information would be included in

Page 82

1    that field?
2        A.   Well, now if the prisoner went from the
3    11th District to the hospital, there would be something
4    in the movant log, or if they were taken out and brought
5    to area headquarters or anywhere, if they were taken
6    anywhere from after 11, it would be put in the movement
7    log.
8        Q.   And you say now, what was -- when did that
9    change?
10       A.   I don't know.  It's just what I know now, and
11   really, I really only know that because I am now a
12   sergeant and have since been a district station
13   supervisor so now I can tell you what the movement log
14   is.
15           As a PO, especially at Homan Square, I might
16   not have known what that is for.
17       Q.   Do you know now if somebody is originally taken
18   to Homan Square for processing and then subsequently
19   taken to a district, would that information be contained
20   in that field?
21       A.   I don't know.
22       Q.   And you said that this holding facility is a
23   drop-down menu.  Is it still a drop-down menu on the
24   first page of this report?

Page 83

1        A.   To the best of my knowledge, it is.
2        Q.   And is there now an option for Homan Square?
3        A.   I believe there is, yes.
4        Q.   Do you know how it's listed?
5        A.   Homan Square-something, it might be police
6    facility.  I'm not really sure.
7        Q.   And in looking back at Exhibit 1 towards the
8    back of that report, it's marked FCRL 01089A?
9        A.   Okay.
10       Q.   Towards the bottom, it says no interviews
11   logged?
12       A.   That's correct.
13       Q.   Is this a field that you could enter
14   information into from Homan Square when you were there?
15       A.   No.
16       Q.   And what about the visiter log below that?
17       A.   No.
18       Q.   So you couldn't enter any information?
19       A.   I couldn't as a police officer, I could not,
20   no.
21       Q.   Could anybody do it from Homan Square?
22       A.   I don't know.
23       Q.   Do you know now whether you're able to include
24   that section from Homan Square?

Page 84

1        A.   I have no idea.
2        Q.   And then flipping to the second one, the final
3    report, when you were at Homan Square, would that same
4    section include any interviews which were placed at Homan
5    Square?
6        A.   Could you repeat the question.
7        Q.   Sure.
8            That same no interviews log which is on FCRL
9    01681 --
10       A.   Okay.
11       Q.   -- once the arrest report has been submitted,
12   could someone enter information there about interviews
13   that were conducted at Homan Square before being brought
14   to the district?
15       A.   As a police officer, I could not.  At Homan
16   Square, I could not.
17       Q.   And what about the visitor log?
18       A.   No, I could not.
19       Q.   And for somebody that is processed through a
20   district facility versus Homan Square, what type of
21   information is usually contained in the interview log?
22       A.   As a police officer, you do not have access to
23   that as a police officer, filling out an arrest report.
24           To the best of my knowledge, there was no

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 85

1    access then and there is no access now to the interview
2    and visitor log information attached to an arrest report.
3        Q.  Does anybody have the ability to enter
4    information into those fields?
5        A.  A district station supervisor or watch
6    operations lieutenant.
7        Q.  And what type of information would be included
8    there if a district station supervisor wanted to put
9    information in there?
10       A.  If there was an attorney that came to interview
11   his client or detectives came to interview an individual,
12   they would put that information in there.
13       Q.  And that was the case when you were working out
14   of Homan Square that station supervisors --
15       A.  When I was Homan Square, there was no station
16   supervisor except for the last month, and I never ran
17   into the issue.
18       Q.  I meant at the district, when you would take
19   someone for booking at District 11?
20       A.  Sure.
21       Q.  That station district supervisor could input
22   that information, is that correct?
23       A.  I have no idea, because I was never a district
24   station supervisor at 11.

Page 86

1        MS. MILLER:  Okay.  I don't know, it's 12:30 right
2    now.  Did you want to take a break or just go through?
3        MS. COLEMAN:  Are we going the whole day or --
4        MS. MILLER:  I don't think so.
5        MR. CIFONELLI:  Well, you haven't heard them yet
6    though.
7        MS. MILLER:  I personally am not.
8        MR. CIFONELLI:  Well, I mean, is it a logical
9    stopping  point?
10       MS. MILLER:  I think, yeah, probably get more into
11   the specifics of the individual situation.
12       MR. CIFONELLI:  Okay.  Yeah.  Why don't we take 40,
13   minutes, 45 minutes.
14       MS. MILLER:  That okay with you guys?
15       MR. TAYLOR:  Sure.
16           (WHEREUPON, A LUNCH RECESS WAS TAKEN
17           FROM 12:40 P.M. TO 1:35 P.M. )
18
19
20
21
22
23
24

Page 87

1        MR. CIFONELLI:  We are ready.
2    BY MS. MILLER:
3        Q.  Just a few follow-up questions about Homan
4    Square generally.
5           Is there a public phone number for Homan Square
6    that you know of?
7        A.  I don't know.  There's a number for the 24-hour
8    desk.  I don't know.  I don't know if it's accessible to
9    the public.  I'm not really sure.
10          I don't know if you were to type in Homan
11   Square police facility in the phone book, on the
12   computer -- I guess, people don't have phone books any
13   more, but I don't know.
14       Q.  Have you ever received a call from someone
15   through the 24-hour desk?
16       A.  Yes.
17       Q.  Related to an arrestee?
18       A.  No.
19       Q.  So you've never received like any phone calls
20   from attorneys looking for people at Homan Square through
21   that 24-hour desk?
22       A.  No.
23       Q.  And never received any calls from like parents
24   or family members regarding an arrestee that was located

Page 88

1    at Homan Square?
2        A.  Not that I recall.
3        Q.  And you said that if somebody asked for an
4    attorney while at Homan Square, you would immediately
5    cease questioning?
6        A.  Right.
7        Q.  Would you mark down anywhere in your arrest
8    report that the person had asked for a lawyer?
9        A.  If I was interrogating about his arrest and had
10   given Miranda, if he invokes his Miranda rights, asked to
11   see a lawyer, I would document that in the case report or
12   arrest report.
13       Q.  Where in the arrest report would you document
14   that?
15       A.  A narrative.
16       Q.  And how would you indicate that the person had
17   asked for an attorney?  Is there a specific language you
18   would use?
19       A.  There's not specific language, no.
20       Q.  And when someone is taken to Homan Square, when
21   are they advised of their Miranda rights?
22       A.  They are interrogated about their case they are
23   in custody for, custodial interrogation.
24       Q.  So before you conduct any interview, they are

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 89

1    provided with or they are given their Miranda warning?
2       **A. No, before they are interrogated about the case**
3    **which they are in custody for, they would be given their**
4    **Miranda warning.**
5       Q. Okay. So if somebody was being asked questions
6    unrelated to the charges that they have been arrested
7    for, would you provide any Miranda warning?
8       MR. CIFONELLI: I object.
9          I was going to object to foundation for
10   everyone.
11         You can answer.
12      THE WITNESS: I generally do not.
13   BY MS. MILLER:
14      Q. Okay. And if someone is given a Miranda
15   warning, is that listed anywhere in the arrest report?
16      **A. Yes.**
17      Q. Where would it be listed?
18      **A. In the narrative.**
19      Q. And when you were working out of Homan Square,
20   was there any specific direction as to how to note that
21   in your arrest reports?
22      **A. No.**
23      Q. So it's your personal procedure to include it
24   in that narrative?

Page 90

1       **A. I do, yes.**
2       Q. And you said that juveniles are also taken to
3    Homan Square, is that correct?
4       **A. Yes.**
5       Q. Are there any special procedures for when a
6    juvenile is taken to Homan Square?
7       **A. Special procedures?**
8       MR. CIFONELLI: Objection, asked and answered.
9       MS. MILLER: And if you did, I apologize. I just
10   didn't remember.
11   BY MS. MILLER:
12      Q. But are there any procedures that are followed
13   that are specific to a juvenile taken to Homan Square as
14   opposed to somebody who is of an adult age?
15      **A. Well, it's not specific to Homan Square, but**
16   **any time a juvenile is taken into custody whether at**
17   **Homan Square or a district facility, a parent has to be**
18   **notified.**
19      Q. And was that the procedure at Homan Square when
20   you were working out of Homan Square?
21      **A. Yes.**
22      Q. The entire time?
23      **A. Yes.**
24      Q. And when you would notify the parents that the

Page 91

1    juvenile was at Homan Square or when you would notify the
2    parents of a juvenile, what information would you provide
3    them?
4       **A. They were in custody for whatever they were in**
5    **custody for, I would tell them where they were, and I**
6    **would tell them I would call back and let them know where**
7    **they could be picked up, or if they were going to go to**
8    **the Cook County Juvenile Justice Center.**
9       Q. And when you would tell them where they were,
10   would you tell them they were at Homan Square?
11      **A. Yes.**
12      Q. And how would you identify it?
13      **A. Homan Square, Homan and Fillmore.**
14      Q. Did you ever notify a parent or guardian that
15   somebody was being -- that a juvenile was being held at
16   Homan Square?
17      **A. Yes.**
18      Q. How many times?
19      **A. I don't know. Every time I had a juvenile in**
20   **custody.**
21      Q. And would you call them from your cell phone or
22   from -- where would you call them from?
23      **A. No, from the office phone, Homan Square.**
24      Q. In your personal office or at the 24-hour desk?

Page 92

1       **A. The team office.**
2       Q. Okay. Did any of those parents ever ask to be
3    permitted to see the juvenile or come to Homan Square?
4       **A. No.**
5       Q. If a witness asked, if a witness of an arrestee
6    taken to Homan Square asked where the person was being
7    taken, what would you tell them?
8       MR. CIFONELLI: Just object to form, witness.
9       THE WITNESS: Could you repeat the question.
10   BY MS. MILLER:
11      Q. So if you were to make an arrest of someone,
12   and somebody on scene asked where to find the person
13   being arrested, where would you tell them to find them?
14      **A. This is a hypothetical or this is -- what kind**
15   **of question is this?**
16      Q. Just generally, have you ever been asked by
17   somebody on scene for the location of the arrestee so
18   they could find the person?
19      **A. I don't recall.**
20      Q. And in cases of juveniles, did you tell the
21   parents that they could come to Homan to see their child
22   or were they directed to go to the district?
23      **A. I would tell them your son or daughter is at**
24   **Homan and Fillmore for delivery, or possession, or**

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 93

1    whatever the case may be, I've got to call the juvenile
2    detectives. They are at Homan Fillmore. Your child is
3    at Homan and Fillmore right now, I will give you a call
4    back and let you know where you can pick them up. It's
5    either going to be here or it's going to be at JJC.
6        Q. Did you ever have any juveniles that were
7    brought to Homan Square and then became cooperating
8    individuals?
9        A. No.
10       Q. Did any parents ever come to pick up a juvenile
11   from Homan Square?
12       A. No.
13       Q. Are there any youth officers at Homan Square?
14       A. No.
15       Q. Were there when you were there?
16       A. Stationed there?
17       Q. Yes.
18       A. No.
19       Q. Have you ever -- were youth officers permitted
20   to come into Homan Square?
21       MR. CIFONELLI: Just object to foundation. We're
22   talking about what he observed?
23       MS. MILLER: Yes.
24       THE WITNESS: If they were police officers, they can

---

Page 94

1    come into Homan Square.
2        The juvenile still has to be fingerprinted and
3    photographed, so that's where they would go next, and
4    that's probably where the youth intake officer would take
5    over.
6    BY MS. MILLER:
7        Q. So before a youth officer can see a juvenile
8    taken to Homan Square, they have to get fingerprinted and
9    photographed?
10       A. No.
11       Q. Maybe I misunderstood you.
12       A. If a youth officer wants to come and see the
13   juvenile, they are more than welcome to do so, but
14   usually they would just wait until he's fingerprinted and
15   photographed wherever that is going to be at and they
16   would go there.
17       Q. So when you arrested a juvenile, do you contact
18   the youth officers or who is responsible for contacting
19   the youth officers?
20       A. Somebody on the team will contact a youth
21   officer.
22       Q. And is that done before fingerprinting and
23   photograph or after?
24       A. Before.

---

Page 95

1        Q. Okay. And what's the information that's
2    provided to the youth officer?
3        A. The name of the juvenile and what they are
4    being charged with.
5        Q. And what what?
6        A. What they're being charged with and then
7    parent's name, phone number, successful contact.
8        Q. And who is permitted to process arrestees out
9    of Homan Square?
10       A. Anybody assigned or detailed to Homan Square.
11       Q. Is anybody outside of those assigned to Homan
12   Square allowed to take people to Homan Square or process
13   people out of Homan Square?
14       A. I don't know.
15       Q. Do you have to be detailed to Homan Square in
16   order to begin an arrest report?
17       MR. CIFONELLI: You mean out of Homan Square?
18       MS. MILLER: Out of Homan Square.
19       I'm sorry.
20       THE WITNESS: I'm sorry?
21   BY MS. MILLER:
22       Q. Do you have to be detailed to Homan Square in
23   order to complete an arrest report at Homan Square?
24       A. I mean, there's no — I believe the only reason

---

Page 96

1    you would bring somebody to Homan Square is if you worked
2    out of Homan Square. That's the only reason you would
3    process there, otherwise you would go to your district
4    station.
5        Q. Okay. Have you ever testified at a criminal
6    trial?
7        A. I have.
8        Q. How many times?
9        A. I don't know, numerous.
10       I would say trial or probable cause hearing,
11   Grand Jury, altogether?
12       Q. Any of those.
13       A. Hundreds.
14       Q. And what about at an actual criminal trial?
15       A. If I had to guess, I'm not certain, maybe a
16   hundred.
17       Q. How many times have you testified at a probable
18   cause hearing related to an arrest out of Homan Square?
19       A. I don't know, possibly -- I don't know. If I
20   had to guess, I would say ten times.
21       Q. And what about a trial related to an arrest
22   from Homan Square?
23       A. I don't know, 15 to 20 perhaps.
24       Q. So generally officers working out of Homan

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 97

1 Square are permitted to testify at probable cause
2 hearings?
3    **A. Are permitted to?**
4    Q. Is there anything that would prevent them from
5 testifying at a probable cause hearing?
6    **A. No.**
7    Q. Are undercover officers working out of Homan
8 Square permitted to testify at probable cause hearings?
9    **A. Are they permitted to?**
10    Q. Yes.
11    **A. Yes.**
12    Q. Are you aware of any undercover officers that
13 have testified at a probable cause hearing?
14    **A. No.**
15    Q. And you were working out of Homan Square on
16 February 6th, 2015?
17    **A. Yes, ma'am.**
18    Q. And you were involved in the arrest of Curtis
19 Coffey and Juanita Berry, is that correct?
20    **A. Yes.**
21    Q. And what team were you working on at this time?
22    **A. Squad D5.**
23    Q. And who were you working with on February 6th,
24 2015?

Page 98

1    **A. I believe I was working with Officer Carlos**
2 **Iglesias and Officer Gus Corona.**
3    Q. And Sergeant Sanchez was your sergeant that
4 day?
5    **A. Yes. There was a team working.**
6    **Do you want the team?**
7    Q. Yes.
8    **A. Okay. Officers Grubisic, Herlehy, Watson,**
9 **Gonzalez, Iglesias, Corona, and I believe there were**
10 **members of other teams working with us that day whose**
11 **names I don't recall without looking at the report.**
12    Q. Sure.
13    In February of 2015, did you have a regular
14 partner or did it change from day to day?
15    **A. It changed from day to day.**
16    Q. Who was your partner on February 6th, 2015?
17    **A. I believe it was Officer Iglesias and I believe**
18 **Officer Corona.**
19    Q. And was there a specific plan in place for that
20 date to attempt to make a purchase from Curtis Coffey
21 that day?
22    **A. Yes.**
23    Q. Were you given assignments each day that you're
24 working out of Homan Square?

Page 99

1    **A. Sometimes.**
2    Q. On February 6th, 2015, was there a specific
3 assignment?
4    **A. I was working enforcement.**
5    Q. And that was with Iglesias and Corona?
6    **A. Iglesias for sure.**
7    **I believe Corona -- Corona I believe was**
8 **enforcement. I can't remember if he was in our car or**
9 **another enforcement car.**
10    Q. But you and Iglesias were in the same car?
11    **A. Yes.**
12    Q. Had you been involved in any prior surveillance
13 or investigation into Curtis Coffey before February 6th,
14 2015?
15    **A. I don't remember.**
16    Q. Okay. So you, and Iglesias, and Corona were
17 working enforcement. Who was on surveillance?
18    **A. Officers Herlehy, Watson, Grubisic -- or I'm**
19 **sorry -- not Grubisic, he was the purchasing officer.**
20    **Herlehy, Watson, Gonzalez, Perez, and I believe**
21 **there were other surveillance officers from another team.**
22    Q. Another team working out of Homan Square?
23    **A. They were working with us that evening.**
24    Q. Were they also in narcotics?

Page 100

1    **A. Yes.**
2    Q. And do you remember what team designation they
3 had?
4    **A. No.**
5    Q. Do you remember who the sergeant was in charge
6 of that team?
7    **A. Officer Sanchez.**
8    Q. So he was in charge of both teams?
9    **A. I don't believe it was a full team. I think it**
10 **was -- it might have actually been officers working for a**
11 **violence reduction initiative which it might have been**
12 **sometimes happens on weekend nights.**
13    **I don't know what day of the week this was, but**
14 **if it was, it might have been officers from different**
15 **teams.**
16    Q. Okay. How frequently would you work with
17 officers from different teams?
18    **A. It depended if we were working VRI, then once a**
19 **week. Otherwise, if another sergeant was off, and we**
20 **were watching their team, then they would.**
21    Q. And what is VRI?
22    **A. Violence reduction initiative.**
23    Q. And what hours were you working on
24 February 6th, 2015?

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 101

1    A. My duty hours were 9:30 to 5:30.
2    Q. When was the first time you heard the name
3  Curtis Coffey?
4    A. I don't recall.
5    Q. Had you heard of Curtis Coffey before
6  February 6th, 2015?
7    A. I don't know.
8    Q. Were you aware of any ongoing investigation of
9  Curtis Coffey prior to February 6th, 2015?
10    A. I don't. Not that I recall.
11    Q. Did you have any other assignments other than
12  the arrest of Curtis Coffey on February 6th, 2015?
13    A. I don't know.
14    Q. Did you make any other arrests on February 6th,
15  2015?
16    A. I don't know.
17    Q. How were you made aware of your assignment to
18  the arrest of Curtis Coffey?
19    A. We formulated a plan to make a covert narcotics
20  purchase from Curtis Coffey and it was my understanding
21  that it was an ongoing investigation, and this time it
22  would result in an arrest.
23    Q. You said that you formulated a plan?
24    A. The team did, under the supervision of Sergeant

---

Page 102

1  Sanchez.
2    Q. So was it a direction from Sergeant Sanchez?
3    A. Yes.
4    Q. And how were you informed of that direction?
5    A. Verbally.
6    Q. Where?
7    A. I don't recall.
8    Q. Was it at Homan Square?
9    A. It could have been.
10    Q. Typically where are you given assignments for
11  days?
12    A. It could be in our office or it could be in a
13  parking lot at Homan Square.
14    Q. But so you said that you learned that it was an
15  ongoing investigation. Was that the first time you were
16  made aware of the ongoing investigation?
17    A. That I remember.
18    Q. And when were you -- what time of day was it
19  when you were made aware of the assignment to attempt to
20  arrest Curtis Coffey?
21    A. I don't recall.
22    Q. Was it in the morning?
23    A. I don't recall.
24    Q. And so you said you guys formulated a plan to

---

Page 103

1  arrest him. What was the overall plan?
2    A. The UCO, the undercover officer, in this case,
3  Officer Grubisic, would make contact with Coffey. They
4  would make a plan to buy a predetermined amount of
5  narcotics in exchange for a predetermined amount of
6  United States currency, and at the conclusion of that
7  exchange, he would attempt to place Coffey in custody.
8    Q. Was this the first day that you had worked with
9  Officer Iglesias?
10    A. No.
11    Q. How many times prior to this had you worked
12  with Officer Iglesias?
13    A. Numerous. Ever since I got on the team, I had
14  worked -- we have worked on the same team together.
15    Q. How many times were you partnered with Officer
16  Iglesias?
17    A. I don't know, numerous.
18    Q. And what about Officer Corona?
19    A. I would say less with Officer Corona but also
20  numerous.
21    Q. So when you formulated this plan to make a buy
22  from Coffey, did you have a general area where you knew
23  he would be located?
24    A. No.

---

Page 104

1    Q. And how did you determine where he was?
2    A. To the best of my recollection, once the UCO
3  made contact with Coffey, he informed team members over
4  closed circuit radio where the purchase was taking place.
5    Q. And so where were you during the purchase?
6    A. I was in the enforcement car nearby.
7    Q. Do you remember where the buy took place?
8    A. I believe it took place at 5th and Kenneth.
9    Q. And where was the surveillance team located?
10    A. I don't know.
11    Q. How far away were you from the buy?
12    A. I don't specifically recall.
13    My customary practice is to get close enough
14  where I can get there quickly but far enough away that
15  you don't spook anybody.
16    Q. And who was driving that night?
17    A. That I don't remember.
18    Q. Do you remember if you were driving?
19    A. No.
20    Q. And typically is surveillance located in the
21  same area as enforcement or a different area?
22    A. Typically surveillance is located near where
23  the buy would take place.
24    Q. And was Sergeant Sanchez with you when you went

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 105

1    out to make the arrest?
2        A. He was not in the car with me, no.
3        Q. Was he there for the -- was he in the general
4    vicinity of the buy?
5        A. To the best of my knowledge.
6        Q. Yes or no?
7        A. Yes, to the best of my knowledge, he was.
8        Q. Does Sergeant Sanchez usually participate in
9    assignments like arrest assignments, like attend with the
10   officers as opposed to wait at Homan Square?
11       A. During a narcotics purchase?
12       Q. Yeah.
13       A. No, he would be on the street.
14       Q. Near where the buy was supposed to take place
15   or --
16       A. Yes.
17       Q. So what time then did you leave or where did
18   you leave from to participate in this arrest?
19           Did you leave from Homan Square?
20       A. I believe so.
21       Q. Do you know about what time it was that you
22   left Homan Square?
23       A. No.
24       Q. Was there any direction from Sergeant Sanchez

---

Page 106

1    as to any information that he was looking for from
2    Coffey?
3        A. No.
4        Q. And was there any -- so your understanding was
5    that Coffey and anybody else arrested with him would be
6    taken back to Homan Square because that's where the
7    default place would be?
8        A. Yes.
9        Q. So can you explain to me what your involvement
10   was with the arrest.
11       A. Sure.
12           I was monitoring a closed circuit radio. I was
13   informed by surveillance officers that a positive
14   narcotics purchase had taken place between the UCO and
15   arrestee. I was then given a location and description of
16   the arrestee's vehicle.
17           I made my way there. I don't recall if I
18   detained the arrestee or if the other enforcement car
19   did, but he was detained. He was positively identified
20   by the undercover officer as the person who sold him
21   narcotics. He was placed into custody and transported to
22   Homan Square.
23       Q. Who were the surveillance officers that
24   reported that there was a positive buy?

---

Page 107

1        A. I don't recall specifically who it was.
2            I know like I mentioned the ones that I
3    remember that were there.
4        Q. And how many enforcement cars were there when
5    you detained Mr. Coffey?
6        A. I believe there was two.
7        Q. And was Mr. Coffey in a car when you detained
8    him?
9        A. Yes, I believe so.
10       Q. Were you the first officer to approach Coffey?
11       A. I don't remember.
12       Q. Do you remember where it was that you detained
13   him initially?
14       A. I believe it was a parking lot on the south
15   side of 5th Avenue west of Kostner.
16       Q. So you don't recall when you pulled up at this
17   parking lot whether or not there were any other officers
18   there at the time?
19       A. I mean, during his detainment, there was more
20   officers there. I don't remember whether we were the
21   first ones there, or the other officers were there first,
22   or we pulled up at the same time on that. I really don't
23   recall.
24       Q. And did you speak to Mr. Coffey while he was in

---

Page 108

1    his car?
2        A. I don't remember.
3        Q. Do you remember who placed Mr. Coffey into
4    arrest?
5        A. No.
6        Q. Do you remember removing Mr. Coffey from his
7    car?
8        A. He was removed from his car. I don't remember
9    if I removed him or if somebody else did.
10           Officer Iglesias possibly.
11       Q. So it would have been either you, or Officer
12   Iglesias, or Officer Corona?
13       A. Or the other two enforcement officers that were
14   there.
15       Q. And those are from the team that you don't
16   remember their names?
17       A. Yeah.
18           I think Officer Meloscia and possibly Officer
19   Sellers.
20       Q. And after Mr. Coffey is removed from his car,
21   what happened?
22       A. There was a custodial search performed, after
23   he was positively identified by the UCO as the person who
24   delivered heroin.

---