ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 109

1    He was placed in custody, a custodial search
2    performed, and then he was transported to Homan Square.
3    Q. Were you there when the undercover officer
4    identified him as the person?
5    A. Yes.
6    Q. Did he inform you that was the appropriate
7    person or somebody else?
8    A. It was over closed circuit radio.
9    Q. Okay. So then the undercover officer stayed in
10   his vehicle to identify Mr. Coffey?
11   A. I assume so. I don't know.
12   Since he was on the south side of the street,
13   the UCO will commonly drive past to identify somebody, so
14   he, Mr. Coffey, would have been facing the street, so he
15   would have been looking north, my back would have been
16   facing north, I would have been facing Mr. Coffey, so I
17   didn't see the undercover drove by, but I heard audibly
18   that he had identified him.
19   Q. Do you remember what kind of car Mr. Coffey was
20   driving that day?
21   A. I don't recall.
22   Q. Was it a two-door or a four-door?
23   A. I don't recall.
24   Q. Do you recall putting Mr. Coffey into

---

Page 110

1    handcuffs?
2    A. I know that he was handcuffed. I don't
3    remember if I am the one that handcuffed him or if one of
4    the other officers did.
5    Q. And was he placed into a car after?
6    A. Yes, I believe I transported Mr. Coffey to
7    Homan Square in the squad car I was in.
8    Q. And who was in the car with you, if anyone,
9    when you transported him to Homan Square?
10   A. I believe Officer Iglesias.
11   Q. And was there a passenger in Mr. Coffey's car
12   when he was arrested?
13   A. Yes.
14   Q. Was that Juanita Berry?
15   A. Yes.
16   Q. Were you responsible for placing Miss Berry
17   under arrest?
18   A. She was seized and transported to Homan Square.
19   I was there. I don't remember if I handcuffed
20   her or somebody else did, but I know she was ultimately
21   taken from the scene to Homan Square, and I don't believe
22   in my car.
23   Q. And was there any conversation with Juanita
24   Berry before she was placed in the car?

---

Page 111

1    A. Not that I recall.
2    Q. How long was it between when you pulled over
3    Mr. Coffey and when he was placed in your car?
4    A. I don't remember.
5    Q. And was Miss Berry immediately taken out of the
6    car?
7    A. I don't remember.
8    Q. Do you know how long it was between when she
9    was taken out of the car and when she was placed in a car
10   to be taken to Homan Square?
11   A. No.
12   Q. Did you do any custodial searches of Miss
13   Berry?
14   A. No.
15   Q. Did you find anything on Mr. Coffey?
16   A. There was eventually 1505 funds were recovered
17   from Mr. Coffey and I believe large sums of money were
18   recovered from Mr. Coffey.
19   Q. And was that recovered at the scene or at Homan
20   Square?
21   A. I believe the 1505 funds were recovered at
22   Homan Square. The other money I believe was recovered on
23   scene.
24   Q. And why was it that the 1505 funds were not

---

Page 112

1    recovered until Homan Square?
2    A. I don't know. I did not recover them.
3    Q. Do you know who recovered them?
4    A. No.
5    Q. And who recovered the non-1505 funds?
6    A. I believe it was Officer Iglesias.
7    Q. Did you see Officer Iglesias removing the
8    non-1505 funds?
9    A. Not that I recall.
10   Q. Do you know where they were located on
11   Mr. Coffey?
12   A. No.
13   Q. And so did you say who it was that was
14   responsible for taking Berry to Homan Square?
15   A. I believe it was the other enforcement car.
16   Q. The team, that separate team?
17   A. The other narcotics officer working with our
18   team.
19   Q. Was Mr. Corona or Officer Corona in your car
20   with Mr. Coffey?
21   A. I don't remember.
22   Q. Would an arrestee typically ride in the back
23   with another officer to go to Homan?
24   A. Sometimes.

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 113

1   Q.   Under what circumstances?
2   A.   If there was three people in the car and we had
3   one arrestee.
4   Q.   And so did you then immediately take Mr. Coffey
5   to Homan Square?
6   A.   Yes.
7   Q.   And what happened when you got to Homan Square?
8   A.   We entered Homan Square, he was put into an
9   interview room, and he was logged in.
10  Q.   Do you recall if you were driving the car back
11  to Homan Square?
12  A.   I don't remember.
13  Q.   And you pulled in through that same garage Door
14  2, and then in through the gated area, and then the back
15  stairwell, is that right?
16  A.   If we didn't pull in the gated area, then the
17  garage door, we stopped outside it and removed Coffey
18  from the car, and somebody would have walked him in, and
19  then somebody would have parked the car.
20       There is no rhyme nor reason.  You have to move
21  the car anyway.  You can't leave it in there, so
22  sometimes we would pull in, take him up, come back down,
23  move the car.
24       Sometimes you would drop off the arrestee, and

---

Page 114

1   the other officer would get out and bring him up, and you
2   would park the car.
3   Q.   So is there a door outside of the garage doors
4   like a pedestrian doorway that you could access the
5   garage area from?
6   A.   It would still come through Door 2, the garage
7   door.
8   Q.   Okay.
9   A.   Yeah, either way.
10  Q.   And do you remember who escorted Mr. Coffey up
11  to the interview room?
12  A.   No.
13  Q.   Do you remember escorting Mr. Coffey up to the
14  interview room?
15  A.   I eventually was in an interview room with
16  Mr. Coffey.  I don't remember if I escorted him up there
17  or not.
18  Q.   Did you place Mr. Coffey in an interview room?
19  A.   I don't remember.
20  Q.   Do you remember anyone involved in placing him
21  in an interview room?
22  A.   Somebody would have.  Either it was somebody in
23  my car, so it was me, Iglesias, or Corona would have
24  brought him into the interview room.

---

Page 115

1   Q.   And who signed Mr. Coffey into the log-in room?
2   A.   I don't remember.  I would have to see that.
3   Q.   And so when is the first time you remember
4   seeing Mr. Coffey in an interview room?
5   A.   Shortly after he was brought to Homan Square.
6   Q.   Do you know about what time that was?
7   A.   I would estimate maybe 20 minutes after his
8   arrest.
9   Q.   And do you remember approximately what time it
10  was that you arrested him?
11  A.   Arrest report says 5:01.
12  Q.   So about 5:20 is when you first remember seeing
13  Mr. Coffey in an interview room?
14  A.   Maybe a little after that, yes.
15  Q.   Did you conduct any search of Mr. Coffey once
16  placed into interview room?
17  A.   I don't believe I did.
18  Q.   Do you know who was responsible for doing a
19  custodial search at Homan Square?
20  A.   I don't know.  I don't recall who conducted it
21  at Homan Square.
22  Q.   So you pulled in the Garage Door 2.  You don't
23  remember if you first went to an interview room or a
24  sign-in desk?

---

Page 116

1   A.   Right.
2   Q.   Would you have gone to your office at that
3   time?
4   A.   I might have parked the car.
5   Q.   Where would you park the car?
6   A.   In the back lot at Homan Square.
7   Q.   Outside of Garage Door 2?
8   A.   No, past Garage Door 2 in the parking lot.
9   Q.   And then would you enter through Garage Door 2
10  to get up to the interview rooms?
11  A.   No, I wouldn't.  I would go to the back
12  entrance and then proceed to the interview rooms.
13  Q.   And where is the back entrance located?
14  A.   It would be off of Spaulding.
15  Q.   Were you responsible for removing any personal
16  items from Mr. Coffey once at Homan Square?
17  A.   I don't remember.
18  Q.   So the first time you remember seeing
19  Mr. Coffey in an interview room, do you remember which
20  interview room it was?
21  A.   I believe it was, if you're walking up the
22  stairwell, it was one of the interview rooms, you would
23  pass one hallway where there would be interview rooms on
24  your right and your left -- well, as you're walking down,

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 117

1 on your right, there would be a hallway. Down that
2 hallway, there would be rooms on your right and your
3 left.
4     If you keep walking past that hallway, there
5 would be another hallway where there are only interview
6 rooms on the left, and I believe he was in one of those
7 interview rooms.
8     I don't remember. I believe they had number
9 and letter designations. I don't recall what they were.
10     Q. And are there three or four interview rooms per
11 hallway or more?
12     A. In the first hallway I described as you're
13 walking from the stairs, I believe there is down that
14 first hallway, there's three on the right and three on
15 the left of that hallway.
16     If you were to go past the second hallway, I
17 believe there's only three on the left. There's no
18 interview rooms on the right.
19     Q. Okay. Do you remember if he was in the first,
20 middle, or last?
21     A. No.
22     Q. Do you remember if anyone was in the interview
23 room the first time you remember seeing him in an
24 interview room?

---

Page 118

1     A. Yeah, I believe Officer Iglesias -- what I
2 remember, I remember seeing him in an interview room,
3 Officer Iglesias was present, and I believe at some point
4 I believe Officer Meloscia was present.
5     Q. Meloscia, you said?
6     A. Yeah.
7     Q. And was that somebody that was working on the
8 team with you that day?
9     A. Yes, he was, but assigned to another team.
10     Q. Okay. And where was Mr. Coffey located? Where
11 was he located in the interview room?
12     A. On a bench.
13     Q. And that's the bench along the back wall?
14     A. Yes.
15     Q. Was he handcuffed?
16     A. One hand was handcuffed, I believe.
17     Q. And do you remember removing the handcuffs to
18 place him on the wall in the interview room?
19     A. I don't personally remember doing it, but it's
20 possible that I did it.
21     Q. And where was Officer Iglesias when your first
22 recollection of the interview room?
23     A. He was on the other side of the interview room,
24 opposite the bench.

---

Page 119

1     Q. On the other side of the table or closer to the
2 bench?
3     A. I don't recall if there's a table in that
4 interview room. I'm not sure.
5     Q. Okay. And was Mr. Coffey standing or sitting?
6     A. I believe sitting.
7     Q. And what about Officer Iglesias, was he
8 standing or sitting?
9     A. Standing.
10     Q. Were there any chairs in the room other than
11 the bench?
12     A. I don't remember.
13     Q. And the other Officer Meloscia, where was he?
14     A. He was standing also on the other side of the
15 interview room.
16     Q. And you said that that was a little after 5:20?
17
18     A. I believe so.
19     Q. Did -- how long were you in the interview room
20 with Mr. Coffey?
21     A. I don't know, five, ten minutes.
22     Q. Did you talk to him at all while you were in
23 the interview room?
24     A. Just to get his demographic information.

---

Page 120

1     Q. So what questions did you ask him?
2     A. What's your name, what's your address, how tall
3 are you, what's your weight, hair color, eye color,
4 tattoos, gang affiliation.
5     Q. And did you record this information anywhere?
6     A. No.
7     Q. And what did you do with the information that
8 you collected from him?
9     A. I told it to other officers who put it in an
10 arrest report or their narcotics sups.
11     Q. Did you prepare any arrest reports related to
12 Mr. Coffey?
13     A. No.
14     Q. Do you know who was responsible for creating
15 the arrest report for Mr. Coffey?
16     A. The attesting officer is Americo Gonzalez.
17     Q. And did you say he was working surveillance
18 that day?
19     A. Yes.
20     Q. Did you see Mr. Americo or Officer Gonzalez
21 prepare the arrest report?
22     A. Yes.
23     Q. Where was he preparing the arrest report?
24     A. In the office.

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 121

1    Q.   In the team office?

2    A.   Right.

3    Q.   And where is the team office located in

4    relation to the interview room where Mr. Coffey was being

5    held?

6    A.   I believe it is -- at that time, I believe we

7    were, if you are to go down the hallway, that would be, I

8    mean, that's like a maze in there.  It was like, I would

9    guess, two -- 200, 250 feet away.

10   Q.   Okay.

11   A.   To the west.

12   Q.   And when was it that you saw Mr. or Officer

13   Gonzalez preparing the arrest report?  Do you know about

14   what time it was?

15   A.   I don't remember.

16   Q.   Was it right after you left Mr. Coffey's

17   interview room?

18   A.   I don't know.

19   Q.   Did you provide Officer Gonzalez with the

20   information you collected?

21   A.   I did.

22   Q.   Do you remember when you provided that

23   information to Officer Gonzalez?

24   A.   Soon after I left the interview room with

Page 122

1    Mr. Coffey.

2    Q.   And would that have been the first time you saw

3    Gonzalez preparing the arrest report?

4    A.   I don't remember.

5    Q.   But Mr. Gonzalez was preparing the arrest

6    report after you left Mr. Coffey's room, so about ten

7    minutes after you first remember seeing him in an

8    interview room?

9         MR. CIFONELLI: Object to form.

10        THE WITNESS: He eventually completed an arrest

11   report but I don't know when he started.

12   BY MS. MILLER:

13   Q.   Okay.  But you provided the information you

14   collected from Coffey almost immediately after you left

15   the interview room?

16   A.   Yes.

17   Q.   And then what did you do?

18   A.   I was in the office going over other reports.

19   Other than that, I don't really recall.

20   Q.   When you left the interview room, was anybody

21   still in the interview room?

22   A.   I don't believe so.

23        MR. CIFONELLI: I'm just going to object to form.

24

Page 123

1    BY MS. MILLER:

2    Q.   When you left Coffey's interview room, did you

3    leave alone or with other officers?

4    A.   I don't know.

5    Q.   Were there -- did you see any other officers

6    other than Officer Iglesias and Officer Corona in the

7    interview room with Mr. Coffey?

8    A.   Officer -- I believe Officer Meloscia was in

9    the interview room.

10        Other than that, no.

11   Q.   I'm sorry.  Did you see Officer Corona in the

12   interview room?

13   A.   I don't remember.

14   Q.   Do you remember seeing Sergeant Sanchez in the

15   interview room with Mr. Coffey?

16   A.   I don't remember that, no.

17   Q.   Did you see Miss Berry at Homan Square?

18   A.   Yes.

19   Q.   About what time did you see Miss Berry?

20   A.   Probably about the same time that I first saw

21   Mr. Coffey and then at certain times throughout the

22   evening.

23   Q.   Was Miss Berry being held in the same hallway

24   as Mr. Coffey?

Page 124

1    A.   I don't believe she was.

2    Q.   Where did you first see Miss Berry?

3    A.   I believe Miss Berry was in the first hallway

4    off the stairwell.

5    Q.   Were there any officers -- do you recall seeing

6    any other officers with Miss Berry while at Homan Square?

7    A.   At one point, I saw Officer Herlehy with Miss

8    Berry.

9    Q.   And when was that?

10   A.   Shortly after we have arrived at Homan Square.

11   Q.   And was that in one of the interview rooms that

12   you saw her with Officer Herlehy?

13   A.   Yes.

14   Q.   Do you recall any other officers in the

15   interview with Miss Berry?

16   A.   Officer Iglesias throughout the night had gone

17   in and talked with Miss Berry.

18   Q.   So the first time you saw Mr. Coffey was around

19   5:20, then you returned to your office around 5:30.  When

20   was the next time that you saw Mr. Coffey?

21        MR. CIFONELLI: Just object to form,

22   mischaracterizes testimony as to the times.

23        THE WITNESS: Could you repeat it.

24

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 125

BY MS. MILLER:

1 Q. So after the first time you saw Mr. Coffey in
the interview room, which you said was about 5:20-ish,
maybe a little bit later, when was the next time you saw
Mr. Coffey?

6 A. Probably about a half hour to 45 minutes later.

7 Q. And where was he at that time?

8 A. In the interview room.

9 Q. Was he alone or with anybody else?

10 A. Alone.

11 Q. And what was he doing?

12 A. Sitting on the bench.

13 Q. Did you talk to him at all?

14 A. Yes.

15 Q. Did you go into the room to talk to him?

16 A. Yes.

17 Q. Were you alone or with somebody else?

18 A. Alone.

19 Q. What did you ask him?

20 A. I asked him if he was okay, if he needed
21 anything.

22 Q. And what was his response?

23 A. He said no.

24 Q. And where was Officer Iglesias at this time?

Page 126

1 A. I don't know.

2 Q. After you then visited him for -- Mr. Coffey
for a second time, what did you do?

4 A. I went to check out Miss Berry.

5 Q. And where was Miss Berry when you went to check
on her?

7 A. In the interview room.

8 Q. Was there anybody with her?

9 A. Not that remember.

10 Q. Did you talk to Miss Merry?

11 A. Yes.

12 Q. Inside the interview room?

13 A. I may have opened the door, talked to her
14 through the door.

15 Q. And what did you ask her?

16 A. If she needed anything.

17 Q. And what was her response?

18 A. I believe it was no.

19 MR. CIFONELLI: I'm sorry. Could you read that

20 back. I just didn't hear him.

21 (RECORD READ BACK BY REPORTER.)

22 MR. CIFONELLI: Okay.

23 BY MS. MILLER:

24 Q. How many times did you go to Mr. Coffey's

Page 127

1 interview room that night?

2 A. Numerous.

3 Q. More than three times?

4 A. Yes.

5 Q. More than five times?

6 A. I would say yes.

7 Q. Was there ever anybody in the interview room
with Mr. Coffey when you went to see him?

9 A. No.

10 Q. Did you talk to him on each occasion that you
11 went to see him in the interview room?

12 A. I did.

13 Q. And what questions did you ask him?

14 A. If he needed anything.

15 Q. Did he ever express the need for anything?

16 A. Yes, he did.

17 Q. When?

18 A. Well, after I checked on him the first time, I
19 attempted to open the door and he said, "No, no, no,
20 don't come in," and I asked why. And he said, "I had to
21 go so I went in my hat."

22 And I said, "What?" And he said, "I had to use
23 it. I had to go, so I went in my hat," and I believe I
24 said, "Shit." I said, "Well, let me get something to

Page 128

1 clean it up."

2 He said, "No, no, no, no. It's fine. I got it
3 all in my hat," which was a skullcap that he had.

4 I said, "Well, let me get a garbage can," and I
5 went in the room, and he said, "I'm sorry. I had to go."

6 And I said, "Don't apologize. Throw it out,"
7 and I took him to the bathroom so he could clean himself
8 up.

9 Q. And you said this was the second time you
10 visited him?

11 A. When I first saw him, I visited him once, he
12 was fine, and then I visited him that time, and I had
13 said to him, "Why? I was just here like a half hour ago.
14 Why didn't you say anything?" He said, "I didn't have to
15 go then." I said okay.

16 Q. So was this how long had this been since the
17 first time you saw Mr. Coffey in the interview room?

18 A. I would approximate a half hour to 45 minutes.

19 Q. And so what did you do with the skullcap? Was
20 it thrown out?

21 A. Yes.

22 Q. And is that something that you typically leave
23 on somebody when you have them in an interview room at
24 Homan Square?

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 129

1   A. I don't know.
2       I mean, I take a belt, shoelaces, strings.
3       Sometimes I will take hats. Sometimes I don't.
4   There's not a hard fast rule on hats.
5   Q. And did you notify anybody of what happened?
6   A. I had told team members and the sergeant.
7   Q. Which team members?
8   A. The people that were there in the room, in
9   the -- not the interview room, in our office.
10  Q. And how many people were in the office?
11  A. Maybe four, five.
12  Q. Do you remember anyone that was in the office
13  at that time?
14  A. I don't remember specifically, no.
15  Q. Was Officer Iglesias there?
16  A. I don't remember specifically.
17  Q. Was Officer Meloscia there?
18  A. I don't know.
19  Q. What about Sergeant Sanchez?
20  A. I mean, he was eventually told. I don't
21  remember if he was told right then.
22  Q. But do you remember him being in the room, in
23  the team room that night?
24  A. Yeah, eventually he was, yes. I don't remember

Page 130

1   specifically when, but he was.
2   Q. So do you specifically remember whether or not
3   he was in the team room when you told the other officers
4   about what happened?
5   A. I don't know.
6   Q. And was there somebody working the 24-hour desk
7   that day?
8   A. No.
9   Q. And after seeing Officer Iglesias in
10  Mr. Coffey's interview room when you -- the first time
11  you remember seeing him in the interview room, when was
12  the next time you saw Officer Iglesias?
13  A. I don't know, throughout the night.
14  Q. And after this happened, how many more times
15  did you check up on Mr. Coffey?
16  A. After, I mean, approximately every half hour to
17  45 minutes.
18  Q. And would you also check up on Berry at those
19  same times?
20  A. If she wasn't otherwise being interviewed by
21  Officer Iglesias.
22  Q. Did you at some point see her being interviewed
23  by Officer Iglesias?
24  A. Yes.

Page 131

1   Q. Were any other officers in the room with
2   Officer Iglesias?
3   A. Not that I recall.
4   Q. And when was it the first -- when was the first
5   time you saw Officer Iglesias in the room with Miss
6   Berry?
7   A. I don't remember specifically.
8   Q. Was it the first time you checked up on her,
9   the second time you checked up on her?
10  A. It wasn't the first time, maybe the second.
11  Q. And how many times did you check up on Miss
12  Berry when Officer Iglesias was in the room with her?
13  A. I don't know.
14  Q. More than once?
15  A. I don't know.
16  Q. So do you have any specific recollection other
17  than in Miss Berry's interview room seeing Officer
18  Iglesias at Homan Square?
19  A. I mean, at times he was in the office, out of
20  the office. He was at least once when I walked by, he
21  was talking to Miss Berry, maybe twice. It might have
22  been more than that.
23      I would check on Mr. Coffey. I would walk
24  through the hall, and sometimes he would be talking to

Page 132

1   Miss Berry and sometimes he would be in the office.
2   Q. Was there anybody else checking up on Miss
3   Coffey -- or Miss Berry and Mr. Coffey?
4   A. I don't know. I was checking up on Mr. Coffey.
5       Whether somebody else went down the hallway and
6   checked on him, I don't know.
7   Q. Did you see anybody else checking up on him?
8   A. No, just Officer Iglesias with Miss Berry.
9   Q. Did -- were there any other interviews being
10  conducted at that time that you observed?
11  A. I don't know. I don't remember.
12  Q. Were you checking up on anybody else?
13  A. No, those were the only people that we were
14  responsible for.
15  Q. Did you discuss the arrest of Miss Berry with
16  Officer Iglesias after returning to Homan Square?
17      MR. CIFONELLI: Object to the form.
18      THE WITNESS: I don't understand the question.
19  BY MS. MILLER:
20  Q. Did you have any conversations with Officer
21  Iglesias on February 6th regarding the arrest of Miss
22  Berry and Mr. Coffey?
23  A. I'm sure that I did.
24  Q. Do you remember Officer Iglesias telling you

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 133

1 anything about interviewing Miss Berry?

2     **A. I know that eventually it led to a consent to**

3 **search of their residence.**

4     Q. Do you recall any specific conversations with

5 Officer Iglesias about interviewing Miss Berry or

6 Mr. Coffey?

7     **A. No.**

8     Q. Do you recall Officer Iglesias informing you

9 that he conducted additional interviews of Mr. Coffey?

10     **A. No.**

11     Q. Do you recall any specific conversations about

12 information that Iglesias was trying to obtain from Miss

13 Berry?

14     **A. I know that I believe she had told Officer**

15 **Iglesias that there was -- she knew where narcotics were**

16 **located, in her residence.**

17     Q. And when did you learn of that?

18     **A. Sometime throughout the evening.**

19     Q. Do you know whether there were any drugs

20 recovered from her residence?

21     **A. I don't have first-hand knowledge of it but I**

22 **believe that there were.**

23     Q. And why do you believe that?

24     **A. I believe Officer Iglesias left with Juanita**

---

Page 134

1 **Berry and other officers to conduct a consent to search**

2 **and they came back with additional narcotics.**

3     Q. Did you see the additional narcotics that were

4 brought back?

5     **A. I believe they were in a bag. I don't remember**

6 **actually seeing the narcotics.**

7     Q. And do you know who else participated in the

8 consent to search?

9     **A. I don't have first-hand knowledge of that. I**

10 **know that I believe the sergeant would have had to be**

11 **present for a consent to search.**

12     Q. Do you recall any conversations about

13 conducting a consent to search at the residence of Miss

14 Berry?

15     **A. No, other than the fact that they conducted a**

16 **consent to search.**

17     Q. Did you -- do you know whether Miss Berry was

18 at her residence when there was a consent to search?

19     **A. I believe they brought her with, but I don't**

20 **have first-hand knowledge of that. I wasn't there.**

21     Q. Do you know how many times Miss Berry was

22 brought to Homan Square on February 6th, 2015?

23     MR. CIFONELLI: Could you read that one back.

24         (RECORD READ BACK BY REPORTER.)

---

Page 135

1     THE WITNESS: The one time I believe.

2 **BY MS. MILLER:**

3     Q. And if somebody is taken to Homan Square

4 multiple times in one night, are they logged in each

5 time?

6     **A. If they're -- I mean, if they're taken out,**

7 **then you would put their out-time, but if they were**

8 **coming back in, you could put in their in-time then**

9 **out-time or you could can log them separately.**

10     Q. Okay. And is there any situation where the

11 log-out time is not recorded in the 24-hour book?

12     **A. Yes, officers might forget.**

13     Q. But there's no like significance to not logging

14 somebody out in terms of where they are taken, or whether

15 charges are brought, or anything like that?

16     **A. No.**

17     Q. And did you other than asking her, asking Miss

18 Berry whether she needed anything, did you ask her -- did

19 you interview her at all?

20     **A. No.**

21     Q. Did you collect her demographic information?

22     **A. I don't believe so.**

23     Q. Do you know who did collect her demographic

24 information?

---

Page 136

1     **A. No.**

2     Q. Was there any conversation about Miss Berry

3 providing the police with an unregistered gun?

4     **A. I believe she did have -- I believe Officer**

5 **Iglesias informed me later that she did have knowledge of**

6 **where a gun was present and they recovered a gun.**

7     Q. And was that the same time that she did the

8 consent to search?

9     **A. I don't -- can you be more specific.**

10     Q. Did you have any --

11     **A. I wasn't there. I didn't go out with them, so**

12 **I don't know if it was a separate stop or it was -- I**

13 **believe it was a separate stop, but I wasn't there.**

14     Q. And did Iglesias give you any information about

15 when and where the gun was recovered from?

16     **A. No, not that I recall.**

17     Q. Do you remember if Miss Berry or why she was

18 taken to Homan Square?

19     **A. I believe she was involved, present and**

20 **possibly involved in a delivery of the narcotics to**

21 **Officer Grubisic.**

22     Q. Do you know whether she was ever charged with

23 any crimes?

24     **A. I don't believe she was.**

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 137

1    Q. Why don't you believe she was?

2    A. To my knowledge, there was no arrest report

3 completed for Miss Berry.

4    Q. And is that because she provided information

5 about additional drugs and the gun?

6    MR. CIFONELLI: Object to foundation.

7    THE WITNESS: I believe that she didn't have much of

8 an arrest record.

9       I believe that upon approach, upon Mr. Coffey

10 seeing the police, I believe he gave narcotics to Miss

11 Berry to conceal. I believe she did it because she (sic)

12 was in a relationship with Miss Berry.

13       I mean, she could have been charged with

14 possession of controlled substance. I believe it was

15 narcotics recovered from her person at Homan Square.

16       I don't recall specifically what her record

17 looked like, but I think we were of the opinion that she

18 was just holding onto the drugs for him, you know, and

19 she became a cooperating individual, so she was not

20 charged.

21 BY MS. MILLER:

22    Q. And so when did you learn that Miss Berry had a

23 relationship with Mr. Coffey?

24    A. I assumed it. They were in the car together.

---

Page 138

1    Q. And why did you believe that she was concealing

2 drugs for Mr. Coffey?

3    A. They were found on her person. He was involved

4 in multiple deliveries to Officer Grubisic.

5    Q. Did you observe Mr. Coffey giving Miss Berry

6 any drugs?

7    A. No.

8    Q. So this is just based on conversations which

9 occurred at Homan Square?

10    A. What? I mean, my personal belief or what?

11    Q. You said we believed that she was concealing

12 drugs for Mr. Coffey.

13    A. Yes.

14    Q. When he knew he was to become arrested,

15 something along those lines, right?

16    A. Uh-huh.

17    Q. What's the basis for that belief? Is that

18 something that was discussed among the officers?

19    A. It probably was discussed amongst us. I don't

20 remember specifically, but I'm sure we did discuss it.

21    Q. And was there any conversation about trying to

22 obtain more information from Miss Berry?

23    A. No, not that I recall.

24    Q. Or using the circumstance to obtain information

---

Page 139

1 about other crimes being committed in the area?

2    A. I mean, those conversations might have taken

3 place. I don't know.

4    Q. And you didn't participate in any discussions

5 about trying to obtain information about other crimes

6 from Miss Berry?

7    A. I did not, no.

8    Q. Did you subsequently have any conversations

9 with Officer Iglesias about what happened on

10 February 6th, 2015?

11    MR. CIFONELLI: Object to timeframe.

12    THE WITNESS: Like that night?

13 BY MS. MILLER:

14    Q. Any time after that night?

15    A. After that night, I don't know.

16       I mean, we discussed that there was a consent

17 to search where narcotics were recovered and at least one

18 firearm was recovered.

19    Q. After February 6th, 2015, did you work with

20 Officer Iglesias again as a partner?

21    A. Yes.

22    Q. How many more times would you say?

23    A. Numerous.

24    Q. Have you had any conversations with Officer

---

Page 140

1 Iglesias about this case?

2    A. Since?

3    Q. Yes.

4    A. After we found out we were getting sued.

5    Q. And how many times did you talk to Officer

6 Iglesias about the allegations in this case?

7    A. I don't know, a couple.

8    Q. Did you ever ask him about or ask him if he

9 interviewed Miss Berry or Mr. Coffey that night?

10    A. No.

11    Q. Did you ask him whether -- or did you ask him

12 how long he interviewed Miss Berry for?

13    A. No.

14    Q. Did you ask him about any details about

15 Miss Berry's consent to search?

16    A. No.

17    Q. And did you discuss the recovery of the

18 unregistered firearm?

19    A. No.

20    Q. And so when was the last time you saw

21 Mr. Coffey that night?

22    A. I can't remember if we took him -- I can't

23 remember if I took him to the 11th District, but it

24 either would have been that night at Homan Square.

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 141

1    I don't remember if I took him to 11 or not, or
2  if the other enforcement car did.
3    Q.  So you don't have any specific recollection of
4  taking him there?
5    A.  No.
6    Q.  Do you know what happened, how Miss Berry left
7  Homan Square?
8    A.  I don't have specific recollection of that.
9    Q.  Do you recall how long Miss Berry was at Homan
10  Square?
11    A.  I believe it was a shorter period of time than
12  Mr. Coffey was.
13    Q.  And do you recall how long Mr. Coffey was at
14  Homan Square?
15    A.  I believe he was in the lockup around at the
16  11th District by 11:42.
17    Q.  So about six hours later?
18    A.  Approximately, yeah.
19    Q.  When someone signs someone in to Homan Square,
20  if there's a different person signing him out, is that
21  reflected on the sign-in sheet?
22    A.  No.
23    Q.  Do you know -- so were there a lot of
24  interviews going on at Homan Square that night, do you

Page 142

1  remember?
2    A.  I don't.
3    Q.  Do you know why Mr. Coffey was kept at Homan
4  Square for six hours?
5    A.  I mean, we were getting together paperwork,
6  processing him, and then Officer Iglesias was also
7  interviewing and conducting investigation with Miss
8  Berry.
9    Q.  And was that -- was the interview of Miss Berry
10  related to the charges that were going to be brought
11  against Mr. Coffey?
12    A.  No -- well, I didn't conduct the investigation
13  with Miss Berry, but to my knowledge, no.
14    Q.  And you're not aware of Officer Iglesias
15  interviewing Mr. Coffey subsequent to the first time you
16  saw him there?
17    A.  No, I don't believe he did.
18    Q.  And you said that you typically review arrest
19  reports when you're listed as the arresting officer, is
20  that correct?
21    A.  That's correct.
22    Q.  Did you review the arresting -- or the arrest
23  report for Mr. Coffey before it was submitted?
24    A.  I believe I did.

Page 143

1    Q.  Did you make any changes to the report?
2    A.  Not that I recall.
3    Q.  Did you make any additions to the report?
4    A.  Not that I recall.
5    Q.  Do you know approximately when it was that you
6  reviewed the report?
7    A.  No.
8    Q.  Would it have been sometime close to when it
9  was submitted?
10    A.  That's possible.  Probable.
11    Q.  What time did you leave Homan Square on
12  February 6th?
13    A.  I don't remember.  I don't recall.
14    Q.  Do you know if it was after 8:00 o'clock?
15    A.  I'm sure it was after 8:00 o'clock.  I'm sure I
16  didn't leave -- there's no way I left before Mr. Coffey
17  was at the 11th District and then customary practice
18  would be then to go back to Homan Square and finish
19  paperwork.
20    Q.  But you don't specifically recall going to
21  District 11?
22    A.  Right.
23    Q.  And did you say Officer Sellers was working
24  with you that night too?

Page 144

1    A.  Yes.
2    Q.  And is there any reason why you didn't go with
3  Officer Iglesias for the consent to search?
4    A.  No.
5    Q.  And what was Officer Sellers assigned to that
6  night?
7    A.  I believe he was working enforcement.
8    Q.  Some of the narcotics raid activities reports
9  to Mr. Coffey and Miss Berry's arrest reference an
10  Operation WVIO.  Do you recognize that?
11    A.  No.  I don't know what that is.
12    Q.  So that doesn't ring a bell at all?
13    A.  No.
14    Q.  Did you complete any reports related to the
15  arrest of Mr. Coffey?
16    A.  I don't believe I did actually.
17    Q.  Did you complete any reports related to the
18  arrest of Miss Berry?
19    A.  I don't believe I did.
20    Q.  Is there any reason for that?
21    A.  No.
22    Q.  Are you familiar with the operation referenced
23  as SNAP or S-N-A-P?
24    A.  I believe that's a generic operation name.  I

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 145

1    don't recall what it stands for.
2        If not working a specific operation, some
3    officers will put SNAP.
4        Q.  And have you ever completed a narcotics raid
5    report?
6        A.  I have.
7        Q.  There's a box on the report that -- a box you
8    can check that says check if confidential?
9        A.  Right.
10       Q.  Have you seen that?
11       A.  Uh-huh.
12       Q.  Under what circumstances would you check that
13   box?
14       A.  If there's going to be an ongoing
15   investigation, then you would check that box.
16       Q.  And would it prevent certain documents from
17   becoming part of a file or a public record?
18       A.  If you were to make an arrest, a narcotics
19   arrest, if you were in patrol, you would pull a report
20   number, a RD number for a UCR, and at a certain address,
21   whatever address it happened, if it was going -- if
22   you're in Organized Crime, which includes narcotics, if
23   you would make an arrest, or not make an arrest, maybe
24   make a covert narcotics purchase and there would be no

Page 146

1    arrest, and it was going to be an ongoing investigation,
2    then you would make it 99 confidential and the address.
3    That would be the address, 99 North Confidential.
4        MS. MILLER:  Okay.
5        MR. CIFONELLI:  Could we take a couple minutes.
6        MS. MILLER:  That's fine.
7            (SHORT RECESS.)
8    BY MS. MILLER:
9        Q.  All right.  Have you ever had any complaints
10   lodged against you or investigations by IPRA?
11       A.  Combined or complaints?
12       Q.  How many IPRA complaints are you aware of that
13   have been lodged against you?
14       A.  IPRA or complaints in general?
15           Let's just go with complaints in general.  How
16   about that?
17       Q.  Okay.
18       A.  If I had to guess, I would say five, give or
19   take a couple.
20       Q.  And do you remember approximately when those
21   five were?
22       A.  No, throughout my 11 and a half years as a
23   police officer.
24       Q.  And do you know how many related -- how many

Page 147

1    complaints were related to arrests made at or arrestees
2    taken to Homan Square?
3        A.  I would guess, I don't know for sure, I would
4    say maybe two.
5        Q.  Do you remember the facts of any of those
6    complaints?
7        A.  I believe one was for -- I believe both were
8    for false arrest.
9        Q.  Both of the ones out of Homan Square were for
10   false arrest?
11       A.  I believe so.
12       Q.  And what was the result of those
13   investigations?
14       A.  Either, I believe they were either not
15   sustained or unfounded.
16       Q.  And do you remember approximately when those
17   were?
18       A.  Within the three years that I was there,
19   between 2013 and 2015.
20       Q.  Do you remember any other officers that were
21   also included in those investigations?
22       A.  I believe all were from the previous team I
23   worked on, so C6 or 9.
24           I believe Ceja, Leveille, Legenza, Nunez,

Page 148

1    Eldridge, and I believe there was one when I was working
2    with another team or another sergeant was watching us, we
3    were working with their team.
4        Q.  And were you asked to provide statements to
5    IPRA?
6        A.  I believe in two cases that I was witness
7    statements.
8        Q.  And were those false arrest claims in those
9    statements, do you remember?
10       A.  I'm sorry?
11       Q.  Were those related to the false arrest claims?
12       A.  I believe so.
13       Q.  And were any of those cases settled?
14       A.  You're asking different things now.  Could you
15   be more clear.
16       Q.  Was there any IPRA complaint that resulted in a
17   civil lawsuit settlement?
18       A.  To my knowledge, I have one settlement that I
19   believe was $350.
20       Q.  And was that related to a false arrest?
21       A.  I believe it was.
22       Q.  And do you remember who else, what other
23   officers were involved in that incident?
24       A.  Ceja, Leveille, Legenza, Shirene Hicks, Nunez,

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 149

1    Eldridge.
2    Q.  Okay.  And was this a situation where you were
3    asked to give a statement for that specific
4    investigation?
5    A.  I don't remember.
6    MS. MILLER: Could we mark this as Exhibit 3.
7        (WHEREUPON, DEPOSITION EXHIBIT NO. 3 WAS
8        MARKED FOR IDENTIFICATION.)
9    BY MS. MILLER:
10    Q.  Do you recognize this investigation or this
11    document?
12    A.  This is a notification of charges of
13    allegations from IAD.
14    Q.  Do you recall these specific allegations?
15    A.  I'd have to --
16    Q.  Yeah, take your time.
17    A.  Yeah.  Okay.  I remember this.
18    Q.  And this is an investigation of you and Anthony
19    Cejas, (sic) is that correct?
20    A.  That's correct.
21    Q.  And did you frequently work with Mr. Cejas or
22    Officer Cejas in September or in 2013?
23    A.  Could you repeat that.
24    Q.  Sure.

---

Page 150

1        In 2013, were you regularly working with
2    Anthony Cejas?
3    A.  Yes.
4    Q.  Were you frequently partnered with Cejas?
5    A.  Ceja.  There is no S.
6    Q.  Sorry.
7    A.  That's okay.
8        For a time, yes, we were regular enforcement
9    officers.
10    Q.  And do you recall bringing Willie Harris to
11    Homan Square?
12    A.  I don't have specific recollection of it.
13    Q.  Do you recall interviewing him at Homan Square?
14    A.  I don't have specific recollection.  That's not
15    to say that it didn't happen.
16    Q.  Okay.  And I believe you were asked to provide
17    a response to IPRA's investigation in this case, is that
18    correct?
19    A.  Yes.
20    Q.  And does that response appear --
21    A.  I believe this is IAD's investigation, not
22    IPRA's, I believe.
23    Q.  Sorry.  Sorry.
24        And your response appears on FCRL 058191?

---

Page 151

1    A.  That's correct.
2    Q.  And Anthony Ceja, his response appears on FCRL
3    58190?
4    A.  Yes, that's correct.
5    Q.  Did you and Officer Ceja prepare these
6    responses together?
7    A.  No.
8    Q.  Did you consult one another in preparing these
9    responses?
10    A.  No.
11    Q.  And do you remember preparing your specific
12    response which appears on FCRL 58191?
13    A.  I don't remember preparing this specific one
14    but I'm sure that I did.
15    Q.  And did you type out this actual response?
16    A.  I believe I did.
17    Q.  And where would you have written this out?
18    A.  In the office at Homan Square.
19    Q.  And earlier in the documents, it indicates that
20    you're requesting representation?
21    A.  Yes.
22    Q.  Were you given representation?
23    A.  I don't recall whether I consulted with an FOP
24    attorney or not.

---

Page 152

1    Q.  Did you receive any assistance in preparing the
2    response that appears on FCRL 58191?
3    A.  Not that I recall.
4    Q.  Do you remember giving it to anybody to review
5    before submitting it?
6    A.  My sergeant and lieutenant.
7    Q.  And those are the two that are indicated below,
8    Sergeant Sanchez and Lieutenant Ryle?
9    A.  Yes.
10    Q.  The first paragraph says, "This statement is
11    not being given voluntarily.  It's under duress.  I'm
12    only giving the statement at this time because I know
13    that I could lose my job if I refuse the direct order
14    given to me"?
15    A.  Uh-huh.
16    Q.  Is that your language?  Did you write that?
17    A.  That's a common disclaimer put in these types
18    of to-froms.
19    Q.  So is this information that's already on the
20    letter when you prepare your response or is it something
21    that you actually include on your own?
22    A.  I believe a common disclaimer is in the FOP
23    book.
24    Q.  And so you would copy it out of the FOP book?

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 153

1    A.  Yes.
2    Q.  And do you know what the intended purpose of
3    that statement?
4    A.  I believe it has to do with Geraghty
5    protections.
6    Q.  And was Officer Ceja being investigated around
7    this time for anything else?
8    MR. CIFONELLI: Objection, foundation.
9    BY MS. MILLER:
10   Q.  That you're aware of?
11   A.  I don't know.
12   Q.  Are you aware of Mr. or Officer Ceja being
13   suspended from the police department at any time?
14   A.  No.
15   Q.  Do you know how long Officer Ceja worked out of
16   Homan Square?
17   A.  I believe we got there at the same time.
18   Q.  So?
19   A.  2013.
20   Q.  Okay.  And do you know if Officer Ceja still
21   works out of Homan Square?
22   A.  He does -- well, I believe he's assigned to a
23   task force now, so I don't know where they work out of.
24   Q.  Okay.  And do you have any interaction with

Page 154

1    Officer Ceja anymore?
2    A.  No.
3    Q.  Last year, Judge Evans entered an order
4    requiring certain access to attorneys for arrestees at
5    district headquarters.  Are you aware of that order?
6    A.  Can you repeat that.
7    Q.  Sure.
8        Last year in March, there was an order
9    requiring that arrestees have access to Public Defenders
10   at districts.  Are you aware of that order?
11   A.  Vaguely.
12   Q.  Have any changes been made to your district
13   based on that order?
14   MR. CIFONELLI: Object to relevance.
15       Go ahead.
16   THE WITNESS: I don't know.  There might have been a
17   sign put up somewhere, but other than that, it's not like
18   there's Public Defenders waiting, sitting around for
19   people to come in.
20   BY MS. MILLER:
21   Q.  But there's been signs put up at the districts?
22   A.  There might have.  I really don't know.
23   Q.  Has that order changed any procedure out of
24   District 25 that you're aware of?

Page 155

1    MR. CIFONELLI: Object to foundation.
2    THE WITNESS: No.
3    BY MS. MILLER:
4    Q.  Are you aware -- yeah, are you aware of any
5    changes that resulted at Homan Square because of that
6    order?
7    A.  No.  I don't work there anymore.  I don't know.
8    Q.  Were you given any direction about arrestees
9    brought to District 25 from Homan Square in relation to
10   that order?
11   A.  No.
12   Q.  And when you were at Homan Square, were there
13   any like any posters or signs in the interview room?
14   A.  There was signs in there.
15   Q.  What types of signs?
16   A.  There was -- I don't recall what it said.
17   There was a sign posted opposite the bench of each wall.
18   I don't recall specifically what it said.
19   Q.  Recently you were involved in a police
20   shooting, is that right?
21   A.  Yes.
22   Q.  When was that?
23   A.  July 9th.
24   Q.  Can you tell me what happened on that date?

Page 156

1    A.  Could you be more specific.
2    Q.  Well, can you tell me the facts or how it
3    resulted in a police shooting?
4    MR. CIFONELLI: I will object to this line of
5    questioning as irrelevant, because there wasn't any
6    complaint against him.
7        You are free to answer any questions.
8    THE WITNESS: On July 9th, I heard over the radio
9    that there was a unit requesting a sergeant to come to
10   their job at the 2700 block of Leclaire.
11       Shortly thereafter, I heard the sergeant, I
12   believe he said over the air that there was an
13   individual -- I can't remember if this was over the air
14   or I come to learn later -- that a man was holding his
15   child and child's mother against their will inside the
16   apartment.
17       They were able to get the child and the mother
18   out.  They were then conversing through an open window
19   with the subject.  The sergeant made it a SWAT incident,
20   because he had been informed that there was a gun in the
21   apartment and that the subject might be armed.
22       Shortly thereafter, the subject came out of the
23   building and fired shots at the police, who returned
24   fire.  The subject then fled on foot, eventually to a

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 157

1  backyard more than two blocks away, or approximately two
2  blocks away.
3          Officers were responding.  Officers were able
4  to locate the yard that the individual was in.  I was
5  positioned at the front gangway of the yard that the
6  subject was in.
7          The officers were giving numerous verbal
8  commands.  I couldn't see where he was.  The officers
9  were pointing that he was -- they were pointing, he's
10 down here, he's down here, he still has a gun.  They were
11 giving verbal direction for him to come out and drop the
12 gun.
13         Eventually he ran out from where he was hiding,
14 ran towards me with a gun in hand, turned around and when
15 he turned around, pointed the gun, brought his hand with
16 him, pointed the gun at what I believed to be other
17 officers in the backyard.
18         He then turned back towards me with the gun in
19 hand.  I yelled for him to stop.  He continued.  I
20 discharged one round and then took cover behind a
21 building.
22         Shortly thereafter I heard numerous other
23 gunshots, and I heard that the individual was down.  I
24 came out from behind my cover.  I observed that he was

Page 158

1  down and EMS was called.
2  BY MS. MILLER:
3      Q.  And did that person survive?  Is he alive?
4      A.  He is not.
5      Q.  Has there been any investigation initiated
6  related to that shooting?
7      A.  There's an IPRA investigation which is now
8  COPA.
9      Q.  And have you been asked to provide any
10 statements related to that investigation?
11     A.  Yes, I did.
12     Q.  When?
13     A.  More than a month later.  I don't recall the
14 exact date.
15     Q.  And was that a statement that you gave to COPA?
16     A.  Yes.
17     Q.  Any other statements?
18     MR. CIFONELLI:  You mean in relation to that?
19     MS. MILLER:  Yeah.
20     THE WITNESS:  No.
21 BY MS. MILLER:
22     Q.  No other sworn statements or testimony?
23     A.  No, this is the first.
24     Q.  And has anybody else been asked to provide a

Page 159

1  statement related to that shooting that you're aware of?
2      MR. CIFONELLI:  Object, foundation.
3      THE WITNESS:  There were other officers who had also
4  discharged their weapons that also gave statements to
5  IPRA or COPA.
6  BY MS. MILLER:
7      Q.  Is the investigation still ongoing?
8      A.  I don't know.  They're not keeping me apprised.
9      Q.  And no other like lawsuits related to that
10 incident?
11     A.  No, ma'am.
12     MS. MILLER:  Let me just go through my notes and I
13 think I'm done.
14         Let's take a short break.
15             (SHORT RECESS.)
16     MS. MILLER:  We can go back on the record.
17         I don't have anything further.
18     MR. CIFONELLI:  I was going to suggest you go ahead.
19             (SHORT PAUSE.)
20          E X A M I N A T I O N
21 BY MS. OHRI:
22     Q.  Hi.  My name is Shubra Ohri.  I introduced
23 myself to you earlier.
24         We are representing Plaintiff in another

Page 160

1  lawsuit, so just to let you know we're not representing
2  the Plaintiffs in this lawsuit, Coffey and Berry.
3          So you just mentioned a shooting that you are
4  under investigation for.  Do you recall or do you know
5  which bullet hit the suspect that ultimately died?
6      A.  No.
7      Q.  Do you know what the suspect's name was?
8      A.  Bryant Alvarez.
9      Q.  Bryant Alvarez?
10         Do you know whether your bullet hit him?
11     A.  I do not.
12     Q.  You said that you heard multiple rounds of
13 shots?
14     A.  I did.
15     Q.  After you shot at him?
16     A.  Yes.
17     Q.  Was it -- did this shooting occur in the
18 nighttime?
19     A.  No.
20     Q.  It was in the daytime?
21     A.  Yes.
22     Q.  So were you able to see the suspect when you
23 took aim?
24     A.  Yes.

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 161

1    Q.   Okay.  And he wasn't concealed by anything, by
2    a building perhaps, or by a column?
3        A.  No.
4        Q.  So you mentioned earlier that you -- well, let
5    me ask did you leave the police department for a while?
6        A.  No.
7        Q.  Okay.  So you've been working for CPD for the
8    last -- since you began?
9        A.  Yes, ma'am.
10       Q.  How many years in total did you work at Homan
11   Square?
12       A.  Approximately three.
13       Q.  Three years.
14           And in that time, did you get to know the area
15   pretty well?
16       A.  What area?  Could you be more specific as to
17   the area.
18       Q.  Sorry.
19           The area surrounding Homan Square.
20       A.  The neighborhood?
21       Q.  Yes.
22       A.  Where I worked previously encompassed where
23   Homan Square was.  I believe I was already familiar with
24   it.

Page 162

1        Q.  When you worked at District 11?
2        A.  Yes.  Correct.
3        Q.  Were you aware of any kind of reputation that
4    Homan Square had among the people in that neighborhood?
5        MR. CIFONELLI: Objection to timeframe.
6    BY MS. OHRI:
7        Q.  During the time that you worked at District 11
8    and at Homan Square?
9        A.  I would say that's where the people in the
10   neighborhood thought that's where the conspiracy police
11   worked.
12       Q.  And what do you mean by conspiracy police?
13       A.  They would often arrest, make arrests for drug
14   conspiracy.
15       Q.  And how did you know that?
16       A.  In my interaction with people on the street.
17       Q.  Did you ever hear anyone referring to people
18   coming out of Homan Square being called snitches?
19       A.  No.
20       Q.  Do you know what a snitch is?
21       A.  Yes.
22       Q.  Did you hear of anyone being -- anyone who had
23   been held at Homan Square who had subsequently been
24   released being referred to someone who gave information

Page 163

1    to the police?
2        A.  I'm sorry.  Could you repeat the question.
3        Q.  Sure.
4            Are you aware of a reputation of people who
5    were taken -- reputation of those people taken to Homan
6    Square for questioning and subsequently released of their
7    reputation of being known to give information to the
8    police?
9        A.  I'm really sorry.  I feel like your question
10   got really complicated at the end.  I was with you for
11   most of it.
12           Can you ask it again.
13       Q.  Sure.
14           So among the people in the neighborhood that
15   Homan Square is located in, do you know if those that are
16   held, suspects who are held in Homan Square and
17   subsequently released, do you know if they have a
18   reputation of  giving information to the police?
19       A.  I don't know.
20       Q.  So when you say conspiracy police, are you
21   referring to just actions among CPD?
22       MR. CIFONELLI:  Object to form.
23       THE WITNESS: As far as I'm aware, the people in the
24   neighborhood thought that the police that worked in Homan

Page 164

1    Square were the conspiracy police because often that's
2    the location where criminal drug conspiracies are charged
3    out of.
4    BY MS. OHRI:
5        Q.  Okay.  Did people ever speak of subjects being
6    flipped at Homan Square?
7        A.  Can you define people.
8        Q.  People in the neighborhood ever describe
9    suspects being flipped?
10       A.  Not that I'm aware of.
11       Q.  Did people in the Chicago Police Department
12   ever describe suspects brought into Homan Square as being
13   flipped?
14       MR. CIFONELLI: Object, foundation.
15           I know you're probably asking what he has
16   observed.
17   BY MS. OHRI:
18       Q.  Sure.  As far as you know?
19       A.  As -- no, not flipped.  No, I have never -- the
20   only time I have heard the term flipped is when somebody,
21   like a witness would make statements to a detective
22   implicating somebody, usually in a murder, and then when
23   they get on the witness stand, they would flip their
24   story.

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 165

1     That's the only time I have heard flip.
2     Q.  Does Homan Square have a reputation of bringing
3     suspects in on charges in order to get information out of
4     them about other crimes?
5         MR. CIFONELLI: Same objection.
6         THE WITNESS: I don't know.
7     BY MS. OHRI:
8     Q.  To the extent that you know, do you know if
9     it's the function of Homan Square to bring suspects in to
10    try to get information out of them about crimes?
11    **A.  That is something that occurs in Homan Square.**
12    **I wouldn't say it's the function of Homan Square.**
13    Q.  Okay.  What would you say the main function of
14    Homan Square is?
15    **A.  We conduct covert operations, out of narcotics**
16    **and the other -- any other -- I can't speak.  That's the**
17    **only place I have worked at Homan Square is narcotics.**
18    **That's the only thing I can speak to.**
19    Q.  And part of narcotics, part of the narcotics
20    team goal is to get information from suspects about other
21    crimes, narcotics-related crimes, isn't that right?
22    **A.  Sometimes, yes.**
23    Q.  And you asked to be transferred to Homan Square
24    in District 11?

Page 166

1     **A.  I put in an application.**
2     Q.  Why did you do that?
3     **A.  I was asked to.**
4     Q.  By who?
5     **A.  Lieutenant.**
6     Q.  What lieutenant?
7     **A.  Ryle.**
8     Q.  Ryle?
9     **A.  Ryle.**
10    Q.  Do you know why he asked you?
11    **A.  He was my tact lieutenant when I was in 11.**
12    Q.  Had you worked in narcotics before you went to
13    Homan Square?
14    **A.  No.**
15    Q.  Was narcotics centralized at Homan Square or
16    are there other areas that CPD works out of -- strike
17    that.
18        Or is narcotics centralized at Homan Square or
19    are there other areas of CPD that narcotics works out of?
20    **A.  So to my knowledge, every team has an office at**
21    **Homan Square.  However, some teams may have an office**
22    **somewhere else, like in an area.**
23    **Like I know that the Fifth District team has an**
24    **office in the Fifth District, but it's also Area South.**

Page 167

1     It's an area center.  They have an office there.
2         And the same for the Second District team, they
3     have an office in the Second District.  The Second
4     District is also Area Central.
5         So instead of them coming to Homan Square every
6     day and then driving all the way back out south, they
7     might just go to their office there.
8     Q.  Do those teams who work out of Area South and
9     Area Central, are those narcotics teams -- do they also
10    detain suspects at Area South and Area Central?
11    **A.  I would assume so, but I don't know.**
12    Q.  Do you know if they detain witnesses to
13    narcotics transactions at Area South and Area Central?
14    **A.  Detain witnesses?**
15    Q.  Uh-huh.
16    **A.  I don't know.**
17    Q.  Do you detain witnesses at Homan Square,
18    witnesses to narcotics transactions?
19    **A.  Witnesses aren't detained.**
20    Q.  Have you ever -- go ahead.
21    **A.  So no.**
22    Q.  Would you have described Plaintiff Coffey as a
23    witness?
24    **A.  No.**

Page 168

1     Q.  Why not?
2     **A.  He was an offender.**
3     Q.  Would you have described Plaintiff Berry as a
4     witness?
5     **A.  No.**
6     Q.  And why not?
7     **A.  I believed she was involved in the drug**
8     **transaction between Coffey and Grubisic and she was in**
9     **possession of narcotics.**
10    Q.  When you saw Plaintiff Berry, did you have
11    probable cause to take her into Homan Square?
12    **A.  I believe so.**
13    Q.  And why was that?
14    **A.  Because she was present during the delivery of**
15    **narcotics and Officer Grubisic.**
16    Q.  So is being present during the delivery of
17    narcotics, is that enough probable cause to take someone
18    in detention in Homan Square?
19    **A.  If you're in the same car, I believe it is.**
20    Q.  Is it enough probable cause to take someone --
21    is it enough to take someone to Homan Square -- do you
22    have probable cause to take someone to Homan Square who's
23    a witness to a narcotics transaction and of which you
24    have no other information other than that they are in a

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 169

1    car?
2        MR. CIFONELLI: Object to form.
3        THE WITNESS: Could you repeat the question.
4        MS. OHRI: Could you read it back.
5            (RECORD READ BACK BY REPORTER.)
6        MR. CIFONELLI: I repeat my objection for the
7    record.
8        THE WITNESS: I don't know.
9    BY MS. OHRI:
10       Q.   Do you not know because the way the question
11   was framed or do you not know based upon your experience
12   whether or not you have enough for probable cause to
13   detain someone who's exhibited no criminal behavior other
14   than being in the same space as criminal behavior?
15       MR. CIFONELLI: Object to form.
16       THE WITNESS: I believe it's a case-by-case basis.
17   BY MS. OHRI:
18       Q.   And in what cases do you bring someone into
19   custody because they are a witness to criminal behavior
20   or in the same area as criminal behavior?
21       A.   If we suspected that they were involved in the
22   criminal behavior and have probable cause, then we would
23   bring them to Homan Square.
24       Q.   And do you expect someone is involved in

Page 170

1    criminal behavior because they are in the same place as
2    criminal behavior?
3        A.   Not all the time, no.
4        Q.   But you do sometimes?
5        A.   Depends on the case.
6        Q.   But do you sometimes?
7        A.   Sometimes, yes.
8        Q.   So you spoke of -- actually, strike that.
9            You also spoke of longer-term investigations
10   that you did on the second team you were part of D5?
11       A.   That's correct.
12       Q.   So when you were conducting those longer-term
13   investigations, did you ever bring people in to
14   questioning to Homan Square in order to get information
15   about these longer investigations or perhaps a narcotics
16   dealer that is higher profile?
17       A.   If we had probable cause to bring them in, then
18   yes.
19       Q.   So you wouldn't just bring someone off the
20   street for questioning?
21       A.   No.
22       Q.   But you would bring someone off the street to
23   question them if they were in the same area as criminal
24   behavior perhaps for the purpose of getting more

Page 171

1    information on this longer-term investigation?
2        MR. CIFONELLI: Objection, form. Objecting to form.
3        THE WITNESS: Could you repeat the question.
4    BY MS. OHRI:
5        Q.   Would you bring someone into custody for
6    questioning about a longer-term investigation that you
7    have if they were in the same space as criminal behavior?
8        MR. CIFONELLI: Objection, vague, incomplete
9    hypothetical.
10       THE WITNESS: We believed that she was in possession
11   of narcotics, we believed we had probable cause to bring
12   her into the station, that's why we brought her into the
13   station, or into Homan Square.
14       MR. CIFONELLI: Just answer her question.
15       Do you want her to read it back?
16       MS. OHRI: I can also rephrase it.
17       Well, you could just read it back.
18           (RECORD READ BACK BY REPORTER.)
19       MR. CIFONELLI: Same objections.
20       THE WITNESS: We believed we had probable cause,
21   yes.
22   BY MS. OHRI:
23       Q.   You spoke of a training at Homan Square
24   earlier?

Page 172

1        A.   I did.
2        Q.   When you went through that training, was it led
3    by DiCristafano?
4        A.   There were -- that was his name. I believe it
5    was, not with a hundred percent certainty.
6            There was also a lot of -- it wasn't all led by
7    him. There would be different people who I did not know
8    that would come down and lead parts of training, and some
9    of it was simply, you know, like past stories of people
10   who come down and tell about incidents that they'd have
11   as kind of guiding officers to be careful when we're out
12   there.
13       Q.   But do you recall who trained you?
14       A.   Like I said, there was numerous people there.
15       Q.   So the specialized training that occurred at
16   Homan Square happened regularly?
17       A.   Well, this was when I got to Homan Square --
18   first of all, I don't know the answer to your question.
19           It did when I was there as I was brought in
20   when they started a West Side Drug Initiative to work
21   specifically 11, the 11th District, the 15th District,
22   and 10th District, and to work primarily afternoon hours,
23   which they had not done before, so I was part of a larger
24   group that was brought in, so the training was --

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 173

1 everybody was at the training. I believe there was maybe
2 30 officers that were brought in.
3    Q. And was there a name to the initiative that you
4 referenced?
5    A. At one point it was called the West Side Area
6 Heroin Initiative.
7       I don't know if that's what it is now or if
8 that's what it started out as.
9    Q. Did you ever receive any training on how to
10 make a detainee a cooperating witness or cooperating
11 individual as you said?
12    A. No.
13    Q. Was there ever any training on how to get
14 information out of a detainee about -- strike that.
15       Were there ever any trainings on interrogation
16 techniques of detainees at Homan Square?
17    A. No.
18    Q. How did you learn how to interrogate detainees?
19    MR. CIFONELLI: Just object to form as to detainees,
20 everywhere?
21 BY MS. OHRI:
22    Q. Detainees at Homan Square?
23    A. I didn't have specific training. It was just
24 through experience.

Page 174

1    Q. So you spoke earlier about having about 20
2 cooperating individuals or over 20?
3    A. I believe that's what I said. I don't remember
4 the exact context.
5       I believe it was -- there was more to it than
6 that, but go on, please.
7    Q. So when you referred to having those
8 cooperating individuals, are you referring to people that
9 you made into cooperating individuals?
10    A. I didn't make them do anything. They
11 volunteered information, on being asked. It just worked
12 out that they were cooperating individuals.
13    Q. Did they volunteer information pursuant to an
14 interaction with you?
15    A. Yes.
16    Q. So you had experience with over 20 cooperating
17 individuals who have become cooperating individuals as a
18 result of interactions with you?
19    A. Approximately, yeah.
20    Q. You spoke earlier about asking them about
21 drugs, and shootings, murders. Do you also ask them
22 about gang affiliations or gangs in general?
23    A. Usually gang affiliation. Sometimes
24 questioning about shootings or murders will lead into

Page 175

1 gangs in general.
2    Q. Do you share that information with any gang
3 investigative units?
4    A. If I'm talking about shootings, or homicides, I
5 would usually share with detectives, so -- but no,
6 usually I haven't.
7       There might be instances where people from
8 narcotics do, but in my situation, I have not.
9    Q. Okay. Have you ever shared information with
10 gang investigative units?
11    A. The only time that has happened for me is when
12 somebody that we have brought to Homan Square, arrested
13 and brought to Homan Square, ends up being a cooperating
14 individual for somebody in gangs, in which case, then we
15 will maybe share a little bit of information.
16    Q. And how do you go about doing that?
17    A. They would usually have a contact number for
18 whoever they're signed up with, or cooperating with, and
19 then I would call them and verify that they are, and then
20 they would ask what do you have them for, and I would say
21 delivery to an undercover officer, and then, you know, it
22 might be, you know, then I would like is anything that
23 he's saying true, is he good, have you gotten good,
24 reliable information off him before, yes, then we would

Page 176

1 work with him that way.
2    Q. What do you mean work with him that way?
3    A. The cooperating individual.
4    Q. So what would you do?
5    A. I would take information from him, and if it
6 was reliable, then he would be released.
7    Q. But initially you would have had probable cause
8 to bring him into custody?
9    A. Yes.
10    Q. Have you ever brought someone in for
11 questioning who you did not believe you had probable
12 cause for?
13    MR. CIFONELLI: Object to bringing somebody in as
14 vague.
15 BY MS. OHRI:
16    Q. Have you ever brought anyone to Homan Square
17 for questioning and in an instance where you didn't
18 believe you had probable cause?
19    MR. CIFONELLI: Same objection, bringing in.
20    THE WITNESS: No.
21 BY MS. OHRI:
22    Q. Not once in your entire career?
23    A. That I believed when I brought them in, I
24 believed I had probable cause.

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 177

1    It may turn out later that we did not and then
2  they were released.
3    Q.  Did you ever bring someone into custody for
4  questioning at Homan Square for like an ordinance
5  violation?
6    A.  I have not, no.  Not that I recall.
7    Q.  Have you ever brought someone into custody at
8  Homan Square for questioning for a misdemeanor violation?
9    A.  Yes.
10   Q.  About how many times?
11   A.  I don't know, numerous, 20 perhaps.
12   Q.  Do you recall what those were?
13   A.  Maybe less.
14   Q.  Do you recall what those misdemeanors were?
15   A.  They would usually be delivery of cannabis.
16   Q.  Any other misdemeanors?
17   A.  Not that I can recall.
18   Q.  Okay.  Mostly delivery of cannabis?
19   A.  Yes.
20   Q.  Do you know what quantity of cannabis?
21   A.  It would be I believe over 10 grams is a
22  felony, so it had to be less than 10 grams and not within
23  a thousand feet of a school.  Then it's a misdemeanor
24  offense.

---

Page 178

1    Q.  In those instances where it's less than 10
2  grams and not near a school, do you have discretion to
3  not bring charges against this individual?
4    A.  At Homan Square, yes.
5    Q.  And so why did you bring these individuals with
6  less than 10 grams of marijuana into Homan Square?
7    A.  Because they delivered to an undercover officer
8  and committed a crime.
9    Q.  So you would bring them into custody in order
10  to charge them with the crime of delivery of less than
11  10 grams of marijuana?
12   A.  Yes.
13   Q.  Did you ever get other information from these
14  individuals who you brought into custody for less than 10
15  grams of marijuana?
16   A.  I don't recall.
17   Q.  Do you recall asking them about other criminal
18  incidents?
19   A.  I'm sure I did, but I have no specific
20  recollection.
21   Q.  Do you recall if you pursued charges against
22  these individuals who you brought into custody for
23  possession of under 10 grams of marijuana?
24   MR. CIFONELLI:  Still talking just Homan, right?

---

Page 179

1    MS. OHRI:  Yeah, Homan.
2    THE WITNESS:  I would assume on occasion we did.
3  BY MS. OHRI:
4    Q.  On those occasions that you didn't, would there
5  have been a supplementary narcotics report?
6    A.  On all occasions, there would have been a
7  supplementary narcotics report.
8    Q.  And where are these supplementary narcotics
9  reports located?
10   A.  Depends.
11   MR. CIFONELLI:  Object, foundation.
12   THE WITNESS:  Homan Square.
13  BY MS. OHRI:
14   Q.  Are they accessible outside of Homan Square?
15   A.  I don't know.
16   Q.  Do you know if they are a paper file?
17   A.  They are at Homan Square.  Beyond that, it's
18  not on paper.  It's not computerized.
19   Q.  Do you know if there's -- I mean, strike that.
20   Do you know if these supplementary narcotics
21  reports for individuals who ultimately become cooperating
22  individuals, do you know if their sup reports are located
23  in its own location?
24   MR. CIFONELLI:  Object to form.

---

Page 180

1    THE WITNESS:  All supplementary narcotics reports
2  are kept at Homan Square.  After they pass a certain --
3  when there's a certain amount -- I don't know how it
4  works beyond that, like if they are stored somewhere else
5  when they are, you know, when it comes that they are five
6  years old, maybe they are stored somewhere else.  I don't
7  really know, but initially they are all at Homan Square.
8  BY MS. OHRI:
9    Q.  Do you know if a copy of these supplementary
10  narcotics reports goes to Central Records?
11   A.  I have no idea.
12   Q.  You spoke earlier about instances where you
13  brought in a cooperating witness for the gang unit,
14  right, that you believed you had probable cause to detain
15  for narcotics?  You spoke about it two minutes ago.
16   A.  Where -- okay.  I didn't bring them in for the
17  gang unit.  We made a covert narcotics purchase from the
18  individual, we brought him into Homan Square, then he
19  informed me he was a cooperating individual for someone
20  in gangs.
21   Q.  Sure.
22   Would there have been any other way for you to
23  verify if this person was a cooperating individual other
24  than calling the police officer that he referenced?

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 181

1    A.  I believe that information would be at
2  Confidential Matters at 35th and Michigan.
3    Q.  They would be Confidential Matters at 35th and
4  Michigan even if they weren't a registered CI?
5    A.  If they were not registered, then no, they
6  would have to tell me that they were a cooperating
7  individual for this person, and then I would have to call
8  them.
9         There is no database of cooperating
10 individuals.
11   Q.  There is no other documentation who is a
12 cooperating individual?
13     MR. CIFONELLI: Object to form.
14     THE WITNESS: Yes.
15 BY MS. OHRI:
16   Q.  Is that true for -- are all the records of all
17 confidential informants kept at Central Records or just
18 those that get paid?
19     MR. CIFONELLI: Object, foundation.
20     MS. OHRI: Confidential -- strike that.
21 BY MS. OHRI:
22   Q.  Are the records that you spoke of about
23 confidential informants, confidential matters, are those
24 only for confidential informants who are paid?

Page 182

1      MR. CIFONELLI: Same objection.
2      THE WITNESS: I believe as long as they are
3  registered, then they are kept at Confidential Matters.
4         Whether or not they are paid, I don't know.
5  BY MS. OHRI:
6    Q.  When you spoke earlier about needing a
7  sergeant's approval before identifying somebody as a
8  confidential individual or cooperating individual, isn't
9  that right?
10   A.  Ultimately the sergeant makes the decision
11 whether the person will be formally charged or cooperate,
12 yes.
13   Q.  So how would you go about getting their
14 approval?
15   A.  I would tell -- the way it works with my
16 sergeant, I would say this individual has information
17 about this, this, and this, and he would say -- he would
18 ask me my opinion, you know, what do you think, and I
19 would say I think it would have potential to turn into an
20 investigation, and then he would have to weigh that
21 against criminal background, propensity for arrest for
22 violence, parole, domestic battery arrests, convictions,
23 and then it's really his call.
24   Q.  Is that assessment recorded anywhere?

Page 183

1    A.  No.
2    Q.  Is the sergeant required to make an affidavit
3  about his decision or her decision?
4      MR. CIFONELLI: Object to foundation.
5      THE WITNESS: Not that I'm aware.
6  BY MS. OHRI:
7    Q.  Is there any approval in writing?
8      MR. CIFONELLI: Same objection.
9         You can answer.
10     THE WITNESS: Not that I'm aware.
11 BY MS. OHRI:
12   Q.  And so you spoke of people offering information
13 to you and in turn becoming a cooperating individual.  In
14 your experience what's the shortest -- strike that.
15       What's the longest amount of time it's taken
16 someone you brought in as a detainee to ultimately become
17 a cooperating individual?
18     MR. CIFONELLI: Objection, form.
19 BY MS. OHRI:
20   Q.  Was it over two hours?
21   A.  Yeah.
22   Q.  Would it be over four hours?
23   A.  Rarely.
24   Q.  Have there been instances where it's over six

Page 184

1  hours?
2    A.  Not for me personally.
3    Q.  Do you know of instances where it's been more
4  than six hours?
5    A.  No.
6    Q.  At Homan Square?
7    A.  No.
8    Q.  Do you know of individuals who have been held
9  overnight at Homan Square?
10     MR. CIFONELLI: Objection, foundation, and term
11 overnight.
12     THE WITNESS: No.
13 BY MS. OHRI:
14   Q.  You have never observed someone being held
15 overnight at Homan Square?
16     MR. CIFONELLI: Object to vague as to the term
17 overnight.
18     THE WITNESS: No.
19 BY MS. OHRI:
20   Q.  Do you consider Coffey to have been held
21 overnight?
22   A.  No.
23   Q.  Why not?
24   A.  I mean, he was gone by 11:30, approximately,

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 185

1    certainly by midnight.
2        Q.  Have you ever heard of someone being brought in
3    on one day, perhaps in the evening, and being transferred
4    to a district station the next morning?
5        MR. CIFONELLI: I mean, just object to the terms
6    evening and morning, but -- as vague, but go ahead.
7        THE WITNESS: That's possible.
8    BY MS. OHRI:
9        Q.  But in your experience, you have never had
10   someone in custody at Homan Square who you have brought
11   in the day before and transferred the following morning
12   or afternoon?
13       MR. CIFONELLI: Same objections.
14       THE WITNESS: Not that I recall.
15   BY MS. OHRI:
16       Q.  And when you were speaking with someone and
17   it's becoming apparent to you that they are going to --
18   they may be a cooperating individual, do you hold off on
19   making an arrest report?
20       A.  Yes.
21       Q.  And so during that time, do you know if there's
22   any public record of where that person is?
23       MR. CIFONELLI: Object to form.
24       THE WITNESS: I don't know.

---

Page 186

1    BY MS. OHRI:
2        Q.  Do you know if procedures have changed in
3    relation to bringing someone in who may become a
4    cooperating individual if those procedures have changed
5    since 2015?
6        MR. CIFONELLI: I just object to the form.
7        THE WITNESS: I believe they have.  I don't know
8    specifics.
9    BY MS. OHRI:
10       Q.  Do you know of any general order that would
11   have called for a procedural change?
12       A.  I don't recall the name of the general order,
13   but there was one changed.
14           I don't know why I can't think of the name of
15   it, but I believe now that specifically says that the
16   first page of an arrest report will be completed without
17   delay, and it specifically -- they have created, I
18   believe, a District Station Supervisor at Homan Square,
19   and I don't know, I'm not there anymore, but there is now
20   Homan Square can be listed in a drop-down menu that
21   wasn't there before.
22       Q.  So in your experience when you were there,
23   there wasn't -- you did not have to fill out the first
24   page of an arrest report, correct?

---

Page 187

1        A.  It wasn't explicit in a general order, right.
2    Yeah, that's correct.
3        Q.  And you also didn't have a sergeant -- how did
4    you say it?
5        A.  District station supervisor.
6        Q.  A district station supervisor?
7        A.  There was no sergeant at the desk, the 24-hour
8    desk when I was there, except -- I'm sorry.  For the last
9    month that I was there, they were starting to initiate
10   those changes.  I think that's when the order went into
11   effect.
12       Q.  That was in 2015?
13       A.  Yes.
14       Q.  Do you know if that's about the same time that
15   the Guardian article came out about Homan Square?
16       A.  I think that was prior.  I don't know how -- I
17   think the Guardian articles came out first.  I don't know
18   specifically when.
19       Q.  Were the procedures -- did the procedures
20   relating to cooperating individuals, did those change
21   while you were at Homan Square?
22       A.  No.
23       Q.  You weren't working at Homan Square when the
24   Guardian articles came out, were you?

---

Page 188

1        MR. CIFONELLI: Were or weren't?
2    BY MS. OHRI:
3        Q.  You were?
4        A.  I believe I was.
5        Q.  Do you recall any reaction among people who
6    worked there?
7        A.  Well, when I saw that Calvin Coffey said that I
8    made him defecate on the floor and clean it up, I was a
9    little surprised, but other than that, I can't speak to
10   other people's reaction.
11           There was none that I recall.
12       Q.  Okay.  You spoke earlier about having picked up
13   numerous juveniles to question at Homan Square, is that
14   right?
15       MR. CIFONELLI: Object to form.
16       THE WITNESS: I don't know if I said -- I don't know
17   if I said I picked them up to question.  They were
18   arrested and brought to Homan Square.
19   BY MS. OHRI:
20       Q.  But you arrested numerous juveniles and brought
21   them to Homan Square?
22       A.  Yes.
23       Q.  About how many?
24       A.  I don't know.

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 189

1    Q.   Would it be over ten?
2    A.   I would say so.
3    Q.   Over 20?
4    A.   Probably.
5    Q.   Over 30?
6    A.   It's possible.
7    Q.   Over 40?
8    A.   I don't know.
9    Q.   So would you say between 30 and 40 in your
10   career?
11   A.   Probably.
12        If you showed me that it was 50, I wouldn't be
13   shocked.
14   Q.   Okay.  So it's possible it could be over 50?
15   A.   Maybe.
16   Q.   Do you recall what the youngest age was of a
17   person that you picked up?
18   A.   No.
19   Q.   Was it -- do you recall picking up someone over
20   the age -- someone under the age of 15?
21   A.   Yes.
22   Q.   Do you recall picking someone up who was under
23   the age of 14?
24   A.   Maybe.  I don't know.

Page 190

1    Q.   What about under 13?
2    A.   It wouldn't surprise me.
3        Under 13?  No, I don't have specific
4    recollection of under 13, while I was in Homan.
5    Q.   But it's possible that you picked up someone
6    over 13 and perhaps under 14?
7    A.   Yes.
8    Q.   Did you ever -- were you ever aware of any
9    order or requirement prohibiting you from picking up
10   someone under a certain age?
11       MR. CIFONELLI: Just object to form.
12       THE WITNESS: No.
13   BY MS. OHRI:
14   Q.   Do you know if there is now?
15       MR. CIFONELLI: Same objection.  Where?
16   BY MS. OHRI:
17   Q.   At Homan Square?
18   A.   No, I have no idea.
19   Q.   Have you ever characterized a detainee brought
20   into Homan Square as "John Doe"?
21   A.   Could you rephrase the question.
22   Q.   Have you ever characterized or named an
23   arrestee brought into Homan Square in an arrest report or
24   any sup report as a "John Doe"?

Page 191

1    A.   In an arrest report, no.
2        In either, no.
3    Q.   Have you ever described someone as being a John
4    Doe another Chicago police officer?
5    A.   If they were a John Doe on a search warrant, a
6    J. Doe, then yes.
7    Q.   And what does that mean?
8    A.   You have somebody that goes before a judge and
9    swears out a search warrant as J. Doe, they would sign J.
10   Doe on the search warrant.
11   Q.   And why would they go as John Doe?
12   A.   They would go as J. Doe to protect their
13   anonymity --
14       MR. CIFONELLI: Anonymity?
15       THE WITNESS: Yes.
16       MR. CIFONELLI: Just say anonymous.
17       THE WITNESS: That's why they would do that.
18   BY MS. OHRI:
19   Q.   Would they ordinarily be confidential
20   informants?
21       MR. CIFONELLI: I'm sorry.  Could you read back.
22       (RECORD READ BACK BY REPORTER.)
23       MR. CIFONELLI: Objection to foundation.
24       THE WITNESS: On the search warrant?  If they are

Page 192

1    registered as an informant, then they would -- they would
2    be a J. Doe.
3        MS. OHRI: I'm sorry.  Could you repeat that.
4        THE WITNESS: If they were registered, then -- and
5    you were doing a registered informant search warrant,
6    then they would be a registered informant.
7    BY MS. OHRI:
8    Q.   They would not be a John Doe or a J. Doe?
9    A.   I have never done that, no.
10   Q.   Okay.  In your career working in Homan Square,
11   have you ever brought someone you arrested to District 11
12   for processing rather than Homan Square?
13       MR. CIFONELLI: I'll just object to the term
14   processing as vague.
15       THE WITNESS: I'm sorry.  Could you repeat the
16   question.
17       MS. OHRI: Yeah.
18   BY MS. OHRI:
19   Q.   In your time working out of Homan Square, have
20   you ever brought someone you arrested to a District
21   Station like District 11 for processing rather than Homan
22   Square?
23   A.   Yes.
24   Q.   And do you know what districts you brought them

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 193

1  to?
2  A. 6 and 5.
3  Q. And do you recall why you did that?
4  A. And also 10, I believe.
5  6 and 5, because we were already working so far
6  south; 10, it was part of a longer-term investigation,
7  and we didn't want the individual to know that we were
8  from Homan Square.
9  Q. Why didn't you want them to know you were from
10 Homan Square?
11 A. Because we didn't want them to think that the
12 conspiracy police were watching them.
13 Q. Was the conspiracy police watching them?
14 A. We worked at Homan Square and we were watching
15 them.
16 Q. So working in narcotics, in your experience,
17 have people ever concealed narcotics on their body?
18 A. Yes.
19 Q. Have people ever concealed narcotics under
20 their clothes on their body?
21 A. Yes.
22 Q. Have you conducted custodial searches of people
23 who concealed narcotics on their body?
24 A. Yes.

---

Page 194

1  Q. Have you ever conducted a custodial search of
2  anyone who has concealed narcotics in their body?
3  A. No.
4  Q. Are you aware of people concealing narcotics in
5  body cavities?
6  A. I have never encountered it.
7  Q. When you conduct custodial searches of people
8  who you suspect of having narcotics concealed on their
9  body, how do you go about doing that?
10 A. I would -- I -- usually I tell people I know
11 that you have narcotics here, take it out, drop it on the
12 floor. That's usually what happens.
13 Q. Have you ever searched someone to try to find
14 narcotics that you suspect is concealed on their body?
15 A. Yes.
16 Q. And how have you searched those people?
17 A. Through their clothing, have them shake their
18 clothing, loosen their clothing, shake it.
19 Front and rear waistband, I would check that.
20 Socks, come off, turned inside out, come down
21 to one layer of clothes, search the clothes.
22 Q. What do you mean one layer of clothes?
23 A. If they have two pairs of pants on, one pair is
24 coming off.

---

Page 195

1  If they had a T-shirt and a hoody on, the
2  hooded sweatshirt is coming off.
3  If they have a jacket, a hooded sweatshirt, and
4  a T-shirt on, the jacket and the hooded sweatshirt is
5  coming off.
6  Q. Have you ever required someone to take off --
7  to strip down to their underwear in order to search them?
8  A. Yes.
9  Q. And have you ever required someone to take off
10 their underwear in order to search them?
11 A. No.
12 Q. When you conducted these searches, have they
13 been in the interrogation rooms or the interview rooms at
14 Homan Square?
15 A. Yes.
16 Q. Have you conducted these searches anywhere
17 else?
18 A. No.
19 Q. When you conducted the kind of search where you
20 needed someone to strip down to their underwear, did you
21 need approval to be able to do that?
22 A. No. To my knowledge, if you were going to
23 search a prisoner to look at parts of their body, or
24 conduct a strip search, then you would need approval from

---

Page 196

1  a commanding officer.
2  Q. Okay. And so your definition of a strip
3  search is for them to take off all of their clothes?
4  A. Yes.
5  Q. Including their underwear?
6  A. Yes.
7  Q. Have you ever conducted searches of women at
8  Homan Square?
9  A. I have not.
10 Q. Do you know if women are searched at Homan
11 Square?
12 A. Yes.
13 Q. Do you know if they are ever searched by male
14 officers?
15 A. I don't believe they are.
16 Q. Do you know of any strip searches that have
17 ever occurred at Homan Square?
18 A. I don't.
19 Q. You have never heard of anyone being strip
20 searched?
21 A. No.
22 Q. So if you did want to conduct a strip search,
23 what would be the procedure to be able to do that?
24 A. I would have to tell my sergeant, who would

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 197

1 then have to tell the lieutenant, who I believe would
2 then need approval from the commander.
3    Q.  If you wanted to do a body cavity search, what
4 would be the procedure to be able to get approval for
5 that?
6    A.  A search warrant signed by a judge.
7    Q.  And who would conduct the search?
8    MR. CIFONELLI: Objection, form -- or foundation.
9 Sorry.
10 BY MS. OHRI:
11   Q.  Pursuant to the warrant?
12   A.  I believe they would have to be taken to a
13 hospital.
14   Q.  And in Homan Square, aside from the interview
15 rooms, there's also a cell area, isn't there?
16   A.  Yes.
17   Q.  Have you ever conducted searches in that area?
18   A.  Yes.
19   Q.  Have you ever conducted searches where you have
20 required people to take off clothes in that area?
21   A.  I'm sure that I have.
22   Q.  Have you ever conducted searches where you have
23 required someone to strip down to their underwear in that
24 area?

Page 198

1    A.  To their underwear?
2    Q.  Uh-huh.
3    A.  Probably.
4    Q.  And you may have said this before, but I just
5 want to ask you, have you ever witnessed anyone visiting
6 a detainee at Homan Square, like family member or
7 community member?
8    A.  Not that I recall.
9    MR. CIFONELLI: Objection, form.
10   THE WITNESS: Not that I recall.
11 BY MS. OHRI:
12   Q.  And have you ever witnessed an attorney
13 visiting a detainee or arrestee at Homan Square?
14   A.  I have never witnessed it, no.
15   Q.  Have you ever heard any screams coming from the
16 interview rooms or holding cells at Homan Square?
17   A.  No.
18   Q.  Have you heard crying coming from the interview
19 rooms or holding cells at Homan Square?
20   A.  Yes.
21   Q.  Can you recall in what instances you have heard
22 crying?
23   A.  Usually they were just crying because they've
24 been arrested.

Page 199

1    Q.  Have you ever investigated why someone was
2 crying?
3    A.  No, not unless it was my arrestee.
4    Q.  And have you ever smelled any urine coming out
5 of cells or interview rooms at Homan Square?
6    A.  No.
7    Q.  Have you ever smelled any urine coming out of
8 the interview rooms?
9    A.  No.
10   Q.  And you described earlier that as a police
11 officer working out of Homan Square, you did not have
12 access to the witness visiting or witness fields in the
13 arrest reports that is Exhibit 1, I think; do you recall
14 that?
15   A.  Yes.
16   Q.  Do you know why you don't have access to that?
17   A.  No.
18   Q.  Have you ever heard of the Community Justice
19 Center?
20   A.  No.
21   MS. OHRI: No?
22   I'm going to have this Exhibit 4, I think.
23   (WHEREUPON, DEPOSITION EXHIBIT NO. 4 WAS
24   MARKED FOR IDENTIFICATION.)

Page 200

1    MS. OHRI: We can pass out Exhibit 5 as well.
2    (WHEREUPON, DEPOSITION EXHIBIT NO. 5 WAS
3    MARKED FOR IDENTIFICATION.)
4 BY MS. OHRI:
5    Q.  So I'm going to draw your attention to
6 Exhibit 5 at the bottom, it says second arresting officer
7 and it has your name, right, Scott Kravitz?
8    Oh, for the record, Exhibit 5 is Community
9 Justice Center arrests occurring in District 11, and at
10 the bottom it's FCRL 058788.
11   And your name, Officer Kravitz, is at the
12 bottom, isn't that right?
13   A.  It is.
14   Q.  So have you seen something like this before?
15   A.  No.
16   Q.  Do you know what it is?
17   A.  No.
18   Q.  Do you remember this arrest of John House on
19 July 18th, 2013?
20   A.  No.
21   Q.  And turning your attention to Exhibit 4, which
22 for the record is FCRL 058708 to 058717, you will see on
23 the top, it says top arrestees in District 11; do you see
24 that?

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 201

1      A.  Yes.
2          Top ten arrestees?
3      Q.  Top ten arrestees?
4      A.  Yes.
5      Q.  Do you know what a top ten arrestee is?
6      A.  It's an arrestee that because of, I don't know
7   how they -- I don't know what formula they use to go
8   ahead and to make it a top ten arrestee list, but they're
9   ten people usually with multiple arrests, I would assume
10  that they're violent arrests, are on the top ten list of
11  arrests in the district.
12     Q.  What's the purpose of a top ten list?
13     A.  I don't know what the purpose is.
14        MR. CIFONELLI: Object to foundation.
15     BY MS. OHRI:
16     Q.  So do you know if -- this is from District 11.
17  Do you know if each district has a top ten arrestee list?
18     A.  I don't know if they still do.  They did at one
19  point, I believe.
20     Q.  Did you ever reference the list before
21  conducting any police work?
22        MR. CIFONELLI: I'm sorry.  I just didn't hear.
23        Could you read it back.
24        (RECORD READ BACK BY REPORTER.)

---

Page 202

1      THE WITNESS: No.
2   BY MS. OHRI:
3      Q.  Did you ever -- okay.  Strike that.
4          I'm just going to pass around, do you know if
5   Homan Square had a top ten list?
6      A.  I don't.  Not that I'm aware.
7      Q.  But you are aware of this concept of top ten
8   arrestees?
9      A.  Yes.
10     Q.  And why are you aware of that?
11     A.  After I or after I had arrested somebody, I
12  might have been notified or told that I believe when
13  somebody -- when you arrest somebody that's on the top
14  ten list, you have to make a copy of the packet and now
15  give it to the district intervention officer, or I don't
16  know what the difference is.
17        You've got to make a -- you've got to notify
18  somebody you locked up a top ten arrest person.
19     Q.  Well, what's in the packet?
20     A.  Just a copy of the arrest.
21     Q.  And who do you notify?
22     A.  I don't know.
23        In 25, there was a bin on the file cabinet door
24  and you would put it in there.

---

Page 203

1      Q.  Do you know who compiles this list or who files
2   the top ten arrestees?
3      A.  No, I don't.
4      Q.  Have you ever arrested someone because you
5   recognized them as a top ten arrestee?
6      A.  No.
7      Q.  Have you ever arrested an identified top ten
8   arrestee?
9      A.  I'm sorry.  Could you repeat the question.
10     Q.  Have you ever yourself arrested someone who
11  happened to be a top ten arrestee?
12        MR. CIFONELLI: Object to relevance to this
13  continuing line of questioning.
14        THE WITNESS: Not that I recall.
15     BY MS. OHRI:
16     Q.  Do you know if there's a top ten arrestee
17  identified for the entire City of Chicago?
18        MR. CIFONELLI: Same objection.
19        THE WITNESS: I don't know.
20     BY MS. OHRI:
21     Q.  Have you ever heard of Operation Impact?
22     A.  Yes.
23     Q.  Why have you heard of that?
24     A.  That was the name of when I first came over to

---

Page 204

1   narcotics, it was Operation Impact.
2      Q.  Oh, okay.  You had mentioned something earlier
3   about a heroin --
4      A.  Yeah, I think eventually it turned into --
5   those teams turned into West Side Heroin Initiative
6   teams, but at first they were Operation Impact teams.
7      Q.  And can you describe to me what Operation
8   Impact was or is?
9      A.  Well, for us in narcotics, it was to make
10  covert narcotics purchases during afternoon and evening
11  hours, in narcotics.
12        As far as the rest of the city, I'm not really
13  sure.
14     Q.  Did you ever have like a training on Operation
15  Impact itself?
16     A.  No.
17     Q.  Did you know other teams who worked on
18  Operation Impact?
19     A.  There was -- I believe there was three teams
20  when I first came to narcotics that were, and then I
21  believe later on, there were two more that were added, I
22  believe.
23     Q.  Was there ever a stated goal of Operation
24  Impact?

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 205

1      A.  It was to -- I'm not sure what the stated goal
2   was.  I think it was an attempt to curb gun violence
3   through narcotics-based arrests.
4      Q.  And how does -- how do you curb gun violence
5   through narcotics-based arrests?
6      A.  I don't know.
7      Q.  Well, when you conducted narcotics
8   investigations, was it ever your goal to ask about guns?
9      A.  Yes.
10     Q.  Was it ever your goal to, while conducting
11  narcotics investigations, to retrieve guns?
12     A.  I wouldn't say it was my goal.
13     Q.  But did you retrieve guns while conducting
14  narcotics investigations?
15     A.  I did.
16     Q.  How often would you say?
17     A.  I don't know, maybe a couple a year, maybe a
18  few more, give or take.
19     Q.  How did you go about identifying these guns?
20     A.  Sometimes you would ask an individual if he had
21  any knowledge of where guns were being kept.  If they did
22  and they were on the street, then you would go get them.
23         If they had knowledge of a person who usually
24  kept a gun on them, you would have to conduct

Page 206

1   surveillance and see if you can make contact with that
2   individual, and if they were -- if they had seen them
3   recently inside a house, then another option was to
4   conduct a search warrant.
5      Q.  All right.  And the people that offered you
6   that information about guns, were they -- did they offer
7   information to you while they were in custody at Homan
8   Square?
9      A.  Yes.
10     Q.  So you spoke earlier about working in
11  enforcement and detaining someone based off of positive
12  identification from a surveillance officer or a person
13  who is doing the buy?
14     A.  Buy.
15     Q.  What's the name for the person doing the buy?
16     A.  Purchasing officer.
17     Q.  Would you need a positive identification from
18  the purchasing officer?
19        MR. CIFONELLI:  Objection, form.
20        THE WITNESS:  Yes.
21  BY MS. OHRI:
22     Q.  Would you need a positive identification from
23  the purchasing officer before you took someone into
24  custody?

Page 207

1         MR. CIFONELLI:  Objection, form.
2         THE WITNESS:  Yes.
3   BY MS. OHRI:
4      Q.  And would you need positive identification from
5   a purchasing officer before you transported someone to
6   Homan Square?
7         MR. CIFONELLI:  Same objection.
8         THE WITNESS:  Yes.
9   BY MS. OHRI:
10     Q.  Do you know of a Sergeant Frank Romaglia?
11     A.  I know him in passing.
12     Q.  And what do you know about him?
13     A.  He, I believe, he works in gang investigations.
14     Q.  Do you know anything else about him?
15     A.  He used to work in narcotics.
16     Q.  In Operation Impact?
17     A.  Yes.
18     Q.  Did you ever work with him?
19     A.  No.
20     Q.  Do you know if he has any kind of reputation
21  among officers at Homan Square?
22        MR. CIFONELLI:  Objection, form.
23        THE WITNESS:  Not that I'm aware.
24

Page 208

1   BY MS. OHRI:
2      Q.  Do you know a Sergeant Brian Kane?
3      A.  Yes.
4      Q.  And how do you know him?
5      A.  He used to work, I believe, he used to work on
6   a gun team while I was in the 11th District, and he was
7   then in narcotics while I was in narcotics as a police
8   officer.
9      Q.  So you worked with him?
10     A.  No.
11     Q.  You just happened to both be in narcotics?
12     A.  Yes.
13     Q.  Do you know anything else about him?
14     A.  I know he's now a sergeant.
15     Q.  What about do you know Police Officer Kathleen
16  McCann?
17     A.  I know who she is.
18     Q.  Have you ever spoken with her?
19     A.  No.
20     Q.  And how do you know who she is?
21     A.  She works in narcotics -- worked.  I believe
22  she retired recently.
23     Q.  Do you know that she was a purchasing officer?
24     A.  I have never worked with her.  I really don't

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 209

1    know.
2        I don't believe I worked with her.
3    Q.  What about Kevin Connolly?
4    A.  He works in narcotics.  I don't know him,
5    personally.
6    Q.  Or Alejandro Miranda?
7    A.  I have no idea who that is.
8    Q.  Okay.  Have you ever heard of the term the
9    police code of silence?
10   A.  Yes.
11   Q.  And how have you heard that term?
12   A.  Media.
13   Q.  Do you agree that there is one?
14   A.  No.
15   Q.  How would you define the police code of
16   silence?
17   A.  I don't know.
18   Q.  So you would say that there isn't one even
19   though you don't know how to define it?
20   A.  It seems like whatever people are saying the
21   code of silence is, it is.
22       I would assume what they're talking about is
23   some kind of like sweeping under the rug, a blatant
24   pattern of sweeping misconduct under the rug or doing

Page 210

1    whatever.
2    Q.  Okay.  Have you yourself ever witnessed police
3    misconduct?
4    A.  No.
5    Q.  Has anyone ever witnessed you participating in
6    police misconduct?
7    A.  No.
8    Q.  Have you ever heard of anyone participating in
9    police misconduct?
10   A.  Sure.
11   Q.  And where have you heard that?
12   A.  I know that there's usually media, or you'll
13   hear that somebody got stripped, or whatever, something
14   like that, and there'll be an investigation.
15   Q.  Do you believe that when you have heard that
16   someone had been strip searched legally?
17   A.  No.  No.  Stripped of police powers.
18   Q.  Stripped of police powers, okay.
19       Do you believe that it was valid that they were
20   being stripped of police powers?
21   MR. CIFONELLI: Objection, incomplete hypothetical,
22   form.
23   THE WITNESS: I don't know what that means.
24       If I heard they were stripped of police powers,

Page 211

1    I'm sure they were stripped of police powers.
2    BY MS. OHRI:
3    Q.  Would you have believed it's justified?
4    MR. CIFONELLI: Same objections.
5    THE WITNESS: If there's an investigation that's
6    conducted, then yes, if they are found at fault, then I
7    believe it's justified.
8    BY MS. OHRI:
9    Q.  And who do you believe needs to find them at
10   fault?
11   MR. CIFONELLI: Objection, form.
12   THE WITNESS: I don't know.
13   BY MS. OHRI:
14   Q.  Have you ever believed that someone being
15   stripped of police powers is justified, not hypothetical,
16   have you ever believed that it's been justified?
17   MR. CIFONELLI: Objection, foundation.
18   THE WITNESS: Yes.
19   BY MS. OHRI:
20   Q.  Oh, in what instances?
21   A.  Well, I just heard today that there was people
22   assigned to a gang team that were stripped of their
23   police powers for taking money during drug
24   investigations.

Page 212

1        If that's true, I think they should be stripped
2    of their police powers.
3    Q.  But you don't know -- you don't have a position
4    of whether or not that's true?
5    A.  No.
6    MR. CIFONELLI: I just object to form.
7    BY MS. OHRI:
8    Q.  Have you heard of Jon Burge?
9    A.  I have.
10   Q.  And what do you think of Jon Burge?
11   MR. CIFONELLI: I object to the relevance of this.
12       Go ahead.
13   THE WITNESS: I don't know him.
14   BY MS. OHRI:
15   Q.  What do you think about the misconduct he's
16   been accused of?
17   MR. CIFONELLI: Same objections.
18   THE WITNESS: If the misconduct is true, I feel it's
19   terrible.
20   BY MS. OHRI:
21   Q.  Are you a member of the FOP?
22   A.  Yes.
23   Q.  Do you support the FOP's policy of paying for
24   police officers charged with misconduct?

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 213

1      MR. CIFONELLI: Objection, foundation, relevance.
2      THE WITNESS: Yes.
3  BY MS. OHRI:
4      Q.  Do you support the FOP paying for the defense
5  of Jon Burge?
6      MR. CIFONELLI: Same objections.
7      THE WITNESS: Yes.
8  BY MS. OHRI:
9      Q.  While you were at Homan Square, did you have a
10  commander that you worked under?
11     A.  Yes.
12     Q.  And what commanders did you work under?
13     A.  O'Grady, Washington, and Waldara.
14     Q.  Can you give me their first names?
15     A.  James O'Grady, Eric Washington, and Thomas
16  Waldara.
17     Q.  And while you were at Homan Square, how many
18  lieutenants did you work under?
19     A.  I don't remember the exact number, maybe six.
20     Q.  Do you recall their names?
21     A.  Ryle, Kilroy, O'Shea, Cline.
22     Q.  If you don't mind giving us their first names
23  as well.
24     A.  Mike Ryle, William Kilroy, Mathew Cline, Melvin

---

Page 214

1  Roman.
2      I don't recall the Lieutenant O'Shea's first
3  name for some reason.
4      Q.  Just to clarify, are these commanders of Homan
5  Square or are they -- no, right.  I'm starting from the
6  top.
7      Are they commanders of Homan Square or are they
8  commanders of a narcotics division?
9      A.  They were commanders of narcotics.
10     Q.  Do you know if they are separate from
11  commanders from gang divisions?
12     A.  There is a separate commander for each.
13     Q.  And I know you didn't work for them, but do you
14  know how many commanders there were?
15     A.  I believe Chris Kennedy was the commander of
16  Gang Investigations Intelligence.  That's the only
17  commander that I'm aware of.
18     Q.  And the lieutenants that you just mentioned,
19  those are lieutenants of the Narcotics Division?
20     A.  That's correct.
21     Q.  And how many sergeants did you work under when
22  you were there?
23     MR. CIFONELLI: Objection, asked and answered, I
24  think.

---

Page 215

1      THE WITNESS: I worked under two.
2      The teams I was assigned to was Alejandro
3  Sanchez at first, and then he left that team, and it was
4  taken over by Sergeant Vincent Avery, and then I then
5  went to the team sergeant-ed by Alejandro Sanchez.
6  BY MS. OHRI:
7      Q.  And then how many were there in total for the
8  Narcotics Division in Homan Square?
9      A.  I think I answered that.
10     MR. CIFONELLI: Asked and answered.
11  BY MS. OHRI:
12     Q.  Was there ever like an overall commander of
13  Homan Square of all divisions?
14     MR. CIFONELLI: Objection, form.
15     THE WITNESS: I suppose that might be the Chief of
16  Organized Crime.
17  BY MS. OHRI:
18     Q.  Where is his office?
19     A.  That's a good question.  I don't know.
20     I know he has one at 35th and Michigan.
21  Whether there's one at Homan Square, I'm not sure.
22     Q.  Okay.  Do you know his name or her name?
23     MR. CIFONELLI: Taking about the one now?
24

---

Page 216

1  BY MS. OHRI:
2      Q.  Well, the one when you were working at Homan
3  Square?
4      A.  I believe it was Chief Roty.
5      Q.  First name?
6      A.  I don't recall.
7      MR. CIFONELLI: Nicholas.
8      MR. TAYLOR: Okay.  The commander in court?
9      MR. CIFONELLI: I think I was on paternity leave at
10  that time.
11     No, it wasn't him.
12     MS. OHRI: I don't think I have any more questions.
13     MR. CIFONELLI: Actually I have to talk to Khara
14  real quick.
15     It's going to be short.
16     MS. MILLER: Sure.
17          (SHORT RECESS.)
18     MR. CIFONELLI: Ready.
19       E X A M I N A T I O N
20  BY MR. CIFONELLI:
21     Q.  Okay.  Sergeant Kravitz, I just have a few
22  follow-up questions for you before we wrap it up.
23     Sergeant, have you ever denied a detainee at
24  Homan Square access to the bathroom?

---

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

Page 217

1       A.   No.
2       Q.   Have you ever denied a detainee at Homan Square
3   access to food or water?
4       A.   No.
5       Q.   Have you ever denied a detainee at Homan Square
6   access to an attorney if they asked for one?
7       A.   No.
8       Q.   Are you aware of any practice of other officers
9   at Homan Square of denying any of those things, bathroom,
10  food, water, attorney to detainees at Homan Square?
11      A.   No.
12      Q.   Are you aware of any practice of keeping
13  detainees at Homan Square overnight in order to hide them
14  from their family, friends, or attorneys?
15      MR. TAYLOR:  Objection to form.
16      THE WITNESS:  No.
17      MR. CIFONELLI:  I don't think we marked -- we didn't
18  mark the complaint, did we?
19      MS. MILLER:  No.
20      MS. COLEMAN:  I think we went up to 5, right?
21  BY MR. CIFONELLI:
22      Q.   Actually, Sergeant, if you could go back to
23  Exhibit 2, please, the arrest report.
24      A.   Yes.

Page 218

1       Q.   And if you could please turn to Page 3 -- I'm
2   sorry, Page 4.
3            For the record, it's Bates stamp FCRL 16081.
4   Do you see that?
5       A.   Yes.
6       MR. TAYLOR:  Is this the completed one rather
7   than --
8       MR. CIFONELLI:  Yes, Exhibit 2.
9   BY MR. CIFONELLI:
10      Q.   And, Sergeant, do you see up there at the top
11  right, there's a line that says transport details two PO;
12  do you see that?
13      A.   Yes.
14      Q.   What does two PO mean?
15      A.   Two POs in the car.
16      Q.   Okay.  And that number to the right there, is
17  that 6245H, do you know what that stands for?
18      A.   Yeah, we were team -- my team was 6245.  That
19  was our call number on the radio, and I was H-Henry is my
20  specific designator for me.
21      Q.   So what does that signify then, the 6245H?
22      A.   That I transported the individual, the arrestee
23  to Homan Square.
24      Q.   And did the two POs, does that mean that there

Page 219

1   were two officers in the car?
2       A.   Yes.  But I don't think -- I think the choices
3   are either -- and it's been a while since I filled out an
4   arrest report -- either one or two.  There's no option
5   for three.
6       Q.   And 6 February, 2015, I think we can understand
7   that, but to the right of there, there's time, looks
8   likes 1751?
9       A.   It does.
10      Q.   So that's 5:51, is that right?
11      A.   That's correct.
12      Q.   What does that 5:51, 1751 represent?
13      A.   That would usually be the time of transport to
14  Homan Square, but I don't recall being on the street for
15  50 minutes before we went in.  I'm not -- I can't explain
16  that time.
17      MR. CIFONELLI:  Okay.  Nothing further.
18      MR. TAYLOR:  I have a couple of questions.
19      I didn't give them to Shubra.
20      MS. COLEMAN:  They belong to Shubra.  They are her
21  questions.
22      E X A M I N A T I O N
23  BY MR. TAYLOR:
24      Q.   Let me ask you a couple of questions.

Page 220

1            You were asked about an officer named Ceja,
2   C-E-J-A?
3       A.   Yes.
4       Q.   And you worked with him in narcotics, is that
5   right?
6       A.   That's correct.
7       Q.   And you said that you didn't believe there was
8   a code of silence in the police department?
9       A.   Right.
10      Q.   Did you know that he had been disciplined just
11  prior to coming to narcotics for lying and participating
12  in the code of silence and disciplined for a couple of
13  months?
14      A.   Are you sure you've got the right Ceja?
15           If that's the same one, I don't know.  I
16  believe he has a father on the job.  I don't know if it's
17  the same one, but if it was the same Ceja, I was not
18  aware of it.
19      Q.   You never discussed it with them?
20      A.   No.
21      MR. TAYLOR:  Okay.  Thank you.
22      MR. CIFONELLI:  We'll reserve.
23      MS. MILLER:  All right.
24      THE REPORTER:  Are you ordering?

ANGEL PEREZ v.
CITY OF CHICAGO

SCOTT KRAVITZ
January 31, 2018

---

Page 221

1    MS. MILLER: Yeah.

2    MR. CIFONELLI: I'll take a copy.

3         (AND FURTHER DEPONENT SAITH NOT.)

4         (WHEREUPON, THE DEPOSITION WAS

5         TERMINATED AT 5:05 P.M. )

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

Page 222

1    STATE OF ILLINOIS )
                       ) SS:
2    COUNTY OF COOK )

3

4         I, Laurel E. Laudien, a Certified Shorthand

5    Reporter, certify:

6         That the foregoing proceedings were taken before

7    me at the time and place therein set forth, at which time

8    the witness was put under oath by me;

9         That the testimony of the witness, the questions

10   propounded, and all objections and statements made at the

11   time of the examination were recorded stenographically by

12   me and were thereafter transcribed;

13        That the foregoing is a true and correct

14   transcript of my shorthand notes so taken;

15        That the signature of the witness was reserved;

16        I further certify that I am not a relative or

17   employee of any attorney of the parties, nor financially

18   interested in the action.

19        I declare under penalty of perjury under the

20   laws of Illinois that the foregoing is true and correct.

21        Dated this 12th day of February, 2018.

22

23        _____

24        LAUREL E. LAUDIEN, RMR, RPR, CSR No. 084.001871

---

Page 223

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3    ANGEL PEREZ, et al.,          )
                                   )
4              Plaintiffs,          )
                                   )
5         vs.                       )   No. 13 C 4531
                                   )
6    CITY OF CHICAGO, et al.,      )
                                   )
7              Defendants.          )

8

9         This is to certify that I have read my

10   deposition taken on the 31st day of January, 2018 in the

11   foregoing cause, and that the foregoing transcript

12   accurately states the questions asked and the answers

13   given by me, with the changes or corrections, if any, made

14   on the errata sheet attached hereto.

15

16        _____

17                          Scott Kravitz

18

19

20

21

22

23   No errata sheets submitted (Please initial)

24   Number of errata sheets submitted _____ (pgs.)

---