**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANGEL PEREZ, et al., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13-cv-4531 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

For the reasons set forth below, the Court denies Plaintiffs' motion for class certification [270]. This case is set for further status hearing on January 16, 2020 at 9:00 a.m.

**I.      Background**

This longstanding case concerns the Chicago Police Department's (CPD) use of its Homan Square facility.  This opinion presumes familiarity with the Court's earlier rulings in this case. See generally, *e.g.*, [124, 186].  Relevant facts regarding the Homan Square facility, named Plaintiffs' arrests, and the present motion for class certification are provided for context.

**A.      Homan Square**

The Chicago Police Department has more than twenty geographically defined police districts throughout the city. [271-1, 18:19]. Each district has its own central stationhouse. [*Id.*, 19:6–11.] Homan Square was a law enforcement facility, but it was not a district stationhouse. [*Id.*, 24:18–20.] Homan Square was nevertheless an important facility for law enforcement: organized crime officers worked out of Homan Square [271-6, 24:11–16.]; the Evidence and Recovered Property Section was housed there [290-2, 221:13–15.]; and federal law enforcement officers also regularly visited Homan Square [*Id.*, 221:19, 291:6–15].

Although Homan Square was not a stationhouse, sometimes arrestees were brought there immediately following their arrest to "begin initial processing." See [290-2, 226:10–11]. The vast majority (perhaps as many as 90%) of arrestees brought to Homan Square were brought in by the narcotics division of the organized crime unit. [271-6, 43:1–10.] Because arresting officers could not complete processing at Homan Square, they would then take the arrestees to the 11th district stationhouse, "which is very close to Homan Square." [290-2, 267:22–268:7.] The 11th district is "probably the most violent district in the city," and is therefore "one of the busier districts," even absent the transferees from Homan Square. [290-4, 235:13–24.][1]

An officer's decision to take a suspect to Homan Square as opposed to a stationhouse is based on several factors. [*Id.*, 207:21–209:15.] Two predominate. First, an arrestee would be brought to Homan Square if the arrest was part of an undercover investigation, because Homan Square has sterile facilities to allow undercover officers to maintain anonymity. *E.g.*, [271-6, 45:3–10]; [290-2, 224:2–12]. Second, an arresting officer may need to use facilities specific to Homan Square. [271-6, 42:11–20.] For example, officers based out of Homan Square have their offices and computers at that location, and thus can process arrestees more quickly than at a stationhouse, where they do not have ready access to computers and investigation rooms. [290-2, 265:24–266:12 ("If you go into Homan Square, you're going to be able to process the person faster. There won't be computers available in the districts because they've very busy districts. There is—there is—interview rooms are full and you can't—you can't even get on a computer and then do anything. * * * It's faster sometimes to bring them to Homan Square to do the initial processing and then

---

[1] The CPD has not published aggregate arrest data during the proposed class years of 2013–15, but 2016 data corroborates this statement: The 11th district had thousands more arrests than any other police district in the city. See Chicago Police Department, "Annual Report 2017" at 83, available at https://home.chicagopolice.org/wp-content/uploads/2019/03/Chicago-Police-Department-Annual-Report-2017.pdf.

bring them to a holding facility afterwards. It all depends on the specifics of the case.")]; see also [*id.*, 279:20–280:16.] That is especially true for arrests made within the CPD's 11th police district, which has a very busy, "constantly over filled" stationhouse; taking someone to Homan Square may simply be quicker. [290-4, 235:17–24]; see also [*id.*, 318:4–18 (providing additional context as to why Homan Square may be quicker.).] That said, sometimes the decision to bring an arrestee to Homan Square was made by the officers' supervisors before the arrest. [290-4, 207:21–209:15.]

Homan Square, until recently, had different policies and procedures regarding processing arrestees than district stationhouses. See [271-5 at 2–3 (amending intake procedures to apply to Homan Square)]. When a suspect is brought to a stationhouse, the CPD must abide by the "general procedures and responsibilities" for "detention facilities." See generally [271-2]. [2] These policies are comprehensive and specific and generally geared toward ensuring arrestee safety and security. [*Id.*] CPD officers are also responsible for allowing arrestees "to make a reasonable number of telephone calls to an attorney, family member, or friend;" generally "the arrestee will be allowed to make the calls within the first hour of entering the lockup." [271-2 at 4, ¶ 28.] That said, before an arrestee is placed in lockup, the entire arrest processing must take place—the arrestee is fingerprinted, photographed, and otherwise "booked" in the district stationhouse. See [271-1, 25:14–26:20]. The CPD has an automated arrest system that allows officers to track compliance with the dictates of the general order, including how frequently the arrestee interfaces with external contacts. See, *e.g.*, [271-4 at 4].

By contrast, Homan Square did not have the facilities to complete booking, most notably a fingerprinting machine. [271-1, 116:21–117:2.] Likewise, Homan Square did not have a

---

[2] The policy that Plaintiffs included in their motion for class certification is dated September 24, 2018—years after their respective arrests and the class closed. Defendants have not contested that these policies were in effect, and they are not central to the instant motion. The Court recites them here for context.

"lockup"; rather, it had a "bullpen." [290-2, 297:4–298:10.] Arrestees taken to Homan Square did not spend the night, as there was nowhere for them to sleep. [*Id.*]; see also [271-6, 40:7–11]. Instead, arrestees were handcuffed and placed into spare interrogation rooms. See [271-7, 68:9–69:9]. After the arrestee was handcuffed in the room, an officer would typically go back to his or her office to complete the initial paperwork before interrogating the arrestee. [271-6, 37:11–17.] As explained above, the organized crime officers at Homan Square had easier access to holding facilities and computers, and beginning processing at Homan Square sometimes expedited the completion of the post-arrest paperwork. *E.g.*, [290-2 at 265:24–266:12]. Officers testified that they attended to the safety, health, and security needs of Homan Square detainees—at least on an ad hoc and as needed basis. [271-7, 216–217]; [290-3, 269:25–270:9]; [290-2, 251:12–20].

Arrestees at Homan Square were given an opportunity to "cooperate" by informing on others. [271-1, 41:7–17.] Those who provided information were sometimes let off without having charges filed (or a formal record of arrest created). [271-7, 56:1–23.] Or, the suspect may be transferred to a district stationhouse and formally booked and processed. See [290-2, 270:4–16]; see also generally [271-3]. Generally speaking, those who agreed to speak to law enforcement were held at Homan Square longer than those who refused to cooperate, to give officers time to complete their interrogation. See [271-6 40:3–6 ("[Arrestees] could be in and out of Homan in a matter of less than an hour, or if they're cooperating, if they wish to cooperate with the police they could be there for several hours.")]. Arrestees were also released directly from Homan Square without further processing at a district stationhouse if "probable cause has dissipated" following arrest. [271-6, 50:17–51:6.]

Importantly, at least for the purposes of this litigation, the CPD's electronic arrest records did not allow officers to input Homan Square as the location of detention.[3] See [271-1 at 49:13–15]; see also [271-5 at 2 (introducing the requirement to record the location of a recent arrestee)]. Thus, when someone was taken into custody at Homan Square, the CPD's searchable database of arrests would not show that arrest. [271-1, 50:8–11.] Family members and friends who called the police to inquire into an individual's whereabouts could not get a straight answer as to whether that person had been arrested and where he or she had been taken. See [271-7, 53:2–54:21.] When arrestees were moved from Homan Square to a district stationhouse, the narrative of their arrest reports often indicated that they had been detained at Homan Square. [271-1, 50:13–24]; see also [271-3 at 3 (recording that Coffey was "transported to Homan Square for processing.")]; see also generally [271-12 (including the names, addresses, and charges of thousands of people who were initially processed at Homan Square)]. But, if an arrestee cooperated or was otherwise released without charges, then no formal arrest record was created. [271-7, 56:1–23.] That said, the CPD does maintain some ancillary files regarding people detained at Homan Square and subsequently released, including a register of every person brought to the facility. See, *e.g.*, generally [290-5]; [290-6].

### B.  Plaintiffs' Arrest[4]

Plaintiffs Curtis Coffey and Juanita Berry were arrested on February 6th, 2015. [271-3 at 2]; [290-6 at 1]. At the time, Coffey and Berry had been living together at Berry's mother's house. [290-9 at 9:11–20.] The CPD had been investigating Coffey for weeks, and had observed him

---

[3] It appears that until 2004, the CPD did not use electronic recordkeeping at all.  [271-1 at 43:2–4.]

[4] Plaintiffs recount different details of their respective arrests than the arresting officers.  Because the Court need not broach these factual issues in order to decide the instant motion, both sides of each story are presented for context.  As explained below, the fact-intensive and case-by-case nature of each putative class member's claim (as evinced by these competing narratives) militates strongly against class certification.

selling drugs within 1,000 feet of a school several times before he was arrested. [271-3 at 3.] On February 6, Coffey sold heroin to an undercover CPD officer. [*Id.*] Berry was with him when he sold the heroin, and both were arrested and transported to Homan Square. [290-6 at 2]; [271-3 at 3.] Following arrest, Coffey was taken first to Homan Square, and then was transferred to the 11th district's stationhouse for formal processing. His fingerprints and mugshot were taken between 11:42 p.m. and 12:06 a.m. [271-3 at 3, 5.] Berry was also taken to Homan Square, where she was interrogated. After she assisted in the officers' investigation of Coffey, they "released [her] pending further investigation." [290-6 at 2.]

Coffey claims that after being taken to Homan Square he was placed into an interrogation room, handcuffed, and immediately interrogated. [290-10, 87:3–17.] When Coffey requested to speak to an attorney, the officers responded that attorneys were not allowed into Homan Square. [*Id.*, 91:15–92:14.] During this initial interrogation, he did not ask to use the restroom. [*Id.*, 95:1.] Then the interrogators left and were replaced by two other officers. [*Id.*, 95:11.] During this second interrogation, Coffey did not ask for food, water, or bathroom access. But he again requested counsel. [*Id.*, 95:12–19.] Then a third set of officers came in to resume the interrogation; by then, hours had passed. [*Id.*, 99:7–18.] Coffey again did not ask for food, water, or bathroom access. [*Id.*, 103:19–23.] Soon after they left, though, Coffey had to use the restroom. He called out to people walking past for up to an hour, but no one would let him use the facilities, so he defecated on the floor. [*Id.*, 105:1–106:3.] An officer finally came in and made Coffey clean up the defecation using a do-rag—all while handcuffed to the wall. [*Id.*, 105:8–24.] After cleaning the room, Coffey fell asleep, and was awakened when he was transferred to another facility. [*Id.*, 110:2–17.]

One of the arresting officers agreed on the general outlines of Coffey's story, but differed on a few key details. According to Sergeant (then-Officer) Kravitz, he checked in on Coffey to ask

"him if he was okay, if he needed anything," to which Coffey said no. [*Id.*, 125:8–24.] Kravitz apparently checked in on Coffey more than five times throughout the evening. [*Id.*, 127:5–6.] On one of these occasions, Kravitz walked in to find that Coffey had defecated into his do-rag. [*Id.*, 127:18–21.] Coffey told Kravitz that he did not need any help cleaning it up, and then Kravitz took Coffey to the restroom to clean himself off. [*Id.*, 127:24–128:12.] According to Kravitz, Coffey had only been alone in the room for 30 to 45 minutes. [*Id.*, 128:18.] Police records indicate that Coffey was brought into the 11th district stationhouse at 11:37 p.m., where he was quickly fingerprinted, photographed, and placed into lockup. [271-3 at 3].

Berry maintains that she was initially held in a bare interrogation room for two to three hours, during which time the officers stood outside laughing at her.[5] [290-9, 57:6–10.] While Berry waited, she was not offered food, water, or the bathroom, but she also did not ask anyone for those facilities or services. [*Id.*, 59:16–60:12]. Berry also concedes that she did not ask to call an attorney, her friends, or family. [*Id.*, 104:5–19.] The officers did, however, allow Berry to make four external phone calls during which she explained she was in custody, but these calls were in service of the investigation—the interrogators wanted her help in tracking down firearms. [*Id.*, 64:8–16, 104:20–105:7.] During one of these calls, Berry arranged with a friend to drop a gun off in an abandoned warehouse. [*Id.*, 84:19–85:7.] Eventually, the officers realized that Coffey had been living at Berry's house and wanted to search their shared bedroom for further evidence. [*Id.*, 72:2–21, 77:7–22.]. She consented, and the officers uncovered a gym bag full of drugs, which they believed to be Coffey's. [*Id.*, 77:10–15; 75:10–76:11.] The officers then demanded that she help them find guns, so she led the police to the abandoned warehouse where her friend had deposited

---

[5] Berry arrived at Homan Square at 5:20 p.m., [290-5], and her bedroom was searched at 7:39 p.m. [290-8].

the firearm. [*Id.*, 76:20–23; 93:19–24.] She was then let go, but the police took her back to Homan Square to retrieve her car. [*Id.*, 97:23–98:3.]

Officer Iglesias has a slightly different story. He claims Berry was carrying 26 baggies of heroin when she was arrested. [290-3, 153:4–9, 260:7–19]; see also generally [290-6]. But after interviewing Berry, he became convinced that she was "a straight and narrow girl" who got "involved with the wrong guy," and that Coffey was the true owner of the drugs. [290-3, 157:12–23.] He claims that Berry was more forthcoming about Coffey's drug dealing, and she volunteered that he kept additional drugs in her bedroom. [290-3, 143:3–21.] She was also asked about "typical homicides and stuff and anything type of illegal activity," to which she replied that she knew "where gang members would store guns." [290-3, 148:7–16.] Berry then signed a consent form allowing the officers to search her bedroom, after which they took her home and searched her bedroom for drugs. [290-3, 168:21–23.] The police found a gym bag containing thousands of dollars' worth of drugs in Berry's bedroom, and Berry then led the police to a location where they found a gang-related gun. [290-8 at 3; 290-3, 191:12–13.] According to Iglesias, rather than taking Berry back to Homan Square, the officers let her go on the scene. [290-9, 192:3–19.]

### C. Motion for Class Certification

The present motion is for class certification. In Plaintiff's third amended complaint [202], Plaintiffs bring several claims, including one set of proposed classes regarding those subject to "secret arrest" [202, ¶¶ 105–24] and one set of proposed classes regarding those subject to unconstitutional conditions of confinement at Homan Square [*id.*, ¶¶ 125–39]. Individual plaintiffs have also brought claims against the City and individual officers regarding their individual experiences. See [*id.*, ¶¶ 140–56.] The present motion for class certification only concerns the

"secret arrest" classes, and not the conditions of confinement classes. See [270 at 2.] Specifically,

Plaintiffs ask to certify two related classes.:

> **Class I (Detainee and Arrestee Class):** All natural persons detained or arrested by a Chicago Police Officer where no public record of the detainment or arrest was created within a reasonable amount of time from the initial detainment (Plaintiffs suggest one hour from the initial detainment) and where no court order existed at the time of arrest or detainment sealing or otherwise making the detainment or arrest confidential, beginning on a date two years prior to the filing of this Complaint to the present.[6]

> **Class II (Future Detainees and Arrestees Class):** All persons who may in the future be subject to the secret arrests Described in Class One. [202, ¶ 117.]

In their reply, Plaintiffs propose narrowing the backward-looking class as follows:

> **Amended Class I (Detainee and Arrestee Class):** All natural persons detained or transported for initial arrest processing by a Chicago Police Officer to the "non-district facility," identified in General Order 06-01-01, Effective Date 11/12/15, as Homan Square, where no public record of the detainment or arrest was created within a reasonable amount of time from the initial arrest (Plaintiffs suggest one hour from initial detainment) and where no court order existed at the time of arrest or detainment sealing or otherwise making the detainment or arrest confidential, beginning March 31, 2013 to the present. [305 at 10.]

Plaintiffs bring this secret arrest claim pursuant to 42 U.S.C. § 1983, but do not describe

which specific constitutional right was violated. Compare [*id.*, ¶ 105 ("42 U.S.C. § 1983 CLAIM

FOR SECRET ARRESTS")], with [*id.*, ¶ 125 ("42 U.S.C. § 1983 CLAIM FOR DEPRIVATION

OF ADEQUATE ACCOMODATIONS IN VIOLATION OF 4TH AMENDMENT")]. Plaintiffs

concede that almost all the known class members were ultimately booked in a CPD district

stationhouse, meaning that a public record of their arrest was eventually created—just not

immediately. See [271 at 11 (the extant list of known arrestees taken to Homan Square is "under

inclusive as it does not take into account those individuals who were not formally booked after

---

[6] The proposed class definition in the motion for class certification is almost identical, except it included the wrong date. See [270 at 2.] The parties have agreed that the correct date from which to count backward two years is March 31, 2015. See [290 at 11]; [305 at 9].

being taken to Homan Square because the data warehouse only maintains records for those arrests which generate a CB number, meaning formal charges were ultimately sought against the person and the person was booked at a District station.") (citation omitted)].

To be clear, the only issue before the Court is whether the celerity with which Homan Square arrests were publicized can be adjudicated on a class-wide basis. Plaintiffs have not moved to certify, and the Court will therefore not consider, its proposed class regarding conditions of confinement at Homan Square. The Court also is not being asked to adjudicate Coffey's or Berry's individual allegations that their arrests were publicized too late, or any of the appalling individual allegations of mistreatment included in the complaint.

## II.    Legal Standard

To be certified as a class action, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternative requirements in Rule 23(b). *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Rule 23(a) provides that a named party may sue on behalf of individuals who are similarly situated if: (1) the class is so numerous that joinder of all putative class members is impracticable ("numerosity"); (2) there are questions of law or fact common to the putative class ("commonality"); (3) the claims or defenses of the named party are typical of the claims or defenses of the putative class members ("typicality"); and (4) the named party will fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a). "[A] proposed class must always meet the Rule 23(a) requirements." *Messner*, 669 F.3d at 811. "Because Rule 23(a) provides a gate-keeping function for all class actions, ordinarily [courts] begin there and only turn * * * to Rule 23(b) after [the court is] certain that all of Rule 23(a)'s requirements had been met." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015).

Rule 23(b) sets forth four circumstances under which a class action may be maintained, two of which Plaintiffs rely on here: Rule 23(b)(2) and Rule 23(b)(3). Rule 23(b)(2) permits class certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(3) permits class certification if: (1) questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members ("predominance"); and (2) a class action is superior to other available methods of resolving the controversy ("superiority"). *Messner*, 669 F.3d at 811. Moreover, the class must also meet Rule 23's "implicit requirement of 'ascertainability,'" meaning that the class is "defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

Plaintiffs bear the burden of demonstrating that they are entitled to class certification. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Although class certification proceedings are not "a dress rehearsal for the trial on the merits," *Messner*, 669 F.3d at 811, for purposes of deciding the certification question, the Court does not presume that all well-pleaded allegations are true. See *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676-77 (7th Cir. 2001). Rather, before it allows a case to proceed as a class action, the Court "should make whatever factual and legal inquiries are necessary under Rule 23." *Id.* at 676. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). But the showing need not be "to a degree of absolute certainty. It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Messner*, 669 F.3d at 811 (citation omitted). "[A] class should not

be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Kohen v. Pacific Inv. Management Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (citations omitted). The Court exercises broad discretion in determining whether class certification is appropriate given the particular facts of the case. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998).

## III. Analysis

The Court proceeds as follows: First, the Court examines the threshold issue of which constitutional rights are at stake in a § 1983 action for "secret arrest." Next, the Court considers the four Rule 23(a) factors. Finally, the Court turns to Rule 23(b)'s requirements.

### A. Threshold Issues

#### 1. Propriety of Instant Motion

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979). As a "threshold inquiry" in any § 1983 suit, the Court must determine which "'specific constitutional right' [is] at issue." *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 920 (2017) (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality opinion)). Here, however, Plaintiffs have not addressed this threshold question, and instead identify it as a common question to be addressed on a class-wide basis. See [270, ¶4(d)]. They cite no authority suggesting that class certification is appropriate when the putative class sues under a vague cause of action, let alone that this *warrants* certification.

Thus, based on the briefing to date, the Court cannot even begin its analysis under Rule 23. For example, "[a]nalysis of predominance under Rule 23(b)(3),' and thus of commonality under Rule 23(a)(2), 'begins * * * with the elements of the underlying cause of action.'" *Boundas v.*

*Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 413 (N.D. Ill. 2012) (quoting *Messner*, 669 F.3d at 815). Here, Plaintiffs do not spell out one of the elements of a § 1983 action—which civil right was violated. Plaintiffs' motion thus turns the commonality analysis into a house of mirrors— to them, the key common question that underlies every class member's case is…whether there is a common question that underlies every class member's case.[7] Likewise, because Plaintiffs do not define the nature of the constitutional injury, it is impossible to discern whether the named class members are typical or would adequately represent the proposed class. That is, the named Plaintiffs allege that their respective *experiences* at Homan Square were typical of those brought there—but they have not shown that their *claims* are typical. Thus, rather than shouldering their burden of demonstrating the class certification is warranted, Plaintiffs have saddled the Court with the task of filling in a three-dimensional matrix of constitutional tests, Rule 23 factors, and underlying facts.

### 2.     The Fourth Amendment Is the Relevant Provision

Nonetheless, the Court proceeds as if this motion were proper, and thus will attempt to determine which constitutional right is at issue. Indeed, as the "threshold inquiry" in any § 1983 suit, the Court must "'identify the specific constitutional right' at issue." *Manuel*, 137 S. Ct. at 920 (quoting *Albright*, 510 U.S. at 271 (plurality opinion)). In their motion for class certification, Plaintiffs propose three constitutional sources for the right to have one's arrest publicized: the Fourth Amendment, freedom of speech, and the writ of habeas corpus. [270, ¶ 4(d).] In their opening brief, they do not cite a single case that directly supports any of those theories and ignore

---

[7] It is not even clear that these questions are common to the class. Different constitutional provisions have different rules, tests, and standards; there is nothing to say that the contours of a habeas corpus claim, for example, will look the same as a Fourth Amendment claim. As such, resolving that there is, for example, a Fourth Amendment right to have one's arrest publicized would do nothing for the class members who can only make out a habeas corpus claim, and visa versa.

the First Amendment and habeas arguments altogether. See generally [271]. They do, however, describe the CPD practices at issue here as a "continuation" of a practice that the Seventh Circuit has held unconstitutional on Fourth Amendment grounds. [271 at 2 (citing *Lopez v. City of Chicago*, 464 F.3d 711 (7th Cir. 2006).] In reply, however, Plaintiffs argue that the Fourth Amendment framework used in *Lopez* should not be used here. Compare *Lopez*, 464 F.3d at 722 (citing Fourth Amendment cases that require analyzing the length of detention at issue and the reasonableness of any delay), with [305 at 12 ("Plaintiffs' issue is with the ***secrecy*** that surrounds the detention and interrogations of citizens arrested on warrantless arrests at Homan Square, ***not the time*** it took police officers to interrogate them.")]. They aver that they meant to bring a freedom of association claim, but repeatedly cite freedom of the press cases elsewhere. See [305 at 8, 3–4]. They also seem to argue that there is a freestanding constitutional right to have one's arrest publicized. [*Id.* at 2–4.][8]

"The Fourth Amendment * * * establishes 'the standards and procedures' governing pretrial detention.'" *Manuel*, 137 S.Ct. at 920 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). The Supreme Court recently reviewed its § 1983 jurisprudence as it applies to methods of arrest and pretrial detention and concluded that its precedents support using the Fourth Amendment as the constitutional framework in these cases. *Id.* at 917–19 (discussing *Gerstein* and the various opinions in *Albright*). Moreover, the Supreme Court has recognized that the established

---

[8] This confusion bleeds into Plaintiffs' description of when a "secret arrest" becomes a constitutional violation. In some places, Plaintiffs argue that any lapse between arrest and publicization is unconstitutional [305 at 12 ("Any person arrested and taken to Homan Square, not pursuant to a warrant, was subject to the same unconstitutional practice (subject to a secret arrest), no matter the length of detention.")]. Elsewhere they seemingly concede that some delays in publicization are reasonable [305 at 10 (defining the putative class to exclude those whose arrests were publicized "within a reasonable amount of time from the initial arrest")]; [270, ¶ 4(a) (scoping the right to be publicization "within a reasonable time"). Finally, they cite dicta in cases that, to the extent that they are relevant, imply that there is no harm if the arrest is publicized *eventually*—even if it is well after the arrest and detention occurred [305 at 2–4].

Fourth Amendment framework governing post-arrest procedures is designed to ferret out "secret detention." See *Corley v. U.S.*, 556 U.S. 303, 306 (2009) (discussing *County of Riverside v. McLaughlin*, 500 U.S. 44, 60–62 (1991) (Scalia, J., dissenting)). This case concerns how arrestees are treated immediately following detention. As such, the Court follows the Supreme Court's guidance and will analyze this putative class action under a Fourth Amendment framework.

The Plaintiffs' arguments to the contrary are unconvincing. First, they argue that this should be analyzed as a First Amendment or habeas corpus case. But they provide no citations that indicate what these provisions have to say about an arrestee's rights. Plaintiffs do cite a pre-*Gerstein* case about convicted prisoners' (qualified) First Amendment right to associate with counsel and loved ones. See [305 at 9 (citing *Procunier v. Martinez*, 416 U.S. 396, 413 (1974))]. But even assuming that the exact same legal standards applied to recent arrestees and people incarcerated in prison following conviction, and even assuming that *Procunier* required that prisoners be given instant access to any external contacts, *Procunier* was overruled and the Supreme Court now mandates using a "reasonableness" framework, which is the precise standard that is used in the Fourth Amendment context. *Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989).[9] In any event, arrestees' ability to contact the outside world is governed by the Fourth Amendment. See *e.g.*, *Chortek*, 356 F.3d, 740, 744, 746 (7th Cir. 2004) (analyzing whether the police violated the Constitution by holding arrestees incommunicado under a Fourth Amendment framework); see also *Moran v. Burbine*, 475 U.S. 412, 421–22, 425 (1986) (suggesting that

---

[9] As explained below in Section III(B)(1), delays in booking an arrestee are judged considering their reasonableness under the circumstances. Because these are fact intensive, case-by-case determinations, the putative class fails the commonality prong. The same analysis would obtain under *Abbott*'s reasonableness framework, which required remand to the district court to determine the reasonableness of prison regulations limiting written material imported to the prison "as applied to each of the 46 publications" at issue in the litigation. *Abbott*, 490 U.S. at 419; see also *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002) (citing *Pope v. Hightower*, 101 F.3d 1382, 1385 (11th Cir. 1996)) (upholding jailor's refusal of pre-trial detainee's use of telephone).

arrestees have no right to be informed that their attorneys are trying to contact them). The Court is also at a loss as to what argument Plaintiffs are trying to make about habeas corpus, but so-called *Gerstein* hearings (which are required by the Fourth Amendment) are thought to provide the first line of judicial review before a writ of habeas corpus. See *Gerstein*, 420 U.S. at 115.

Plaintiffs also cite to a variety of cases that they claim establish a freestanding constitutional right to have one's arrest publicized. Their authorities are not on point, certainly as applied to the rights of individuals within hours of their arrest. First, Plaintiffs cite to several cases brought in the aftermath of the terrorist attack on September 11, 2001. See [305 at 2–4 (citing *Center for Nat. Sec. Studies v. U.S. Dept. of Justice*, 215 F. Supp. 2d 94, 96 (D. D.C. 2002); *In re Application of U.S. for Material Witness Warrant*, 214 F. Supp. 2d 356, 364)]. In *Nat. Sec. Studies*, a district court held that federal *statutes* required the Department of Justice to furnish the names of people detained *indefinitely* on the suspicion of terrorist activity. *Id.* at 100 (discussing the Freedom of Information Act, 5 U.S.C. § 552). Plaintiffs fail to mention that the district court went on to hold that the First Amendment does not require the government to furnish the date of arrest or location of detention. *Id.* at 111. Even the court's limited statutory holding, however, was overturned on appeal. *Center for Nat. Sec. Studies v. U.S. Dept. of Justice*, 331 F.3d 918, 928 (D.C. Cir. 2003). And *In re Application of U.S.* is further afield. In that case, the government detained a suspected 9/11 accomplice for ten days to secure his testimony before a grand jury. *Id.* at 359. During that time, he falsely confessed, which seemingly justified a longer detention. *Id.* After the false confession was brought to light, the *New York Times* and the detainee sought to unseal the grand jury proceedings, which the district court refused to do. *Id.* at 363–64. Plaintiffs cite to another case regarding the detention of a material witness in which the district court also refused to release the name of that witness. See [305 at 3 (quoting *In re Grand Jury Material Witness*

*Detention*, 271 F. Supp. 2d 1266, 1268 (D. Or. 2003)]. Even assuming these cases were relevant, Plaintiffs have not shown how any of these cases should apply to the putative class, which is almost entirely composed of people who ultimately did have a public record of their arrest created. See [271 at 11].

Next, Plaintiffs cite dicta from *McNabb v. U.S.*, 318 U.S. 332, 343 (1943). Although *McNabb* strongly condemned secret arrests and lengthy, incommunicado interrogations, the Supreme Court did not announce a *constitutional* rule in that case—rather, it reached its holding (that a confession following a lengthy, incommunicado interrogation must be suppressed) under its "supervisory authority over the administration of criminal justice in federal courts." *McNabb*, 318 U.S. at 341; *id.* at 340 ("In the view we take of the case, however, it becomes unnecessary to reach the Constitutional issue pressed upon us."); see also *Mallory v. U.S.*, 354 U.S. 449, 451–54 (1957) (explaining how Congress's adoption of Fed. R. Crim. P. 5 clarified the *McNabb* rule). Congress later statutorily narrowed this doctrine, giving law enforcement officers a 6-hour safe harbor to interrogate suspects incommunicado before presentment to a magistrate—and even then, the trial court may still discretionarily admit a confession extracted more than six hours after arrest. *Corley*, 556 U.S. at 311, 314–15, 322 (interpreting 18 U.S.C. § 3501(c)); see also *United States v. Abu Khatallah*, 275 F. Supp. 3d 32, 52 (D. D.C. 2017) (discussing the evolution of the *McNabb-Mallory* doctrine, and finding that a 13-hour delay in presentment was reasonable). All of this to say that the modern iteration of the *McNabb-Mallory* doctrine tolerates incommunicado interrogations of the sort at issue in the instant case and never announced a constitutional rule that would have supported a § 1983 tort suit in the first place.

Plaintiffs go on to cite cases about the freedom of the press, arguing that these create a right in having one's arrest publicized. [305 at 3–4.] Preliminarily, Plaintiffs do not actually advance a

freedom of the press theory. See, *e.g.*, [270, ¶ 4(d).]  The cases they cite concern the press's freedom to obtain information about the government, not individuals' rights to have their information publicized.  In fact, the parties have not briefed whether Plaintiffs have standing to bring such a claim and, if so, whether class certification is appropriate.

Regardless, the Supreme Court has held that the press's constitutional right of access to judicial proceedings does not extend to all aspects of criminal justice processing, particularly when the press's rights abut suspects' Fourth Amendment rights. *E.g.*, *Wilson v. Layne*, 526 U.S. 603, 612–613 (1999). Thus, whatever First Amendment right the press has in obtaining information regarding criminal trials must be balanced against arrestees' Fourth Amendment privacy rights. See *American Civil Liberties Union v. U.S. Dept. of Justice*, 750 F.3d 927, 932 (D.C. Cir. 2014) ("[W]e have regularly concluded that individuals have a strong interest in avoiding disclosure of their involvement in alleged criminal activity.") (quotation marks and citations omitted); see also generally Sadiq Reza, *Privacy and the Criminal Arrestee or Suspect: In Search of a Right, In Need of a Rule*, 64 Md. L. Rev 755 (2005) (reviewing legal and policy considerations and suggesting model legislation to *prevent* disclosure of arrestees' identities); cf. *Demery v. Arpaio*, 378 F.3d 1020, 1029–30 (9th Cir. 2004) (holding video-stream of pretrial detainees unconstitutional); *Lauro v. Charles*, 219 F.3d 202, 212 (2d Cir. 2000) (holding staged perp walk unconstitutional).

Plaintiffs' strongest dicta regarding secret arrests comes from *Morrow v. D.C.*, 417 F.2d 728, 741–42 (D.C. Cir 1969). See also [305 at 2 (quoting same)]. The procedural posture of that case is complicated, but, in broad brushstrokes, the D.C. Circuit was asked to assess whether a statute allowed somebody's arrest record to be expunged. *Id.* at 730–31. Although the D.C. Circuit did not ultimately decide that question, it opined in dicta about the policy considerations that weigh in favor of and against publicization of arrest information. *Id.* at 741–43. As Plaintiffs note, statutes

generally require "that arrest books be open to the public [] to prevent any 'secret arrests,' a concept odious to a democratic society."[10] *Id.* at 741-42; *see also* [305 at 2–3 (citing same)]. But, suspects typically do not want their respective arrests publicized, because disclosure of this embarrassing information can hurt their employment prospects. *Id.* at 742. In any event, *Morrow* did include any holding regarding publicizing arrests and was not even a constitutional case to begin with. *Id.* at 741.

### B.     Rule 23(a) Factors

Even if the Court were to find the instant motion for class certification cognizable, the motion fails to meet the necessary four factors in a Rule 23 class action: numerosity, commonality, typicality and adequacy. The parties do not dispute that the numerosity prong is met. See [290 at 10].

### 1.     Commonality

For a class to be certified, questions of law or fact must exist common to the class. Fed. R. Civ. P. 23(a)(2). Only one common question is necessary to satisfy Rule 23(a)'s commonality requirement. See *Wal-Mart*, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do." (cleaned up)); *Walker v. Bankers Life & Cas. Co.*, 2007 WL 2903180, *4 (N.D. Ill. Oct. 1, 2007) ("Not all factual or legal questions raised in a lawsuit need be common so long as a single issue is common to all class members." (citation and internal quotation marks omitted)). However, superficial common questions—like whether each class member shares a characteristic or "suffered a violation of the same provision of law"—are not

---

[10] The "arrest books" at issue were not the contemporaneously updated, searchable public database for which Plaintiffs advocate.  Rather, the District kept a paper records system at a central location that compiled arrest records after they had been completed. *Id.* at 741.

enough. *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 350).

"Commonality requires the plaintiff to demonstrate that class members 'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 349–50 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)). Plaintiffs must show that "their claims can productively be litigated at once. Their claims must depend upon a common contention * * *. That common contention, moreover, must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. "'If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.'" *Messner*, 669 F.3d at 815 (citation and internal quotation marks omitted); see also *Tyson Foods, Inc. v. Bouaphakeo*, ——— U.S. ———, 136 S. Ct. 1036, 1045 (2016) (common questions exist where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." (citation omitted)).

"'Analysis of predominance under Rule 23(b)(3),' and thus of commonality under Rule 23(a)(2), 'begins * * * with the elements of the underlying cause of action.'" *Boundas*, 280 F.R.D. at 413 (quoting *Messner*, 669 F.3d at 815). As such, the Court must review Fourth Amendment doctrine. "'[T]he ultimate touchstone of the Fourth Amendment is reasonableness.'" *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Riley v. California*, 573 U.S. 373, 382 (2014)) (some internal quotation marks omitted). In the context of post-arrest detention, a suspect must promptly be brought before a magistrate for a judicial determination of probable cause. *Gerstein*,

420 U.S. at 125. But the Supreme Court also acknowledged the difficulties police officers may have in trying to "cope with the everyday problems of processing suspects through an overly burdened criminal justice system," and established a presumption shifting framework, whereby if a suspect is brought before a magistrate within 48 hours, the post-arrest process was presumptively reasonable, whereas if the delay was greater than 48 hours, it was presumptively unreasonable. *McLaughlin*, 500 U.S. at 53, 56; see also *Portis v. City of Chicago, Ill.*, 613 F.3d 702, 703-04 (7th Cir. 2010) (explaining that notwithstanding *McLaughlin*'s presumptions, individual determinations are required in every case). Unreasonable delays in criminal justice processing within that 48-hour window may include "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake."[11] *McLaughlin*, 500 U.S. at 56.

In this circuit, delays in individual steps of post-arrest processing may be actionable as a Fourth Amendment violation, but that, in turn, depends on the "reasonableness" of the officer's actions. *E.g.*, *Chortek*, 356 F.3d at 747–48 (7th Cir. 2004) (holding that delaying processing arrestees' paperwork and resultingly detaining arrestees incommunicado for up to 14 and a half hours was justifiable, but requiring explanation for delay); *Arlotta v. Bradley Center*, 349 F.3d 517, 523 (7th Cir. 2003) (holding that police policy of delaying formal booking for two hours for police convenience was justifiable); *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 437 (clarifying that a delay of "four hours requires explanation"); see also *Portis*, 613 F.3d at 704 (discussing the interplay between *McLaughlin*'s 48-hour presumption shifting framework and *Chortek* and *Gramenos*'s requirements of "an explanation for extended delay"). Which is to say,

---

[11] Notably, delays for the purpose of gathering evidence of unrelated crimes is not per se unreasonable.

each allegedly unreasonable detention must be evaluated in light of the specifics of what happened and the officer's justification for delay.

The Seventh Circuit has parsed the intersection between the Fourth Amendment's reasonableness standard and Rule 23's commonality requirement in several recent cases. First, the Seventh Circuit examined a putative class comprised of people who had been arrested for fine-only offenses who complained that they were held in police stationhouses for an unreasonably long period of time. See generally *Portis*, 613 F.3d 702. The district court certified the class and held that a delay of two hours from booking to release constituted a per se unreasonable delay. *Id.* at 703. The Seventh Circuit decertified the class, explaining that what constitutes a reasonable time to release is necessarily fact intensive; for example, officers may be "tied up with more urgent matters (a riot starts, for example, or a group of youngsters is arrested, and juveniles' higher processing priority delays the handling of adult cases)." *Id.* at 705, 704. Moreover, "[t]he premise of [] class certification is that one rule applies to all members," making bright-line determinations about what is a reasonable amount of time generally inappropriate; reasonableness is a standard that must be considered individually. *Id.* at 705; see also *Harper v. Sheriff of Cook County*, 581 F.3d 511, 515 (7th Cir. 2009).[12] *Portis* left the door open, however, for classes seeking to litigate "a policy of deliberate delay." *Portis*, 613 F.3d at 705 (citing *McLaughlin*, 500 U.S. at 59).

Picking up on this thread, the Seventh Circuit recently certified a class of people who asserted that they were subject to such a policy of delay. See generally *Driver v. Marion County Sheriff*, 859 F.3d 489 (7th Cir. 2017). The class was "composed of persons for whom legal

---

[12] Admittedly, both *Harper* and *Portis* analyzed Rule 23(b)(3)'s predominance standard, rather than Rule 23(a)(2)'s commonality requirement. The Seventh Circuit has subsequently clarified that "both cases made clear that a question about the length of detention could not be common to the class," and used the logic of those cases to decertify a class as lacking commonality. *Phillips v. Sheriff of Cook County*, 828 F.3d 541, 555–56 & n.34 (7th Cir. 2016).

authority for detention has ceased, whether by acquittal after trial, release on recognizance bond, completion of jail time in the sentence, or otherwise." *Id.* at 491. The county, though, had a policy of detaining arrestees for an additional *72 hours* after any legal basis for detention abated. *Id.* Moreover, the uncontroverted evidence showed that processing a detainee for release was substantially less time-consuming than booking an arrestee in the first place—that is, the 48-hour presumptive maximum discussed in *McLaughlin* is exponentially more time than necessary to process release. *Id.* at 491–92. The panel concluded that class certification was appropriate because "[a]t some point well short of the 24-plus hours alleged here, there is no reason to believe that individual issues would account for that delay." *Id.* at 492. In other words, the 72-hour policy definitively "caused [class members] to be detained for an unconstitutionally-unreasonable length of time" and thus constituted "a policy of deliberate delay." *Id.* (internal quotation marks and citations omitted).[13] Because all the class-members were subject to the same policy, and that policy was so far beyond the bounds of reasonableness, their cases would not need to be bogged down in the specifics of each individual detention.

Plaintiffs have not met their burden of showing that there is an issue common to the class. They propose two[14] common questions of fact: (1) "Whether CPD policy and use of facilities other

---

[13] Policies that explicitly delay the booking process—including the creation of a public record of arrest—are not necessarily per se Fourth Amendment violations. See *Arlotta*, 349 F.3d at 523 (holding that a policy of detaining arrestees in a police van for one to two hours was not actionable, because the police adequately justified said policy). Perhaps what distinguishes *Driver* is simply that the policy and practice of detaining people with no legal basis for days on end, when it should take no more than a couple hours to release them, is so outrageous to be unjustifiable. *Cf. Otero v. Dart*, 301 F.R.D. 276, 281–82 (N.D. Ill. 2013) (*Otero I*) (suggesting, in a pre-*Driver* case, that "overdetention-plus" claims may be amenable to class litigation, but expressing skepticism that they can be brought when the law enforcement officer's reasonableness is at issue).

[14] Plaintiffs submit two other supposedly common questions: (1) "Whether the failure to make a public record of the detention and arrest of an individual within a reasonable time violates constitutional rights" and (2) which constitutional right(s) guarantee the right to publicization. [270, ¶ 4(a)&(d).] As explained above, these questions cannot underlie the commonality inquiry. See supra Section III(A)(1). In any event, these proposed questions boil down to whether Plaintiffs suffered the same constitutional injury, but the

than district Police Stations allows CPD to detain citizens for prolonged periods of time, incommunicado" and (2) "Whether there is a custom of practice within the CPD of misusing facilities like Homan Square." These questions are not common to the class in that answering them will not "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Preliminarily, Plaintiffs' questions would merely resolve that CPD policies were susceptible to manipulation. But whether CPD's Homan Square policies are more susceptible to surreptitious delay would not resolve whether any given detention was unconstitutional.

Moreover, Plaintiffs have demonstrated neither that there is some point at which delays in publicization are per se unreasonable nor that the CPD had a policy of deliberate delay actionable under *Driver*. As explained above, the Seventh Circuit has repeatedly found that delays in bringing a suspect in for booking (and thus publicizing the arrest) must be subject to inquiries as to the reasonableness of the actions and justifications for delay. *Chortek*, 356 F.3d at 747; *Arlotta*, 349 F.3d at 523; see also *Portis*, 613 F.3d at 704; *McLaughlin*, 500 U.S. at 55 (explaining that numerous contingencies can delay criminal justice processing). Indeed, *Arlotta* even upheld a policy of deliberately delaying booking (and thus publicization) for up to two hours because such delays were convenient to arresting officers. *Arlotta*, 349 F.3d at 523. And *Chortek* clarified that even upon booking, the police could hold arrestees incommunicado for up to 14 and a half hours, so long as their delays in processing were justifiable or reasonable. *Chortek*, 356 F.3d at 744, 747. These cases provide no basis for determining that delaying publicization for one hour [proposed

---

common question cannot be whether Plaintiffs "suffered a violation of the same provision of law." *Jamie S.*, 668 F.3d at 497 (quoting *Wal-Mart*, 564 U.S. at 350). Moreover, determining whether the Constitution forbids unreasonably delayed publicization does not necessarily resolve a core issue of *all* the putative class members' claims. That is, whether the question is actually common to all the class members turns on whether each class member was treated reasonably, which cannot be resolved on a class-wide basis.

class definition]; two to three hours [Berry's timeline]; or six hours [Coffey's timeline] is so lengthy that it is *necessarily* unreasonable. This case thus does not fall within the narrow exception laid out in *Driver* allowing a class action to go forward when a county had an explicit policy of holding people without legal basis for days on end. See *Driver*, 859 F.3d at 492; see also *Otero v. Dart*, 306 F.R.D. 197, 203–04 (N.D. Ill. 2014) (*Otero II)* (explaining that following *Portis* and *Harper*, Fourth Amendment classes based on delay generally lack commonality). Indeed, Plaintiffs have done nothing to rebut the extensive testimony that being initially detained at Homan Square may *expedite* various aspects of booking, including the creation of the initial arrest record. [290-2 at 265:24–266:12, 279:20–280:16]; [290-4 at 235:17–24, 318:4–18].[15] In other words, Plaintiffs have not carried their burden in showing that should such a policy exist, it is so unreasonable that individualized factors need not be considered.[16] To the contrary, it appears that the Court may need

---

[15] To be clear, at this stage, the Court need not determine whether these statements are true on a class-wide or individual basis. Rather, *Gramenos* and *Chortek* allow law enforcement defendants to justify delays, and this justification would be at issue in many if not all of putative class members' cases.

[16] Plaintiffs attempt to analogize the instant case to *Dunn v. City of Chicago*, 231 F.R.D. 367 (N.D. Ill. 2005) in which a class of people detained in interrogation rooms for too long was certified. [271 at 12–13.] In *Dunn*, the plaintiffs alleged that the interrogation rooms were "inherently unfit for human occupancy for more than a few hours" because they lacked basic amenities, including a toilet or bed. *Dunn*, 231 F.R.D. at 373. The class definition was significantly narrower than that, encompassing people who spent most of the day—more than 16 hours—in an interrogation room. *Id.* at 371. The court reasoned that even if some people were treated better than others during those 16 hours, that baseline of time spent in an unadorned interrogation room is always beyond the pale. *Dunn* is a far cry from the case at bar: That case was solely about the amenities provided in interrogation rooms, not with how long it takes to generate a public record. *Id.* Moreover, *Dunn* is quite similar to *Driver*: keeping an arrestee in a room that is inherently unfit for human occupancy for upwards of 16 hours a day is so far beyond reasonableness that individual circumstances cannot explain any delay. In any event, to the extent that *Dunn* is analogous to the case at bar, the Seventh Circuit's decisions in *Harper*, *Portis*, and *Driver* (let alone the Supreme Court's decision in *Wal-Mart*) have subsequently provided greater clarity into the contours of commonality. See *Otero I*, 301 F.R.D. at 281 (viewing district court opinions that predated *Harper* and *Portis* skeptically); *cf.* also *Dunn*, 231 F.R.D. at 372, 376 (approvingly citing the district court's (subsequently reversed) class certification in *Portis v. City of Chicago*, 2003 WL 22078279 (N.D. Ill. September 8, 2003), for the legal standard for classifying Fourth Amendment classes).

to examine the details of every Homan Square detention to determine whether taking a particular arrestee to Homan Square was justifiable.

Even if the Court were certify this class and find on the merits that there is a city-wide policy of interrogating people at Homan Square, that does not make out the prima facie case for a deprivation of civil rights under § 1983. Each plaintiff will have to show not only that their detention delayed formal processing and not only that the announcement of their arrest was delayed—but also that all of these delays and any associated decisions were unreasonable. *Arlotta*, 349 F.3d at 523. Based on Plaintiffs' submission, the Court concludes that none of these questions can be addressed commonly.

Plaintiff's arguments to the contrary miss the mark. First, Plaintiffs seem to argue that *any* period of secrecy—no matter how brief—is a per se constitutional violation, and thus class treatment is appropriate. [305 at 12 ("Plaintiffs' issue is with the **secrecy** that surrounds the detention and interrogations of citizens arrested on warrantless arrests at Homan Square, ***not the time*** it took police officers to interrogate them.")] But this flies in the face of the explicit holdings of *Arlotta* and *Chortek*, which explained, respectively, that detaining an arrestees for hours before bringing them in for booking can be justified, and arrestees can be held incommunicado for hours if the delay in processing is due to an administrative backlog. *Arlotta*, 349 F.3d at 523; *Chortek*, 356 F.3d at 747. In other words, when faced with a nearly identical legal question, the Seventh Circuit refused to establish a per se rule that booking (and thus publicization) must occur immediately—instead, the constitutionality of any given delay turns on its reasonableness. Thus, under *Portis*, class certification would be inappropriate. *Portis*, 613 F.3d at 705.

Next, Plaintiffs advocate "bifurcating liability and damage trials" or otherwise separating liability from damages calculation. [271 at 13 (quoting *Carnegie v. Household Intern., Inc.*, 376

F.3d 656, 662 (7th Cir. 2004)).] This argument is beside the point, as liability will also have to be determined on an individualized basis. See *id.* That is, before the Court can proceed to individual damages trials, it will have to determine whether any given delay in booking and processing was reasonable, which must also be done on an individualized basis. The "members of [the] proposed class will need to present evidence that varies from member to member," meaning there is no common question of liability that can be expeditiously bifurcated. *Messner*, 669 F.3d at 815.

Plaintiffs' citations to cases regarding blanket policies are inapposite. They claim that "[a]llegations of a policy or a widespread practice affecting members of a putative class are usually sufficient" to satisfy commonality.[17] [271 at 12 (citing *Keele*, 149 F.3d at 594.] But the underlying liability determination in *Keele* did not require individualized reasonableness inquiries—the putative class was comprised of people who had received a form letter that was allegedly sent in violation of the Fair Debt Collection Practices Act. See *Keele*, 149 F.3d at 594. And, in any event, *Keele* required that the class members' suits all derive from a "common nucleus" of fact, which was obviously satisfied by the content of the form letter. *Id.* Here, there is no common nucleus of fact, because the Court must examine each detention on a case-by-case basis to determine (1) what happened and (2) whether it was reasonable. The allegation that there is a widespread practice is not enough to show that (1) every class member was affected by it and (2) it was always unreasonable. Compare *Portis v. City of Chicago*, 621 F.Supp.2d 608, 620 (N.D. Ill 2008) (concluding that CPD had "practice" of unconstitutionally delaying release), with *Portis*, 613 F.3d at 705 (decertifying class because the practice may be justifiable on a case-by-case basis); see also *Otero I*, 301 F.R.D. at 282–83 (refusing to certify Fourth Amendment class when all putative class

---

[17] It is worth noting that the widespread practice of the CPD was *not* to take people to Homan Square. In fact, Plaintiffs concede that CPD officers "typically bring arrestees" to stationhouses. [271 at 2.] Thus, every putative class-member will have to contend with the threshold question of why he or she was treated differently than typical arrestees in the first place—that is, why the usual practice did *not* apply to them.

members were subject to the same policy, but the alleged injury caused by the policy was unreasonable delay); *cf. Van v. Ford Motor Company*, 332 F.R.D. 249, 275–76 (N.D. Ill. 2019).

### 2. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Claims of class representatives and class members are typical if they arise from the same practice or course of conduct and are based on the same legal theory. *Keele*, 149 F.3d at 595. Typicality and commonality are closely related. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996). Typicality ensures that the claims of the class representatives have the "same essential characteristics as the claims of the class at large." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993) (citation and internal quotation marks omitted). "[T]here must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). Representative class members fail the typicality prong when the class "contains a great many persons who have suffered no injury at the hands of the defendant." *Van*, 332 F.R.D at 280 (quoting *Kohen*, 571 F.3d at 677–78).

Preliminarily, Plaintiffs fail the typicality prong for the same reason that they fail the commonality prong: They have not defined what constitutes an unreasonable delay in publicizing arrest, and therefore have given the Court little to go on by way of what constitutes a "typical" unreasonable delay. Likewise, the differences in Coffey's and Berry's treatment suggests that there is a high degree of heterogeneity in the types of processing steps taken at Homan Square. The fact that there are so many individualized contingencies—the identities of the arresting officers, the

identities of the interrogators, the length of detention, whether the arrestee was allowed to contact anyone on the outside, and the reasons for being taken to Homan Square in the first place—mean that it is almost impossible to establish a baseline of typicality. See *Van*, 332 F.R.D. 281 (explaining that class fails typicality prong where there is a "wide range of allegations at issue" and "putative class-members' claims depend on exposure to differing conduct"). Likewise, Plaintiffs advocate a deliberately over-inclusive class definition, including anyone whose arrest was not publicized within an hour, despite the fact that *Arlotta* held a two-hour delay to be reasonable. *Arlotta*, 349 F.3d at 523. Based on that proposed class definition, the named Plaintiffs are atypical and the class likely "contains a great many persons who have suffered no injury at the hands of the defendant." *Van*, 332 F.R.D. at 281 (quoting *Kohen*, 571 F.3d at 677–78).

Berry's experience is also far from the "secret" "incommunicado" interrogation that forms the basis of Plaintiffs' putative constitutional claim. Plaintiffs' motion for class certification says that Berry's claim is typical because she was "prevented from communicating with attorneys, family members, or others about [her] detainment and arrest." [270, ¶ 6.] But Berry conceded that she was allowed to call externally four times, alerting each call recipient of the fact that she had been arrested and detained. [290-9, 64:8–16, 104:20–105:7.] Likewise, Berry was not "prevented" from communicating with anyone; she admitted that she did not ask to speak with an attorney or otherwise call her friends or family. [*Id.*, 104:5–19.] Berry's experience was therefore highly atypical on the single criterion of typicality that Plaintiffs have laid out.

It is unclear to what extent Coffey's injury can be said to be typical. At some points, Plaintiffs imply (through their citations) that *eventual* publication satisfies any law prohibiting secret arrests. See [305 at 2–4 (citing, *e.g.*, *Morrow*, 417 F.2d at 741 (discussing a central hard-copy police filing system that records the progress of each arrest after it happens); *Center for Nat.*

*Sec. Studies*, 215 F. Supp. 2d at 100 (recognizing that FOIA requests call for "a particularized and focused inquiry" before turning over requested information); *Newspapers, Inc. v. Breier*, 89 Wis.2d 417, 427 (1979) (explaining that Wisconsin statute that required disclosure of public records allowed data custodian to deliberate about whether to furnish a "Daily Arrest List")]. If that is Plaintiff's ultimate theory, then Coffey did not suffer a typical injury in that a public record of his arrest was, in fact, created. See generally [271-3].

### 3.    Adequacy

Given that the Plaintiffs have failed to adequately support the commonality or typicality prongs, the Court need not delve too deeply into adequacy. Briefly, Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). For the adequacy requirement to be satisfied, the claims and interests of the named Plaintiffs must not conflict with those of the class, the class representatives must have sufficient interest in the outcome of the case, and class counsel must be experienced and competent. *Retired Chicago Police Ass'n*, 7 F.3d at 598.

The class representatives have not demonstrated that they are adequate; in fact, they may have interests that conflict with those of the class. Their Fourth Amendment theory appears to be that their arrests should have been publicized more broadly. But many arrestees do not want a public record of their arrest to live on. *Morrow*, 417 F.2d at 742; Reza, *Privacy* at 762 ("Indeed, the privacy interest of a person accused or suspected of crime—her interest in avoiding the social, professional, emotional, and other harms that attend being named as a possible criminal—is arguably most pressing, and the need for protection accordingly greatest, * * * at the moment when police routinely identify alleged wrongdoers to the public: upon arrest, accusation, or initial suspicion."). With the advent of the Internet, these concerns are even more pronounced. See *ACLU*,

F.3d at 941 (Brown, J., dissenting) ("In today's echo chamber of big data, metadata, and the Internet, the once wholly forgotten memory of some unsavory, minimally broadcast misdeed is resurrected for global consumption."). *A fortiori*, those who were taken to Homan Square and never booked—*i.e.*, those for whom probable cause did not exist or who confidentially informed on third parties—have even greater privacy interests. *E.g.*, [271-1, 41:13–20] (describing confidential informants' greater privacy interests). Plaintiffs even acknowledge that "many of the class members will fear bringing claims on their own to assert their rights." [270, ¶ 7.] Plaintiffs' demands that the CPD create and promulgate arrest records clearly conflicts with these class members' interests.

Also, Coffey has not demonstrated his adequacy as a named Plaintiff. In addition to bringing this claim for "secret arrest," he also has a bevy of more established state and federal law claims related to his detention, including unconstitutional conditions of confinement, excessive force, and intentional infliction of emotional distress. [202, ¶¶125–52.] In his deposition, when asked about the secret arrest claim, he admitted that he did not talk to his family about whether they even tried to locate him. [290-10, 137:9:23.] Instead, he focused his answers on the distress and embarrassment he felt after his appalling alleged ordeal. *E.g.*, [*Id.*, 131:7–132:4]. Coffey's focus on his individual claims and laissez faire attitude toward the secret arrest claim suggest that he is not sufficiently interested in the outcome of this claim and that he would not adequately represent the interests of the absent class members.

## C.  23(b) Classes

For the reasons explained above, Plaintiffs have failed to satisfy several of the class prerequisites required by 23(a), and therefore the Court need not determine whether either of Plaintiffs' proposed classes meet the respective requirements of Rule 23(b). Even if Plaintiffs met

the 23(a) prerequisites, however, they do not meet the requirements of either a 23(b)(2) ("injunctive") class or a 23(b)(c) ("damages") class.

### 1.      23(b)(2) Injunctive Class

A Rule 23(b)(2) class is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Preliminarily, Plaintiffs do not support their injunctive class, Class II, at all in their opening brief and support it only cursorily in their reply. [305 at 15.] But Plaintiffs bear the burden of showing why class treatment is appropriate; in failing to advocate for an injunctive class, they have not met that burden. See *Oshana*, 472 F.3d at 513.

Even if they had properly advocated for an injunctive class, the proposed Class II cannot be certified. "By virtue of its requirement that the plaintiffs seek to redress a common injury properly addressed by a class-wide injunctive or declaratory remedy, Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Lemon v. International Union of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000). Here, the proposed forward-looking class-members have divergent and heterogenous interests. As Plaintiffs concede, those who are arrested and taken to Homan Square may be (1) formally charged with a crime and transferred to a stationhouse (such as Coffey) or (2) released without having their arrest publicized or charges filed (such as Berry). The Plaintiffs proposed class would pit these two potential classes against each other.  Plaintiffs seem to believe that timelier initiation of formal arrest procedures, and the publicization thereof, would benefit those who are ultimately formally

charged. However, those who are not charged may appreciate that their detentions (which do not lead to booking or charging) are not publicized. *Morrow*, 417 F.2d at 742; Reza, *Privacy* at 762; *cf. ACLU*, 750 F.3d at 437–39. Unfortunately, the Court cannot determine *ex ante* whether any given future suspect would prefer to be formally and publicly processed, or to not have a public record of arrest created at all. Because Class II lacks cohesive interests, it cannot be certified under Rule 23(b)(2).

### 2.    23(b)(3) Class

In order for a class to be certified under Rule 23(b)(3), class issues must predominate over individual ones, and the class action mechanism must be superior to alternatives. Although related to the commonality requirement, "the predominance criterion is far more demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). It requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Plaintiffs satisfy predominance requirement only if they can show that " 'common questions represent a significant aspect of [a] case and * * * can be resolved for all members of [a] class in a single adjudication.' " *Messner*, 669 F.3d at 815 (citation and internal quotation marks omitted).

As the Supreme Court recently explained, "[t]he predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.' " *Tyson Foods*, 136 S. Ct. at 1045 (citation omitted). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though

other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id*. (citation omitted).

Preliminarily, if the Plaintiffs have failed to meet the commonality requirement, then they have likewise failed the "more demanding" standard for predominance. *Amchem*, 521 U.S. at 624. But even if Plaintiffs had properly shown that there is a common question amongst class members, that common question would not predominate. If (1) CPD had a blanket policy of taking people to Homan Square, and (2) that policy had the effect of delaying publicization of arrest and other booking steps, the class mechanism would not be aggregation-enabling in this case, because the Court still would have to delve into the circumstances of each arrest to see how the policy was carried out and whether it was reasonable. *Portis*, 613 F.3d at 705; *Harper*, 581 F.3d at 516. The Court would need to examine on an individual basis the timing of each arrest, the pre-booking steps the officers took, the available alternatives at the time, and the justification for using Homan Square as opposed to any available alternative. See *id*; see also *Otero I*, 301 F.R.D. at 283. Individual issues will predominate if the Court is forced to hold mini-trials to determine the CPD's liability with regard to each arrestee. See *Carnegie*, 376 F.3d at 662; *Van*, 2019 WL 3976370 at *27 (explaining that individual issues predominate when "hundreds (if not thousands) of individual hearings still would be necessary to resolve the remaining elements" of plaintiffs' claims, even if a common question is answered class-wide).

Finally, a class action is "the superior method for managing litigation if no realistic alternative exists." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996). "A central question" for evaluating Rule 23(b)(3)'s superiority requirement is the issue of "manageability." *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 760 (7th Cir. 2000) (citations omitted); see also Fed. R. Civ. P. 23(b)(3)(D) (noting that "the likely difficulties in

managing a class action" are a pertinent consideration). But, a "class action is superior where potential damages may be too insignificant to provide class members with incentive to pursue a claim individually." *Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344, 353 (N.D. Ill. 2008) (quotation marks and citation omitted).

Plaintiffs have not demonstrated that the class action is superior to individual lawsuits. Here, a realistic alternative exists: To the extent that Plaintiffs want to expose the allegedly unconstitutional practices of Homan Square, see [290-9, 119:1–21], the "desire to prove the existence and illegality of the * * * practice can be satisfied in an individual suit without the management issues of a class action." *Harper*, 581 F.3d at 516. For example, Coffey already is litigating the circumstances of his arrest and detention; "[i]t would be better to litigate" his secret arrest claim with his "other individual claims." See *id.*; see also [202, ¶¶125–56.] Moreover, litigating the secret arrest claim as a class action would be unmanageable—as explained above, the Court would have to delve into the circumstances surrounding thousands of years-old arrests. See *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 439 (N.D. Ill. 2003) (denying motion for class certification because the need to conduct thousands of individual determinations "would render [the] case totally unmanageable as a class action"). Indeed, for this reason, class treatment would be inappropriate even if each individual's damages are slight. Any benefit to aggregation would be negated by the fact-intensive (*i.e.*, expensive-to-litigate) nature of each individual claim.

## IV.    Conclusion

For the foregoing reasons, the Court denies Plaintiffs' motion for class certification [270]. This case is set for further status hearing on January 16, 2020 at 9:00 a.m.

Dated: December 27, 2019

Robert M. Dow, Jr.
United States District Judge