UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANGEL PEREZ, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> THE CITY OF CHICAGO; EDMUND ) <br> ZABLOCKI, Star No. 7505; and JORGE L. ) <br> LOPEZ, Star No. 20298, ) <br> ) <br> Defendants. ) | No. 1:13-cv-04531 <br><br> Hon. Franklin U. Valderrama |

## DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants, Edmund Zablocki, Jorge Lopez, and the City of Chicago, through their undersigned counsel, pursuant to Fed. R. Civ. P. 56(b) and Local Rule 56.1 (a)(3), hereby submit the following statement of undisputed material facts in support of their motion for summary judgment.

### PARTIES

1. Plaintiff Angel Perez is a citizen of the United States and resides in Chicago, Illinois. (Ex. 1, Defs.' Answer to Pl.'s 4th Am. Compl., ECF No. 453.)

2. Defendants Jorge Lopez and Edmund Zablocki were at all relevant times employed by the City of Chicago as police officers. (Ex. 1, Defs.' Answer to Pl.'s 4th Am. Compl. ¶¶ 4-5.)

3. The City of Chicago is a municipal corporation of the State of Illinois. (Ex. 1, Defs.' Answer to Pl.'s 4th Am. Compl. ¶ 7.)

**JURISDICTION & VENUE**

4. This court has original jurisdiction over plaintiff's federal claims (see 28 U.S.C. §§ 1331, 1343) and supplemental jurisdiction over his state law claim. (Ex. 1, Defs.' Answer to Plaintiff's 4th Am. Compl. ¶ 1.)

5. Venue lies in the United States District Court of the Northern District of Illinois because all parties reside in the Northern District of Illinois and the events giving rise to this action occurred in Chicago. See 28 U.S.C. § 1391(b) (Ex. 1, Defs.' Answer to Plaintiff's 4th Am. Compl. ¶ 2.)

**BACKGROUND**

6. In October 2012, Officers Jorge Lopez and Edmund Zablocki served on a Gang Investigations team of the Chicago Police Department. (Ex. 2, Lopez Dep. 5:5-7; Ex. 3, Zablocki Dep. 155:3-11; Ex. 4, Cline Dep. 16:7-17:4.)

7. At the time, the gang team was conducting a joint investigation with the U.S. Drug Enforcement Agency of drug-trafficking activities in the Chicago area. Dwayne Payne was one of the investigation's many targets. (Ex. 2, Lopez Dep. 10:5-7; Ex. 3, Zablocki Dep. 290:23-291:15; Ex. 4, Cline Dep. 24:2-4.)

8. As part of the investigation, the gang team obtained a Title III wiretap of various telephones being used by Payne. (Ex. 4, Cline Dep. 25:21-26:5.)

9. From time to time, however, Payne would send and receive text messages, which were not subject to the Title III wiretap. As such, the gang team needed a new Title III warrant. (Ex. 4, Cline Dep. 25:21-26:5, 49:18-50:5.)

10. To obtain court authorization for the warrant, the gang team required the assistance of an informant to send a "dirty text" to Payne's phone—*i.e.*, a text involving the sale of narcotics. (Ex. 4, Cline Dep. 24:17-22, 49:18-50:5.)

11. In October 2012, the gang team intercepted a large call volume between plaintiff and Payne, and they identified plaintiff as someone who might cooperate with the investigation. (Ex. 4, Cline Dep. 25:21-26:13, 27:1-3.)

12. On October 20, 2012, the gang team was monitoring Payne when they observed him sell drugs to plaintiff. (Ex. 4, Cline Dep. 27:4-28:5; Ex. 5, Pl. Dep. 95:2-19, 96:7-12, 98:10-17.)

13. Officer Lopez and his partner (Officer John Dolan) stopped plaintiff's car as he left the scene, recovered narcotics from the vehicle, and arrested him. (Ex. 2, Lopez Dep. 7:5-14, 12:12-15; Ex. 4, Cline Dep. 29:15-19; Ex. 5, Pl. Dep. 84:2-9, 105:20-24, 106:1-7, 107:10-11, 110:19-23.)

14. Officers Lopez and Dolan transported plaintiff to the 11th District police station where they asked him if he was willing to cooperate with the investigation. (Ex. 2, Lopez Dep. 13:9-11, 20:13-15, 82:14-16; Ex. 4, Cline Dep. 30:14-17; Ex. 5, Pl. Dep. 121:13-16, 123:5-9.)

15. Plaintiff agreed to assist in the investigation, and he made plans to meet the officers the following day to purchase narcotics from Payne. (Ex. 2, Lopez Dep. 20:13-21; Ex. 4, Cline Dep. 31:11-15, 32:5-13, 33:11-34:2.)

16. Because plaintiff agreed to cooperate, he was released from the 11th District police station without being charged with a crime. (Ex. 2, Lopez Dep. 20:13-21; Ex. 5, Pl. Dep. 148:21-24, 149:1-10.)

17. On October 21, 2012, Officers Lopez and Zablocki met plaintiff in the rear parking lot at Al's Beef and drove him to Homan Square, a law enforcement facility. (Ex. 2, Lopez Dep. 32:11-16, 33:1-7; Ex. 3, Zablocki Dep. 77:12-14, 114:1-15; Ex. 5, Pl. Dep. 179:10-19, 179:20-24, 195:5-8.)

18. Upon arriving at Homan Square at 2:50 p.m., plaintiff was taken to an interview room on the second floor where Officers Lopez and Zablocki interviewed him and explained what he was going to be doing. (Ex. 3, Zablocki Dep. 159:22-160:13, 161:17-162:5; Ex. 4, Cline Dep. 40:4-9; Ex. 5, Pl. Dep.196:4-6, 199:20-24, 200:1-7; Ex. 6, 08-24 Prisoner Entrance at 2:49:38.)

19. Sergeant Cline was present for parts of the interview. After introducing himself, he left the room to ensure the recording equipment was available and that enough officers were available to assist. (Ex. 4, Cline Dep. 40:10-41:24; Ex. 2, Lopez Dep. 37:7-12.)

20. Thereafter, plaintiff used his phone to arrange the drug deal with Payne. (Ex. 2, Lopez Dep. 40:7-18; Ex. 3, Zablocki Dep. 161:17-162:5.)

21. Because the interview room had poor phone reception, Officer Lopez and plaintiff went downstairs to the garage to call and text Payne. (Ex. 2, Lopez Dep. 42:15-43:1; Ex. 3, Zablocki Dep. 132:2-13; Ex. 4, Cline Dep. 45:15-46:8, 46:24-47:4; Ex. 5, Pl. Dep. 254:12-22.)

22. Surveillance footage confirms that plaintiff went downstairs to the carport on two occasions with Officers Lopez and Nguyen. (Ex. 6, 08-24 Prisoner Entrance 3:52:50 to 4:08:08, 5:06:46 to 5:09:09; Ex. 2, Lopez Dep. 43:2-5; Ex. 3, Zablocki Dep. 131:9-18, 133:6-134:8)

23. The video reveals that plaintiff was not handcuffed or wearing leg restraints when he walked into the carport. (Ex. 6, 08-24 Prisoner Entrance at 3:52:50, 4:05:31, 4:08:08, 5:06:46, 5:09:09.)

24. After placing the phone calls and text messages from the carport, plaintiff was taken back upstairs to the interview room. (Ex. 4, Cline Dep. 45:5-7; Ex. 5, Pl. Dep. 251:14-23.)

25. From time to time, Officer Zablocki also left the interview. Although he doesn't recall how long he left the room, he remembers conferring with Sergeant Cline and going to the "wire room" to listen to the phone conversations between plaintiff and Payne. (Ex. 3, Zablocki Dep. 134:15-23, 135:19-136:9, 163:2-18, 166:7-13, 167:7-12.)

26. There were times when Officer Lopez was not present in the interview room with plaintiff. (Ex. 3, Zablocki Dep. 207:9-13.)

27. Eventually, plaintiff made arrangements to buy one gram of heroin from Payne. They agreed to meet in the area of Humboldt Park. (Ex. 4, Cline Dep. 42:1-11, 48:8-12, 48:19-49:1; Ex. 7, Surveillance Log Report No. 148.)

28. Plaintiff was given a recording device, $100 to buy the gram of heroin, plus an additional $80 to settle a debt he owed Payne from a previous deal. (Ex. 2, Lopez Dep. 43:19-44:3; Ex. 4, Cline Dep. 48:19-49:1; Ex. 5, Pl. Dep. 256:13-23.)

29. Surveillance video reveals that plaintiff left Homan Square with Officers Lopez and Zablocki at 5:39 p.m. (Ex. 6, 08-24 Prisoner Entrance 5:39:40.)

30. Around 6:45 p.m., plaintiff arrived at Thomas and California where he purchased a gram of heroin from Payne. (Ex. 2, Lopez Dep. 50:23-51:4; Ex. 3, Zablocki Dep. 198:11-21; Ex. 4, Cline Dep. 50:12-51:12; Ex. 5, Pl. Dep. 259:3-9, 260:14-16, 267:24, 268:1, 268:9-10.)

31. After the transaction, plaintiff drove to a predetermined location where he met with Officers Lopez and Zablocki. (Ex. 2, Lopez Dep. 53:4-8; Ex. 3, Zablocki Dep. 191:19-20; Ex. 4, Cline Dep. 51:13-22; Ex. 5, Pl. Dep. 269:12-20.)

32. Officers Lopez and Zablocki recovered the narcotics and recording equipment from plaintiff; they also asked plaintiff what he discussed with Payne during the purchase and whether any additional text messages were sent or received by plaintiff while he was by himself in his car. (Ex. 2, Lopez Dep. 53:21-54:20; Ex. 3, Zablocki Dep. 191:21-192:4; Ex. 4, Cline Dep. 51:23-52:6, Ex. 5, Pl. Dep. 270:4-22.)

33. After plaintiff met with Officer Lopez and Zablocki, his involvement in the narcotics investigation was over and he drove away. (Ex. 2, Lopez Dep. 57:19-23, 59:17-60:12; Ex. 3, Zablocki Dep. 196:13-16.)

34. Officers Lopez and Zablocki, meanwhile, relocated back to Homan Square where they debriefed Sergeant Cline and the other members of the gang team. (Ex. 3, Zablocki Dep. 196:19-197:24; Ex. 4, Cline Dep. 52:21-53:1.)

35. In the days following the covert drug transaction, plaintiff contacted the Independent Police Review Authority (IPRA) and alleged that he was abused and tortured at Homan Square. (Ex. 5, Pl. Dep. 274:17-23.)

36. According to plaintiff, there were four other officers (in addition to Officers Lopez and Zablocki) who entered and exited the interview room. (Ex. 5, Pl. Dep. 202:14-24, 207:23-24.)

37. Plaintiff described one of the officers tall, light-complected black male, who looked like Alonzo Mourning. (Ex. 5, Pl. Dep. 203:1-8.)

38. Plaintiff described the second officer as tiny, very small, Irish, and in his mid-30s. (Ex. 5, Pl. Dep. 203:22-204:3.)

39. The third officer was black, short like the Irish officer, skinny, in his mid-50s, and spoke with a "Cajun" or "south Chicago" accent. (Ex. 5, Pl. Dep. 204:20-206:19.)

40. Plaintiff could not remember what the fourth officer looked like, other than he was "bigger" and weighed 200-225 pounds. He clarified that the fourth officer was not Officer Lopez or Officer Zablocki. (Ex. 5, Pl. Dep. 206:20-207:5, 207:10-15.)

41. Plaintiff testified that the fourth officer pushed him over a chair, sat on his chest, and pressed his palms into his eyes. (Ex. 5, Pl. Dep. 207:1-5, 219:14-22, 222:8-20; Ex. 8, Pl. IPRA Stmt. 64:2-6.)

42. Plaintiff acknowledged that Officers Lopez and Zablocki did not push him over the chair, sit on his chest, or press their palms into his eyes. (Ex. 5, Pl. Dep. 207:3-5, 207:16-19, 219:17-22, 220:1-7, 249:15-21; see also Ex. 3, Zablocki Dep. 202:2-4, 207:14-16.)

43. At another point in time, plaintiff claims that an officer entered the room with leg restraints and cuffed his legs. (Ex. 5, Pl. Dep. 210:1-17.)

44. Thereafter, the "Cajun" officer entered the room and argued back and forth with plaintiff. (Ex. 5, Pl. Dep. 210:12-17, 214:15-23.) The "Irish" officer was also present and became "really upset" and made comments about having someone rape plaintiff. (Ex. 5, Pl. Dep. 215:1-216:2.)

45. The officers began to argue about what to do with plaintiff. (Ex. 5, Pl. Dep. 218:13-21.) The officers grabbed and pulled him like a game of "tug of war." (Ex. 5, Pl. Dep. 224:19-226:3.)

46. Officers Zablocki and Lopez deny that plaintiff was handcuffed to a wall in the interview room and deny placing him in leg restraints. They further deny grabbing and pulling on plaintiff. (Ex. 3, Zablocki Dep. 201:8-14, 201:16-18, 202:5-8, 202:19-20.)

47. Plaintiff avers that someone removed the leg restraints and re-handcuffed his hands behind his back. (Ex. 5, Pl. Dep. 218:13-21.)

48. Plaintiff asserts that some of the officers left the room, but the Irish officer remained. (Ex. 5, Pl. Dep. 234:13-20.)

49. According to plaintiff, one of the officers flipped him around, but he doesn't remember who. (Ex. 5, Pl. Dep. 237:3-4.)

50. Plaintiff felt a metallic object being rubbed down his back in an "S" pattern. (Ex. 5, Pl. Dep. 237:15-21, 238:4-14.)

51. Plaintiff claims his pants became unbuckled, but he doesn't remember how. (Ex. 5, Pl. Dep. 238:18-21.)

52. Plaintiff testified that someone asked if he knew what "a big black n*** dick feels like," at which point a cold metal object penetrated his rectum for a second or two. (Ex. 5, Pl. Dep. 238:18-239:13, 240:1-4, 240:15-16, 247:23-24, 248:1.)

53. Plaintiff did not see who sodomized him; he does not know who pushed the gun up his rectum. (Ex. 5, Pl. Dep. 249:22-24, 250:1-6; Ex. 8, Pl. IPRA Stmt. 70:2-13.)

54. Officers Lopez and Zablocki deny that they (or anyone else on their team) pulled down plaintiff's pants, sodomized him, threatened or coerced him, or said anything about "a big n*** dick" or what it feels like to be sodomized by a gun. (Ex. 2, Lopez Dep. 80:23-24, 81:1-4; Ex. 3, Zablocki Dep., 11:10-24, 12:1-24, 13:1-17, 201:2-14, 205:5-9, 206:12-15, 207:14-208:13, 209:23-210:3, 212:12-24; Ex. 4, Cline Dep. 57:17-22.)

55. As part of its investigation, IPRA collected and inventoried the firearms belonging to Officers Lopez, Zablocki, and other members of the gang team. (Ex. 9, IPRA Request for Forensic Services; Ex. 10, Lopez Inventory Sheets; Ex. 11, Zablocki Inventory Sheets.)

56. IPRA then requested that the firearms be swabbed for the presence of biological matter. (Ex. 9, IPRA Request for Forensic Services.)

57. The swabs were submitted to the Illinois State Police (ISP) Division of Forensic Services for testing and analysis, but the forensic scientists did not find human DNA on any of the swabs. (Ex. 12, Lab Report dated Jan. 28, 2013; Ex. 13, Lab Report dated Feb. 4, 2013.)

58. On June 20, 2013, plaintiff filed this action against the City and Officer Lopez alleging that his constitutional rights were violated because the officers used excessive force and failed to intervene to stop the constitutional deprivation from occurring. He also brought a supplemental state law claim of IIED and indemnification. (Ex. 14, Pl. Compl.)

59. On October 8, 2013, the defendants served their disclosures pursuant to Rule 26(a) and identified Officer Zablocki by name and star number as someone who "will testify to all matters concerning his involvement in the alleged incident which the subject of this lawsuit." (Ex. 15, Defs.' Rule 26(a) Initial Disclosures.)

60. On October 16, 2013, the defendants produced 7 CDs containing attachments to IPRA Log No. 1057930, which identified Officer Zablocki as one of the officers who plaintiff accused of wrongdoing on October 21, 2012. (Ex. 16, Letter dated Oct. 16, 2013; Ex. 17, Log No. 1057930.)

61. On August 8, 2014, Officer Lopez served his answers to plaintiff's first set of interrogatories and first set of requests for production. (Ex. 18, Lopez Answers to Interrogatories.)

62. In response to interrogatory number 6, which asked Officer Lopez to "[l]ist all officers *** that were involved on the days you interacted with [p]laintiff on any level," Officer Lopez referred plaintiff to the personnel listed on the Surveillance Report Logs from October 20, 2012, and October 21, 2012. (Ex. 18, Lopez's Answers to Interrogatories.)

63. The Surveillance Report Logs dated October 21, 2012, identifies Officer Zablocki as one of the officers who was working that day, conducting electronic surveillance and enforcement. (Ex. 7, Surveillance Report Log No. 148.)

64. On November 10, 2014, plaintiff filed a *pro se* amended complaint, which added Officer Zablocki as a defendant. (Ex. 19, Pl.'s Am. Compl., ECF No. 67.)


DATED: February 8, 2024                    Respectfully submitted,

                                           */s/ Jordan F. Yurchich*
                                           JORDAN F. YURCHICH
                                           Assistant Corporation Counsel Supervisor

Jordan F. Yurchich, Assistant Corporation Counsel Supervisor
Greg Beck, Assistant Corporation Counsel Supervisor
Benjamin J. Barr, Assistant Corporation Counsel
City of Chicago, Department of Law
2 North LaSalle Street, Suite 420
Chicago, Illinois 60602
Jordan.yurchich2@cityofchicago.org
(312) 744-1625
**Attorneys for Defendants**

- 10 -

## CERTIFICATE OF SERVICE

I hereby certify that, on **February 8, 2024**, I submitted with the Clerk for the Northern District of Illinois using the Court's electronic filing system or CM/ECF **Defendants' Local Rule 56.1 Statement of Undisputed Material Facts,** which served a copy to all counsel of record.

*/s/ Jordan F. Yurchich*
JORDAN F. YURCHICH
Assistant Corporation Counsel Supervisor